## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

PHYLLIS ANDREWS
284 Smith Ridge Road
South Salem, NY 10590,

THOMAS E. MINOGUE, Co-Trustee
of the Phyllis Andrews Family Trust
237 Elm Street
New Canaan, CT 06840,

HERMAN H. TARNOW, Co-Trustee
of the Phyllis Andrews Family Trust
108 Napa Ridge Way
Naples, FL 34119, and

JANE F. SIMS, Co-Trustee
of the Phyllis Andrews Family Trust
20 Branchwood Court
Baltimore, MD 21208,

                    Plaintiffs,

            v.                                  Civil Action No. : _____

ARTHUR B. MODELL,
8 Laurelford Court
Cockeysville, MD 21030,

                    Defendant.

---

## NOTICE OF REMOVAL : EXHIBIT E

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

|   |   |
|---|---|
| PHYLLIS ANDREWS<br>284 Smith Ridge Road<br>South Salem, NY 10590,<br><br>THOMAS E. MINOGUE, Trustee<br>Co-Trustee of the Phyllis Andrews Family Trust<br>237 Elm Street<br>New Canaan, CT 06840,<br><br>HERMAN H. TARNOW, Trustee<br>Co-Trustee of the Phyllis Andrews Family Trust<br>108 Napa Ridge Way<br>Naples, FL 34119, and<br><br>JANE F. SIMS, Trustee<br>Co-Trustee of the Phyllis Andrews Family Trust<br>20 Branchwood Court<br>Baltimore, MD 21208,<br><br>          Plaintiffs,<br><br>    v.<br><br>ARTHUR B. MODELL,<br>8 Laurelford Court<br>Cockeysville, MD 21030-2236<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

RECEIVED

MAR 13 2007

Tₕₑ ... ... ...
Cₒ... ... ...
C⁻... ... ... ...STER

**COMPLAINT FOR**
**DECLARATORY JUDGMENT,**
**ACCOUNTING AND DAMAGES**

CASE NO.: _____

For their Complaint against Defendant Arthur B. Modell, Plaintiffs Phyllis Andrews,

Thomas E. Minogue, Herman H. Tarnow and Jane F. Sims state as follows:

### SUMMARY OF THE ACTION

1.     This action seeks damages and equitable relief in recompense for and response

to the unlawful evasion by Defendant Modell ("Modell") of his contractual obligation to pay

the heirs of Vincent Andrews, Sr. ("Andrews") a finder's fee of at least $21.5 million that Modell agreed in the early 1960s to pay Andrews or his estate upon Modell's sale of the Cleveland Browns (now the Baltimore Ravens).

2.    Modell's obligation to pay that fee is memorialized in a two-page written agreement between Modell and Andrews executed in February 1963 (hereinafter, the "Letter Agreement"). Because there has already been substantial litigation relating to this dispute, most of the material facts relating to the dispute are now known. Following in Paragraphs 3 to 21 is a summary of the most salient facts, with a more detailed statement appearing in Paragraphs 28 to 87.

3.    After Andrews brought his friend Modell the opportunity to acquire the Cleveland Browns in 1960, Modell purchased the team in 1961 for less than $4 million. In return for Andrews's help, Modell agreed in both 1961 (orally) and 1963 (in the Letter Agreement) to pay Andrews or his heirs a finder's fee equivalent to 5% of Modell's net gain upon the sale or gift of his stock interest in the team.

4.    Andrews died in 1969, leaving his interest in the Letter Agreement to his wife and sole legatee, Phyllis Andrews.

5.    In 1996, Modell moved the Cleveland Browns to Baltimore, Maryland, and renamed the team the Baltimore Ravens.

6.    In December 1999, Phyllis Andrews created the Phyllis Andrews Family Trust (the "Trust") for the benefit of her and her husband's descendants, and entered into a written Purchase Agreement in which she transferred to the Trust all of her interest in the Letter Agreement.

2

7.    In February 2000, Modell agreed to sell 100% of the Ravens for approximately $600 million to Baltimore Football Company ("BFC"), a company owned by Baltimore businessman Stephen Bisciotti. Pursuant to the terms of that agreement, BFC acquired 49% of the team in 2000, and obtained an irrevocable option to acquire the remaining 51% of the team on or before December 1, 2005.

8.    In early 2003, press reports stated that Bisciotti intended to exercise his option and acquire the remaining 51% of the team in 2004. However, Bisciotti privately reconsidered his prior insistence on owning 100% of the team, and gave Modell the opportunity to retain up to a 20% minority interest in the Ravens. Modell replied that he did not want to retain *any* interest in the team.

9.    On May 23, 2003, after Modell's counsel refused to provide information requested by representatives of Mrs. Andrews and the Trust regarding the announced sale of the entire team, Plaintiff Minogue and former Trustee Thomas O. Callaghan sued Modell in the Cuyahoga County, Ohio, Court of Common Pleas on behalf of the Trust. That lawsuit, *Minogue, et. al v. Modell* (hereinafter "*Minogue I*"), was removed by Modell to the United States District Court for the Northern District of Ohio and transferred to the United States District Court for the District of Maryland.

10.    *After* Modell was served with the Complaint in *Minogue I*, his personal banker told Bisciotti that Modell had changed his mind and now wanted to retain a 1% interest in the team. Modell's accountant has admitted that one reason for this request was to try to frustrate the Trust's rights under the Letter Agreement. Modell has denied that, and given different reasons for that request. Modell's proffered reasons do not withstand scrutiny.

3

11.     In any event, Modell and Bisciotti did not immediately amend their 2000 agreement in order to allow Modell to retain a 1% interest in the team.  On March 18, 2004, pursuant to the terms of their 2000 agreement, Bisciotti delivered to Modell the "Option Exercise Notice," which obligated Modell to sell his entire remaining 51% interest in the Ravens to BFC on the previously agreed-to "Closing Date."  This Notice required Modell to convey his remaining 51% interest in the team to Bisciotti on the contractually defined "Closing Date" at a specified price, and thus triggered Modell's obligation to pay the finder's fee to the Trust.

12.     Instead of selling his entire remaining 51% interest in the Ravens to BFC on the "Closing Date" three weeks later, Modell negotiated and on that date signed an amendment to his 2000 agreement with Bisciotti that allowed a recently-created entity named Nevermore, LLC ("Nevermore"), in which Modell held an indirect interest, to retain a nominal 1% interest in the limited partnership that owns the Ravens, thereby purporting to prevent the occurrence of the condition precedent to his obligation to pay the fee.  In fact, as detailed below, this indirectly-held "retained interest" has been stripped of all indicia of equity and does not constitute a Modell-owned "stock interest" as that term is used in the Letter Agreement.

13.     Moreover, Modell's last-minute renegotiation of his 2000 agreement with Bisciotti was a bad faith effort to avoid his obligations under the Letter Agreement while still, in substance, selling the entire team.  Therefore, under the common law doctrine of prevention, Modell is liable to the Trust for the full value of the finder's fee.

14.     Modell refuses to pay the finder's fee to the Trust, claiming that he has not yet divested his entire stock interest in the Ravens.

4

15.    On July 22, 2005, the district court in Maryland granted Modell summary judgment in *Minogue I* – not on the merits of the plaintiffs' claims, but on the ground that plaintiffs Minogue and Callaghan had failed to "establish" that Mrs. Andrews transferred the Letter Agreement from the estate to herself before she transferred it from herself to the Trust. Therefore, according to the district court, plaintiffs Minogue and Callaghan failed to establish that they had standing to bring their claims.

16.    That standing issue is now moot. On September 19, 2005, Mrs. Andrews executed documents reconfirming and ratifying (i) the transfer of the Letter Agreement from her deceased husband's estate to herself, and (ii) the transfer of the Letter Agreement from herself to the Trust. In those documents, Mrs. Andrews also agreed "to refund to the Estate of Vincent Andrews any amounts necessary to pay any debts, taxes or other charges or expenses of any kind which, if charged to the Estate [of Vincent Andrews] prior to distribution, would be a proper charge against the legacy receipted for herein (*i.e.*, the Letter Agreement)".

17.    Thomas O. Callaghan resigned as a Trustee of the Trust on December 19, 2005. Plaintiffs Tarnow and Sims accepted appointments and consented to act as Trustees of the Trust on December 17, 2005, and December 19, 2005, respectively.

18.    Having cured the standing issues identified by the Maryland district court in *Minogue I*, the Trustees returned to the Cuyahoga County Court of Common Pleas where they brought a second action against Modell on December 30, 2005. Modell removed the lawsuit, *Minogue, et. al v. Modell* (hereinafter "*Minogue II*"), to the United States District Court for the Northern District of Ohio. The Trustees filed a motion to remand the case to the Cuyahoga County Court of Common Pleas, which was granted on June 16, 2006.

19.    Modell filed motions to dismiss on various grounds and, on October 4, 2006, the court granted Modell's motion on the ground of *forum non conveniens*. Believing the dismissal to be an abuse of discretion, the Trustees appealed to the Eighth Appellate District of Ohio. A panel of that court dismissed the appeal *sua sponte* for lack of a final appealable order.

20.    The Trustees then filed a motion to certify a conflict to the Ohio Supreme Court, which was denied, and a discretionary appeal to the Ohio Supreme Court, which was withdrawn on March 13, 2007, immediately prior to the filing of this Complaint.

21.    In light of the Ohio court's refusal to accept jurisdiction of this case, the Plaintiffs have brought this action in this Court, because they seek to have the merits of their claims considered and because New York has an interest in the fair and efficient resolution of this dispute.

## PARTIES

22.    Plaintiff Phyllis Andrews is a citizen of the state of New York and a resident of South Salem, New York. Pursuant to Article VI, Paragraph Y of the Trust Agreement, Mrs. Andrews retains the absolute right at any time to reacquire the Letter Agreement from the Trust by substituting other property of equal value. This provision gives her a beneficial interest in the Trust that supplies her with standing to bring the claims set forth herein.

23.    Plaintiff Thomas E. Minogue is a citizen of the state of Connecticut and a resident of New Canaan, Connecticut. He was appointed a Trustee of the Trust on April 8, 2003, and as such is entitled to initiate actions in the interest thereof.

24.    Plaintiff Herman H. Tarnow is a citizen of the state of Florida, a resident of Naples, Florida, and an attorney who is knowledgeable concerning Florida probate law. He

accepted an appointment and consented to act as a Trustee of the Trust on December 19, 2005, and as such is entitled to initiate actions in the interest thereof.

25.    Plaintiff Jane F. Sims is a citizen of the state of Maryland, a resident of Baltimore, Maryland, and an attorney who is knowledgeable concerning Maryland probate law. She accepted an appointment and consented to act as a Trustee of the Trust on December 17, 2005, and as such is entitled to initiate actions in the interest thereof.

26.    On information and belief, Defendant Modell is a citizen of the state of Maryland and a resident of Cockeysville, Maryland.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over this matter because the causes of action alleged herein arise from Modell's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1). Specifically,

   a.   Andrews was a resident of New York at the time the Letter Agreement was executed, and until his death on January 2, 1969.

   b.   The Letter Agreement was drafted and at least partially negotiated in New York, and signed by Andrews in New York.

   c.   The Letter Agreement contemplated an ongoing relationship between Andrews and Modell involving services to be performed over the course of eight years by a New York resident for an Ohio resident and a finder's fee agreement for services performed in New York leading to the acquisition of the Cleveland Browns by Modell, who was a New York resident prior to the acquisition.

   d.   There is a substantial nexus between the Letter Agreement and the Plaintiffs' claims at law, which stem directly from the interpretation and application of the Letter Agreement – thus, the claims "arise out" of the Letter Agreement itself.

   e.   The Trust, which owns the Letter Agreement and all related rights and claims against Modell, was formed under and is governed by the laws of New York.

f.   Mrs. Andrews is a resident of New York.

g.   Venue is appropriate in this Court pursuant to C.P.L.R. § 503(a).

## FACTS COMMON TO ALL CLAIMS

**I.     Modell Purchases the Cleveland Browns.**

28.   Vincent Andrews brought his friend Arthur Modell the opportunity to acquire the Cleveland Browns.  But for Andrews' assistance, Modell would never have had the opportunity to purchase the Browns.

29.   In 1960, when Andrews learned that the Browns were for sale, he asked Modell, then a New York business executive, if he was interested in buying a professional football team.  When Modell answered "yes," Andrews introduced him to Fred "Curly" Morrison, a former Browns player who was seeking a buyer for the team on behalf of the Browns' then-current ownership.

30.   Modell and Andrews agreed between themselves to buy the Browns together, and they jointly engaged John Wells and Robert Frisch of the New York City law firm Royall, Koegel, Harris & Caskey to act as their counsel.

31.   After many of the preliminary negotiations were completed, Andrews found that he was unable to raise the money for his share in the team.  Modell then found a new partner, brewing executive R. J. Schaefer.

32.   On January 25, 1961, a day before coming to final terms on the purchase, the customary releases were delivered:  the then-current owners of the Browns (not Modell) agreed to pay Morrison and others finder's fees of approximately 5% (*i.e.*, $200,000) in connection with the anticipated sale to Modell, and those individuals gave releases to the sellers and to Modell.

8

33.    Andrews was paid no fee at that time, but nevertheless gave Modell a release from any claim for a finder's fee in connection with the Browns purchase so that Modell could proceed with the closing.

34.    The next day, January 26, 1961, Modell signed an agreement to buy the Browns for $3.925 million.

35.    The agreement Modell signed on January 26, 1961 effectively entitled Modell to purchase 100% of the Browns for his own account.  This entitlement was subject only to a side agreement between Modell and Schaefer in which the two men agreed they would own the team's stock in equal shares.

36.    On March 22, 1961, the Browns' assets were transferred to a Delaware corporation named Cleveland Browns, Inc. ("CBI"), of which Modell was the controlling shareholder, a director, Chairman of the Board, and Chief Executive Officer.  For the closing, CBI obtained $2.7 million in purchase money financing from the Union Commerce Bank of Cleveland.

**II.    Modell Agrees to Pay Andrews a Finder's Fee.**

37.    On April 11, 1961, Frisch wrote Wells the following memo, entitled "Vincent Andrews":

> Vinnie called me today to say that Arthur Modell had agreed to retain Vincent Andrews, Inc. as his business manager at the standard fee of 5% of annual gross earned income, and to pay a 5% fee on any proceeds realized by Arthur from sale of his Cleveland Browns stock.  Presumably, this latter item would go into Vinnie's corporation as well.  Vinnie wants us to draw the necessary documents.  Have you any objection?

In a handwritten response on the memo, Wells wrote "No!  Provided we first check with Artie — you can do it Monday night."

38.     In February 1963, this oral agreement between Modell and Andrews was reduced to a written contract (the "Letter Agreement"), in which Modell agreed to compensate Andrews for making possible the transaction that enabled Modell to acquire control of the Browns.

39.     In the provision of the Letter Agreement that is the subject of this and the prior lawsuits, Modell promised to pay Andrews a finder's fee amounting to 5% of Modell's "net gain" from either the liquidation of the Browns or the divestment of all of Modell's "stock interest" in the team. The Letter Agreement also stated that any such finder's fee was to be paid to Andrews' estate in the event of his death, and that in the event of Modell's death the fee would be payable by his estate.

40.     As of February 1963, Modell's "stock interest" in the Browns included, at a minimum, the 250 shares of CBI common stock that Modell owned directly.

41.     Modell's 250 shares were held subject only to (i) a "Voting Trust Agreement" between Modell and Schaefer, in which the two men agreed to vote in lockstep the stock each held individually, and (ii) a second agreement in which Schaefer agreed that Modell should be the company's "principal executive officer" and each man granted the other a right of first refusal on the purchase of their respective CBI shares.

42.     In the Letter Agreement, Modell also agreed to retain Andrews as his business manager for an eight-year period beginning January 1, 1963, and to compensate Andrews $750 quarterly for that service. As required, Modell paid Andrews this amount on a quarterly basis for the remainder of Andrews' life.

### III.    Andrews Dies and Modell Moves the Team to Baltimore.

43.    On January 2, 1969, Andrews died. His last will and testament named his widow Phyllis as the executrix of his estate and his sole legatee.

44.    Through a series of treasury redemptions (*i.e.*, repurchases by the company of stock held by other shareholders) and stock purchases from other shareholders (including the purchase of Schaefer's stock in 1965), Modell acquired over half of the outstanding issued stock in the Cleveland Browns by 1996.

45.    In that year, Modell moved the Cleveland Browns to Baltimore, Maryland, and the team was renamed the Baltimore Ravens.

46.    In 1997, the remaining minority stockholders were redeemed, and entities controlled by Modell came to own 100% of the Ravens.

47.    Modell's buyout of the other stockholders left the team with too much debt, and he was required to find a minority investor or sell the team.

### IV.    Modell Agrees to Sell the Entire Team.

48.    In 1999, Baltimore businessman Stephen Bisciotti offered to purchase a minority interest in the Ravens from Modell, but only on the condition that Modell grant him an irrevocable option to purchase the remainder of the team.

49.    Because of his pressing need to pay creditors, Modell agreed to Bisciotti's offer, thereby foregoing any guarantee of retaining any interest in the Ravens.

50.    While Bisciotti insisted on the right to acquire 100% of the team, he also made certain that Modell would continue to be actively involved in team affairs even after Bisciotti became the sole owner. Bisciotti promised to appoint (and did appoint) Modell as "Chairman Emeritus" of the Ravens, and agreed to provide Modell's family with a stadium suite and

11

access to Super Bowl tickets. Bisciotti also told Modell that he was welcome to continue attending Ravens' practices and participating in personnel meetings, and he agreed to give Modell a position as consultant to the Ravens and an office in the team's new training facility.

51.    In the agreement between Bisciotti and Modell that was announced in December 1999 and finalized in February 2000, companies owned and controlled by Modell and his wife committed to sell 100% of the Ravens to Bisciotti's Baltimore Football Company ("BFC") for approximately $600 million.

52.    Pursuant to two contracts between the relevant parties – the Preferred Unit Purchase Agreement ("PUPA"), executed on February 25, 2000, and the Option Purchase Agreement ("OPA"), executed on April 19, 2000 – the sale was to take place in two stages.

53.    In the first stage, on February 25, 2000, BFC purchased 49% of BRLP, the limited partnership that owns the Ravens. At that time, BFC also obtained an option to purchase the remaining 51% of BRLP in the transaction's second stage, to occur on or before December 1, 2005.

**V.    Phyllis Andrews Forms the Trust and Transfers the Letter Agreement to It.**

54.    Shortly after the December 1999 announcement of Modell's sale of the Ravens to BFC, Phyllis Andrews – then eighty-eight years old – created the Phyllis Andrews Family Trust (the "Trust") for the benefit of her husband's descendants.

55.    On January 27, 2000, Mrs. Andrews entered into a written Purchase Agreement in which she transferred to the Trust all of her interest in the Letter Agreement. In that Purchase Agreement, Mrs. Andrews represented and warranted that she had taken "[a]ll necessary action required to have been taken by or on [her] behalf . . . by applicable law" to authorize her as an individual to transfer the Letter Agreement to the Trust.

56.     Mrs. Andrews' sons were the initial Trustees of the Trust. They resigned and were replaced as Trustees by Thomas O. Callaghan and Plaintiff Minogue on April 8, 2003. Plaintiffs Tarnow and Sims accepted appointments and consented to act as Trustees of the Trust on December 17, 2005 and December 19, 2005, respectively. Thomas O. Callaghan resigned as a Co-Trustee of the Trust on December 19, 2005.

**VI.     Modell Decides to Retain Nominal 1% Interest after Being Sued by the Trust.**

57.     In the spring of 2003, Bisciotti announced his intention to exercise his option and acquire the remaining 51% of the Ravens. However, for financial reasons, Bisciotti decided to offer Modell the opportunity to retain a minority interest, up to 20%, in the team. Modell responded to Bisciotti that he did not want to retain any interest in the team.

58.     On May 23, 2003, after Modell repeatedly refused to provide information requested by Mrs. Andrews and the Trust regarding the planned sale of the entire team – despite numerous press reports on the subject – Plaintiff Minogue and former Co-Trustee Callaghan filed a lawsuit against Modell in the Cuyahoga County, Ohio, Court of Common Pleas. That lawsuit, *Minogue I*, was subsequently removed by Modell to the United States District Court for the Northern District of Ohio and transferred pursuant to U.S.C. § 1404(a) to the United States District Court for the District of Maryland.

59.     In the summer of 2003, *after* Modell had been served with the Complaint in *Minogue I*, Modell's personal banker Ned Kelly told Bisciotti that Modell now wanted to retain a nominal 1% interest in the Ravens.

60.     Although Bisciotti was amenable to Modell retaining a nominal 1% interest in the team, he testified in *Minogue I* that from his point of view, he was not "actually bound to

13

allow Mr. Modell to retain the 1% interest" until April 2004, "the time [he] actually signed the agreements that provided for Mr. Modell to retain [that] interest."

### VII. Modell Becomes Contractually Obligated to Sell the Entire Team and Pay the Finder's Fee.

61.     On March 18, 2004, Bisciotti initiated the second stage of the Ravens sale by delivering to Modell and his companies the "Option Exercise Notice" in which BFC elected to exercise its option to buy the remaining 51% of BRLP.  No binding agreement was then in place between Bisciotti and Modell that would allow Modell or any of his companies to retain any interest in the Ravens.

62.     Accordingly, as of March 18, 2004, Modell was obligated to sell his entire remaining stock interest in the Ravens to BFC on the "Closing Date."  Pursuant to the OPA, this was to be a date to occur "as soon as practicable, but in no event later than . . . the third Business Day after the date on which each of the conditions set forth in Article VII [of the OPA] ha[d] been satisfied or waived by the parties entitled to waive same," subject to each of the parties' qualified right to terminate the transaction if "the Option Closing shall not have occurred by 5:00 p.m. Eastern Standard Time on the Termination Date" of December 31, 2006.

### VIII. Modell Revises His Contractual Relationship with BFC to Avoid His Obligation to the Trust.

63.     On April 8, 2004, almost a year *after* the Complaint in *Minogue I* was filed, Modell revised his contractual relationship with Bisciotti.  The two men amended the OPA to release the Modell companies from their existing legal obligation to sell all their remaining interests in the Ravens to BFC.  As amended, the OPA instead allowed a recently-formed

14

Modell company named Nevermore, LLC ("Nevermore"), to retain a nominal 1% limited partnership interest in BRLP.

64.    Since its creation as an estate-planning vehicle in January 2003, Nevermore has been indirectly owned by Modell, in part through his ownership of 100% of the stock in Baltimore Ravens, Inc. ("BRI"), which in turn has at all times owned a 99% membership interest in Nevermore, and in part through his ownership of 65% of the stock in MSLP, Inc., a corporation which owns the remaining 1% membership interest in Nevermore and acts as the "Manager" of Nevermore. Modell's wife Patricia owns the remaining stock in MSLP, Inc.

65.    On April 8, 2004 (the same day that Modell and Bisciotti agreed to allow Nevermore to retain a nominal 1% limited partnership interest in BRLP), BFC purchased 50 of the 51 remaining "Common Units" in BRLP, giving it a 99% unrestricted ownership interest in the Ravens. At the completion of that purchase, the total consideration paid by BFC to the Modell companies for its ownership interest (in both 2000 and 2004) amounted to approximately $579 million.

66.    When Modell persuaded Bisciotti to amend the OPA to allow Nevermore to retain a nominal 1% indirect interest in BRLP, he purported to prevent the occurrence of the condition precedent to his contractual obligation under the Letter Agreement to pay the finder's fee.

67.    Modell's use of Nevermore as a mechanism through which to frustrate the Trust's legal entitlement to the finder's fee is an example of his habit of relying on legal formalities only when it serves his purposes to do so. He is equally willing to ignore the law when it works to his disadvantage. For example, from April 2000 (well before Nevermore was formed in January 2001 as a subsidiary of BRI) until April 2004 (when BRI's certificate

15

of incorporation was amended), BRI was expressly prohibited by its certificate of incorporation from "(a) acquir[ing] or own[ing] any asset other than" a general partnership interest in BRLP, and "(b) own[ing] any subsidiary". In other words, BRI was without legal authority to own its 99% membership interest in Nevermore during this approximately three-year period.

68.    In any event, Modell's last-minute efforts to frustrate the Trust's legal entitlement to the finder's fee are unavailing as a matter of law, including because Modell acted in bad faith to avoid his contractual obligation to sell the entire team, and thus the common law doctrine of prevention entitles the Trust to recover the full value of the finder's fee.

### IX.    Modell's Indirect, Nominal 1% Interest Is Not a "Stock Interest" under the Letter Agreement.

69.    Separate and apart from the common law doctrine of prevention, Modell's obligation to pay the finder's fee has been triggered because (1) the character of Nevermore's indirect interest in the Ravens is so materially different from the "stock interest" referred to in the Letter Agreement that Modell can be said to have sold his entire "stock interest" in the team for purposes of that agreement; and (2) Modell's use of Nevermore to hold this nominal 1% interest in the team is also inconsistent with the parties' understanding of the term "stock interest" in the Letter Agreement.

70.    Specifically, on April 8, 2004, Modell and Bisciotti executed agreements that subjected Nevermore's 1% interest in BRLP to "calls," restraints on transferability, and an irrevocable voting proxy, all in favor of BFC or Bisciotti, the collective effect of which was to strip Nevermore's 1% interest of each of the indicia of equity, making it nothing more than a synthetic debt instrument.

71.     In the "Investors' Rights Agreement" executed that day, Nevermore was granted the right to "put" its 1% interest to BFC (*i.e.*, require BFC to purchase that interest) at any time prior to April 9, 2014, for a price of $6 million plus interest at a 3% simple annual rate. In the event of Nevermore's failure to "put" its 1% interest to Bisciotti during that ten-year period, BFC was granted the right to "call" that 1% interest in 2014 for a price equal to the greater of (i) Nevermore's BRLP capital account balance, or (ii) the fair market value of Nevermore's 1% interest. The Investors' Rights Agreement also imposed permanent and severe restrictions on the transferability of Nevermore's 1% interest in BRLP, as well as on the transferability of interests in Nevermore and the entities owning direct and indirect interests in Nevermore.

72.     Finally, under the "Irrevocable Proxy" agreement executed on April 8, 2004, Nevermore permanently transferred its BRLP voting rights to BFC.

73.     In other words, Nevermore's retained 1% interest cannot vote, has no upside because of the call, has no downside because of the put, and cannot be freely sold.

**X.     Modell's Explanations for the Belated Amendment of His Agreement to Sell the Entire Team Are Unpersuasive on their Face, Do Not Begin to Explain the Timing of His Actions, and Are Contradicted by His Own Accountant.**

74.     Modell's proffered explanations for why he retained an indirect interest in 1% of the team are contradicted by other witnesses, NFL rules and practices, and common sense, and do not even begin to explain why he changed his mind and decided to retain his indirect interest in the summer of 2003, after refusing Bisciotti's offer in the spring of that year.

75.     When Modell was asked at his deposition in *Minogue I* if the Letter Agreement entered into his mind at all when he was arranging to retain an indirect interest in 1% of the Ravens, he answered "No. . . . Not at all. I wanted continued ownership in the NFL which I

17

had for 43 years." But the Ravens' accountant, Art Yonowitz, confirmed at his deposition in *Minogue I* that Modell's advisors told him that one of the two reasons why Modell retained that interest was that doing so "would have the salutary effect of avoiding a finder's fee" under the Letter Agreement.

76.     Modell also testified in *Minogue I* that he retained the nominal 1% interest held by Nevermore because "[w]ell, that's the least amount an owner can have, a stockholder can have in the NFL and [t]hen you get certain rights with it. I mean, you're not – not dealing in half shares or three-quarter shares, it's either one – either one percent or more." However, no NFL bylaw, rule, policy or procedure precludes a minority owner from owning fractional shares of less than one percent in an NFL franchise, nor are there any rights or privileges which accrue to owners of at least 1% of a team's stock.

77.     When asked what rights he retained by continuing to own an indirect interest in 1% of the team, Modell testified, "Go to league meetings, I'm allowed to sit in on a league meeting, allowed to join committees, serve on committees. Ownership is very – is an important thing for the league, has been for decades." Yet, no NFL bylaw, rule, policy or procedure requires an individual to own a minority interest in an NFL franchise in order to attend league meetings or serve on committees.

78.     Finally, when asked if it was his testimony in *Minogue I* that his indirect interest in 1% of the team allowed him to attend NFL owners' meetings, Modell testified that "[m]y interest in the Baltimore Ravens, whatever form it takes, allows me to attend league meetings . . . as a recognized part owner of a football team." But Jacksonville Jaguars' minority owner and former CEO David Seldin testified at his deposition in *Minogue I* that because Modell is universally viewed as one of the architects of the modern NFL as a

18

consequence of his many years of participation at the organization's highest levels, it is not credible that he believed he stood to gain any advantage he did not already possess within the league by being a "recognized part owner of a football team" as opposed to Chairman Emeritus – the title Bisciotti had already agreed to give him.

79.    Modell's retention of a nominal 1% interest through Nevermore also fails to prevent the triggering of his obligations under the Letter Agreement because Nevermore is not an operating company, and is instead an "estate planning" vehicle intended to postpone Modell's tax and contractual obligations. The parties could not have intended such a maneuver to constitute the retention of a "stock interest" by Modell, because it would allow Modell to postpone the payment of any fee *in perpetuity*, which is manifestly unreasonable.

80.    Modell now claims that he may never have to pay anything to Plaintiffs (or anyone else) under the Letter Agreement, by asserting in a pleading filed in *Minogue I* that "the Letter Agreement contemplates the possibility that a triggering event might never occur." Modell also has refused to make any provisions to guarantee the availability of funds to pay any finder's fee – even on the understanding that such provision would be without prejudice to his position on the merits.

81.    Thus Modell and his family currently have the benefit of 99% of Modell's net gain on his sale of the team, and Modell has been reducing his holdings by transferring his assets to family members through "estate planning" measures that involve the transferal of substantial portions of his assets to entities such as Nevermore and to other members of his family.

19

### XI. The District Court in Maryland Identifies Possible Standing Issues and the Trust Cures Them.

82.     On July 22, 2005, the United States District Court for the District of Maryland granted Modell summary judgment in *Minogue I* on the ground that the plaintiffs had failed to establish that they had standing to bring their claims. According to the Court, the plaintiffs failed to offer evidence "establishing that Mrs. Andrews ever transferred the [L]etter [A]greement from the estate to herself . . . Consequently the Trust can not support its claim that the January 27, 2000 Purchase Agreement gave the Trust ownership of the [L]etter [A]greement. Though it is attempting to assert its own rights in enforcing the [L]etter [A]greement, the Trust has not established it has any rights to assert."

83.     On September 19, 2005, Mrs. Andrews executed documents reconfirming (i) the transfer of the Letter Agreement from her deceased husband's estate to herself, and (ii) the transfer of the Letter Agreement from herself to the Trust.

### XII. The Ohio State Court Refuses to Accept Jurisdiction over this Case.

84.     Having cured the standing issues, the Trustees returned to the Cuyahoga County Court of Common Pleas and re-filed the lawsuit on December 30, 2005. Modell removed the case to the United States District Court for the Northern District of Ohio, and that court remanded the case back to the Cuyahoga County Court of Common Pleas.

85.     On October 4, 2006, the Cuyahoga County Court of Common Pleas granted Modell's motion to dismiss in *Minogue II* on the ground of *forum non conveniens*, finding that "neither Plaintiffs nor Defendant reside in Ohio or have any connection to this forum."

86.     The Trustees appealed, and a panel of the Eighth Appellate District of Ohio dismissed the appeal *sua sponte* for lack of a final appealable order. The Eighth Appellate District also refused to certify a conflict between this decision and conflicting precedent in

20

other Ohio appellate courts.  The Trustees filed a discretionary appeal to the Ohio Supreme

Court, which was withdrawn on March 13, 2007, immediately prior to the filing of this

Complaint.

**XIII.   Plaintiffs File this Action.**

87.     Modell has engaged in bad faith conduct since the filing of *Minogue I* with the

express purpose and intent of frustrating the Trust's efforts to enforce the Letter Agreement.

If Modell is allowed to continue to avoid paying the finder's fee, there is a real risk that he

will divest himself and his estate of the proceeds he has received from his sale of the Ravens,

and permanently defeat the Trust's ability to collect any judgment it may obtain or, at best,

force the Trust to engage in yet more expensive and protracted collection litigation against

Modell's heirs.

88.     Accordingly, and in order to have their claims heard on the merits before the

applicable statute of limitations runs, Plaintiffs bring this action for damages and other

equitable relief, as set forth below.

**COUNT ONE**
**(Breach of Contract)**

89.     Plaintiffs reallege and incorporate by reference the allegations set forth in

Paragraphs 1 – 88 as though set forth fully herein.

90.     The transactions between Modell and Bisciotti set forth above constitute a sale

of Modell's "stock interest" in the team as that term is used in the Letter Agreement.

91.     Modell's sale of the team to Bisciotti in 2004 triggered his obligation to pay

the Trust 5% of his net gain from that sale.

92.     Modell has breached the Letter Agreement by refusing to pay the finder's fee

required therein.

93.     Modell is therefore liable to the Trust, as successor-in-interest to Andrews, for the 5% finder's fee, with the precise amount of such fee to be determined at trial.

### COUNT TWO
### (Violation of the Common Law Doctrine of Prevention)

94.     Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 -- 93 as though set forth fully herein.

95.     Under the common law doctrine of prevention, Modell's obligation to pay the Trust attached on or about March 18, 2004, when Bisciotti delivered the Option Exercise Notice to Modell, thus requiring Modell to sell the entire team to BFC. Modell could not limit his liability to the Trust by making the new arrangement with Mr. Bisciotti in April 2004 that purported to prevent BFC from purchasing the entire team.

96.     The common law doctrine of prevention mandates that where the obligations arising under a contract have attached, and thereafter one party without the consent of the other does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms, that party cannot avail itself of its own conduct to avoid liability to the other party.

97.     Modell's conduct in renegotiating the OPA after the Complaint in *Minogue I* was filed has caused and, if deemed to be valid, will continue to cause substantial damage to Plaintiffs by depriving them of the substantial fee that would have been paid if not for that renegotiation. Plaintiffs therefore seek damages in the amount of the fee that would be paid under the Agreement if Modell had performed his obligations under the OPA and the Option Exercise Notice, and not frustrated the Letter Agreement by renegotiating the OPA after the Complaint in *Minogue I* was filed.

## COUNT THREE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

98.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 – 97 as though set forth fully herein.

99.    On April 8, 2004, when Modell revised his contractual relationship with Bisciotti by amending the OPA to release the Modell companies from their existing legal obligation to sell all their remaining interests in the Ravens, he did so in response to the filing of the Complaint in *Minogue I* and with the purpose and intent of denying or delaying the payment of the finder's fee due under the Letter Agreement, which Plaintiffs calculate at not less than $21.5 million.

100.    Modell's conduct in negotiating the April 2004 amendment of the OPA breached the covenant of good faith and fair dealing implicit in the Letter Agreement.

101.    The covenant of good faith and fair dealing embraces a pledge that neither party to a contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or put another way, reflects an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

102.    Had Modell not engaged in this bad faith conduct, the entire amount of the finder's fee due under the Letter Agreement would have indisputably been due and payable within sixty days after April 8, 2004 – *i.e.*, it would have already been paid.  Plaintiffs have therefore been damaged, and continue to be damaged, by being deprived of the use of that substantial finder's fee, in an amount to be determined at trial.

## COUNT FOUR
### (Equitable Lien and Constructive Trust)

103.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 – 102 as though set forth fully herein.

104.    In the Letter Agreement, Modell incurred an obligation to pay Andrews or his estate, and by extension, the Trust, a finder's fee of 5% of the "net gain" recognized by Modell from the complete divestiture of his stock interest in the Cleveland Browns.

105.    Modell and Andrews implicitly intended that Modell's stock interest in the Cleveland Browns and any proceeds received by Modell as a consequence of its partial or complete sale would serve as security for the payment of the finder's fee obligation.

106.    Modell has, through a number of restructurings and sale transactions, divested essentially all of his stock interest in the Cleveland Browns, both by transferring it to his wife and by selling it for cash to entities controlled by Stephen Bisciotti. Modell has already received, and has the use of, 99% of the proceeds of his sale of his "stock interest" in the Browns/Ravens. Thus Modell has, and has the use of, 99% of the 5% fee that will eventually have to be paid to Plaintiffs.

107.    Modell's April 2004 renegotiation of the OPA purports to postpone any payment to Plaintiffs for another ten years – by which time Modell's acknowledged estate planning may well have divested himself and his estate of sufficient assets to pay the fee.

108.    Modell would be unjustly enriched if he were allowed to spend or transfer his proceeds from the sale of the team and not pay Plaintiffs any fee from his admitted 99% sale of the team. Moreover, Modell's own testimony and admissions show that there is a real and

continuing risk that Modell will engage in transactions during those ten years that would
defeat any judgment in Plaintiffs' favor.

109.    Accordingly, the Trust is entitled to an equitable lien and a constructive trust
on 5% of the proceeds received to date by Modell and his wife from prior sales of portions of
his stock interest in the Browns, and on 5% of Modell's remaining indirect interest in BRLP.

## COUNT FIVE
### (Accounting)

110.    Plaintiffs reallege and incorporate by reference the allegations set forth in
Paragraphs 1 - 109 as though set forth fully herein.

111.    Under the Letter Agreement, Modell assumed a continuing duty to provide
Andrews with information on the sale, gift or other transfer of shares of the Cleveland Browns
by Modell or any intervening or succeeding corporate event affecting Andrews' interest.

112.    Since the date of the Letter Agreement, Modell has engaged in a number of
transactions including sales, gifts and other transfers involving the stock of the original
corporation and has undertaken restructuring and re-financings of the original corporation,
including the creation of subsidiaries and estate planning entities such as Nevermore.  Modell
has refused to account to Andrews or his successors-in-interest for any of those transactions,
or for any stock that has been sold or gifted since February 1963.

113.    The Letter Agreement provides that if any amounts received by Modell from
either the divestiture or liquidation of the Cleveland Browns are payable over a period of
time, Modell is obligated to pay the Andrews or his successors-in-interest 5% of the net gain
attributable to any particular installment within 60 days next following Modell's receipt of
such installment and to account to Andrews or his successors-in-interest for any intervening
sale or gift of stock.

25

114.    The precise amount due to the Trust from Modell may only be ascertained by the rendering of a full and complete accounting by Modell of all transactions since the execution of the Letter Agreement.

115.    Plaintiffs therefore seek an accounting of all amounts due the Trust from Modell under the Letter Agreement.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demand relief as follows:

(i)      That Plaintiffs have declaratory judgment herein, pursuant to C.P.L.R. § 3001, interpreting the Letter Agreement, and declaring the rights, duties and other legal relations of the parties in respect thereto in consideration of the various transactions involving Modell's interests in the Browns and any and all successor entities;

(ii)     That Modell be required to render a full accounting to Plaintiffs of any purchases, sales or gifts of stock in the Cleveland Browns, its successors, subsidiaries or related entities as well as any transaction giving rise to a change in Modell's ownership in the Cleveland Browns and any fees due the Trust;

(iii)    That the April 8, 2004 modifications to the Option Purchase Agreement and the other existing agreements concerning BFC's option to allow Nevermore to retain 1 Common Unit in BRLP be declared void;

(iv)     That Modell be required to pay Plaintiffs money damages, in an amount to be determined at trial;

(v)      For costs of suit, including reasonable attorney fees; and

26

(vi)     For such other relief as the Court may deem just and equitable.


March 13, 2007

Christopher M. Green
Daniel E. Holloway
Lisa M. Nousek
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)

*Attorneys for Plaintiffs*
Phyllis Andrews and Thomas E. Minogue, Herman H.
Tarnow, and Jane F. Sims, Co-Trustees of
The Phyllis Andrews Family Trust


OF COUNSEL:


Neil McGinness, Esq.
McGINNESS, PAINTER & McGINNESS
Tower Press Building
1900 Superior Avenue
Suite 230
Cleveland, OH 44114
(216) 696-8440 (telephone)
(216) 696-0910 (facsimile)

27