# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| THOMAS E. MINOGUE, TRUSTEE, CO-TRUSTEE OF THE PHYLLIS ANDREWS FAMILY TRUST, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARTHUR B. MODELL, <br><br> Defendant. | CASE NO. 1:03-CV-03391CCB |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION

Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs Thomas E. Minogue and Thomas O. Callaghan respectfully seek reconsideration of that portion of the Court's July 22, 2005 Memorandum Opinion granting summary judgment to Defendant Modell in which the Court opined that Plaintiffs cannot rely on the doctrine of prevention to prevail on their breach of contract claim.

### PRELIMINARY STATEMENT

In its Memorandum Opinion, the Court granted Defendant Modell summary judgment on the ground that Plaintiffs had failed to establish that they had standing to bring their claims. Mem. Op. at 6. Noting that this decision deprived it of subject matter jurisdiction over the remaining issues in the case, the Court nevertheless proceeded to address those issues "in the interests of efficiency." *Id.* at 6, fn. 8. Among other things, the Court concluded that Plaintiffs' reliance on the doctrine of prevention must necessarily fail because the Letter Agreement

"imposes no obligation on Modell to sell his interest at any time." *Id.* at 8. Plaintiffs believe that, due to the Court's lack of jurisdiction, this portion of the Memorandum Opinion is *dicta* at best. However, given the possibility that this dispute may ultimately return to this Court and consistent with the Court's emphasis on efficiency, Plaintiffs respectfully request that the Court reconsider its opinion on the prevention issue.

## DISCUSSION

When one party to a contract acts *in bad faith* to prevent the occurrence of a condition precedent, the other party is entitled to recover the full value of the contract *even though* the occurrence of the condition precedent could have been prevented by the good faith conduct of the party who prevented it. *Rohde v. Mass. Mut. Life Ins. Co.*, 632 F.2d 667, 670 (6th Cir. 1980) (applying Ohio law). "[T]he issue of [a] defendant's good or bad faith is primarily a question of fact requiring an examination of defendant's intent or state of mind." *Id.* Although the Court noted in its Memorandum Opinion that "[t]here is evidence from which a reasonable jury could find that avoidance of the fee was in fact Modell's motive" in retaining "a 1% interest by agreement with Bisciotti after the 51% option was exercised . . . to avoid paying the finder's fee," it nevertheless opined that the Plaintiffs cannot rely on the doctrine of prevention for their claim to succeed.

According to the theory adopted by the Court, because the Letter Agreement itself does not impose on Modell any duty to sell all of his interest in the Ravens, Modell's avoidance of his duty to sell all of that interest pursuant to a separate agreement with Steven Bisciotti (the "Option Purchase Agreement") can never give rise to a claim of prevention by Plaintiffs. Plaintiffs respectfully submit that this theory is contrary to Ohio law and New York law, and is also

inconsistent with *Shear v. National Rifle Ass'n of America*, 606 F.2d 1251 (D.C. 1979), a case from which the Court cites language to support its opinion.

## I.     The Court's Prevention Opinion is Contrary to Ohio Law.

In Ohio, it has long been the law that the avoidance of a contractual duty owed by a defendant to a third party can give rise to a claim of prevention by a plaintiff when the act avoided would have, if performed, satisfied a condition precedent to the required performance of the defendant's separate contractual duty to the plaintiff. *See, e.g., Suter v. Farmer's Fertilizer Co.*, 126 N.E. 304 (Ohio 1919); *Benatty Corp. v. Transatlantic Energy Corp.*, 1994 WL 668103 (Ohio App. Ct. 1994).

In the seminal Ohio prevention case, *Suter v. Farmer's Fertilizer Co.*, a single agreement was executed by three parties – the plaintiff (Suter), the defendant (Farmers), and a third party (Aetna). In that agreement, Farmers agreed to sell six hundred tons of sulphuric acid each month to Aetna for a twelve month period at the rate of $27 per ton, for a total consideration of $194,400. *Id.* at 304. Farmers also agreed to pay Suter a 1% broker's fee "on this sale to be paid . . . as payments are received." *Id.* at 306. After Farmers had been paid only $15,836 following numerous deliveries, it became concerned about Aetna's ability to complete the contract, and it negotiated a cash settlement (without Suter's involvement or consent) releasing Aetna from its obligations in return for $45,000 and Aetna's agreement to pay Suter any brokerage fee over and above $608.36 (1% of $60,836, the total amount Farmers had received from Aetna). Farmers then paid Suter $608.36, but refused to pay him more. Aetna was placed in receivership and Suter sued Farmers for the difference between $608.36 and $1,944 (the amount he would have received if the original contract had been fulfilled). *Id.* at 304.

3

First, the *Suter* court determined that "the contract of sale [between Farmers and Aetna] was complete. So far as the obligations of the parties to the contract of sale are concerned, they were fixed by the terms of that contract." *Id.* at 306. Next, the court determined that under the parties' agreement, the 1% was to be paid "on the sale," rather than "upon such sums as the purchaser actually paid the seller on the price." *Id.* Finally, the court held that Farmers could not avoid its duty to pay Suter 1% of the total sale price by commuting its separate contractual duty to sell all of the sulphuric acid to Aetna:

> "[W]here the obligations of a contract have attached, and one party, without the consent of the other, does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms, he cannot avail himself of this conduct to avoid his liability to the other party to the contract. Even where the liability depends upon a condition precedent, one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it. So here the subsequent contract by which [Aetna] was relieved of further liability on its contract by the payment of the $45,000, while perfectly proper and binding on the parties to the subsequent contract, did not in any wise affect the rights of the plaintiff." *Id.*

To summarize, the *Suter* court held that although the commission agreement between Farmers and Suter did *not* obligate Farmers to sell all of the sulphuric acid to Aetna – thus the later commutation between Farmers and Aetna was "perfectly proper and binding" – it *did* obligate Farmers to pay Suter 1% of the total sale price once Farmers was legally bound to sell all the sulphuric acid to Aetna. Farmers could not avoid its duty to pay Suter a commission by commuting its *separate* duty to sell all the acid to Aetna.

Similarly, in the case before this Court, although the Letter Agreement between Modell and Andrews did not impose a duty on Modell to sell the entire team at any given time, it *did* obligate Modell to pay Andrews's estate a 5% finder's fee once Modell became legally bound to sell the entire team to Stephen Bisciotti. As in *Suter*, rules recognizing the distinction between a

4

contract of sale and the sale itself "have no application" to such a case. *Id.* at 306. Modell could not avoid his duty to pay Andrews's estate merely by renegotiating his separate duty to sell all of his interest in the Ravens to Bisciotti.

The fact that the operative duties in *Suter* were embedded in a single contract does not provide a basis for distinguishing *Suter* from the case before this Court. The subsequent Ohio case of *Benatty Corp. v. Transatlantic Energy Corp.*, 1994 WL 668103 (Ohio App. Ct. 1994), makes this clear. In *Benatty*, as here, there were two separate contracts. Under the first contract, executed in 1989, a third party (Texas Eastern) contracted to take or pay for 10,000 million cubic feet of natural gas per day from the defendant (Transatlantic). The contract required that the gas be produced from wells in Monroe, Belmont and Noble counties in Ohio, but it permitted Transatlantic to buy gas from other producers in order to resell to Texas Eastern.

Later, Transatlantic and the plaintiff (Benatty) entered into a second contract under which Benatty agreed to sell Transatlantic all of the gas produced from certain of its wells in Noble County at a specified price. The terms of this contract allowed Transatlantic to terminate or reduce the price offered if it could not redeliver gas to Texas Eastern at a reasonable profit. However, no provision in the Transatlantic/Benatty contract either imposed a duty on Transatlantic to continue selling gas to Texas Eastern or precluded Transatlantic from terminating its contract with Texas Eastern.

In 1992, Texas Eastern and Transatlantic reached a settlement agreement to commute their contract. Under this agreement, Texas Eastern paid Transatlantic $24,000,000, and Transatlantic released Texas Eastern from any further obligations to buy gas. Shortly afterwards, Transatlantic advised Benatty that its contract with Texas Eastern had been terminated.

5

Transatlantic reduced its offering price to Benatty for gas and asked Benatty to either accept the reduced price or terminate the Transatlantic/Benatty contract.

Benatty eventually sued Transatlantic, alleging that Transatlantic breached the Transatlantic/Benatty contract by voluntarily terminating its prior contract with Texas Eastern, and thereafter unilaterally lowering the price at which it would purchase gas from Benatty. The jury rendered a verdict in favor of Benatty.

On appeal, Transatlantic argued that Benatty had no standing to complain because it was not a third party beneficiary of the terminated Texas Eastern/Transatlantic contract, and because nothing in the Transatlantic/Benatty contract obligated Transatlantic to continue to sell gas to Texas Eastern. The Ohio appellate court disagreed:

> "Transatlantic argues that *Suter* does not apply because Benatty was not a third-party beneficiary to the Texas Eastern contract. However, *Suter* does not limit its holding to a situation where a third-party beneficiary is involved. Transatlantic further urges this court to distinguish *Suter* on the basis that its contract with Benatty was executory, as the amount owed to Benatty was not fixed until the gas was delivered. The *Suter* doctrine applies when the obligations have attached. Transatlantic's contractual obligation to pay $3.22 per mcf had attached, even though the contract had not been fully performed by delivery of the gas." *Id.* at *3.

This Court's prevention opinion cannot be reconciled with the holding of *Benatty*. In effect, this Court has concluded that because the Letter Agreement between Modell and Andrews imposes no duty on Modell to sell his entire interest in the Ravens, Plaintiffs cannot make out a claim of prevention based upon Modell's agreement with Bisciotti – even after Bisciotti exercised his option to acquire 100% of the team on March 18, 2004 – presumably because Plaintiffs are not third party beneficiaries of the Option Purchase Agreement. But as *Benatty* makes clear, "*Suter* does not limit its holding to a situation where a third-party beneficiary is involved."

6

In *Benatty*, Transatlantic employed commutation to avoid its independent duty to sell under the Texas Eastern/Transatlantic contract, thereby giving rise to Benatty's successful claim for prevention under the Transatlantic/Benatty contract. That is almost precisely the fact pattern in the case before this Court – indeed, if anything, the facts here present a stronger case for application of the doctrine, because (1) there was no finding that Transatlantic had commuted its contract with Texas Eastern for the purpose of renegotiating its contract with Benatty, and (2) Modell did *not* terminate his contract with Bisciotti, but rather renegotiated that contract to retain all the benefits of a sale while purporting to frustrate his contract with Andrews. If the doctrine of prevention means anything under Ohio law, it bars Modell from responding to this lawsuit by renegotiating his contract with Bisciotti, *after* Bisciotti had exercised his option, and with the intention (at least in part) of frustrating the Letter Agreement.

## II.   The Court's Prevention Opinion is Contrary to New York Law.

The rule in New York is the same as Ohio's: the avoidance of a contractual duty owed by a defendant to a third party can give rise to a claim of prevention by a plaintiff when the act avoided would have, if performed, satisfied a condition precedent to the required performance of the defendant's separate contractual duty to the plaintiff. *See, e.g., Stern v. Gepo Realty Corp.*, 264 A.D. 265 (N.Y. App. Div. 1942).

In *Stern*, the defendant (Gepo) executed a contract of sale to sell hotel property to a third party. Gepo also executed a memorandum agreement to pay the plaintiff (Stern), a real estate broker (who was acting with another broker), $1,250 "as and for our commissions in connection with the sale, when and if consummated, of hotel property ... of which Gepo Realty Corp. is now the owner and contemplates making sale to our proposed client." The third party

7

subsequently declined to buy the hotel property because of liens that Gepo refused to clear up. Stern sued Gepo for the commission. The trial court granted summary judgment for Gepo on the ground that the sale was never consummated. The Appellate Division reversed:

> "No doubt a contract could be devised between the owner and the broker which would protect the seller against claims for brokerage arising under such a state of facts, but we think that in the absence of language unmistakably indicating an intention to deprive the broker of commissions on account of the default of the seller, such a purpose is not to be implied. *Rather must it be assumed that the parties intended the general rule to apply that 'a party cannot insist upon a condition precedent, when its non-performance has been caused by himself.'* The conclusion which we have expressed is sustained by the weight of authority in this State." *Id.* at 267 (emphasis added; internal citations omitted).

In *Stern*, as in *Benatty*, the triggering event was not the breach or avoidance of a duty owed by the defendant to the plaintiff. Rather, it was the breach or avoidance of a contractual obligation owed by the defendant to a third party when the purpose or effect was to nominally excuse the defendants' performance of its contract with plaintiff. Thus the *Stern* court found that Gepo's breach of its duty under the contract of sale with the third party buyer to deliver clean title gave rise to a claim of prevention by the plaintiff Stern founded on his separate memorandum agreement with Gepo. *See also Amies v. Wesnofske*, 174 N.E. 436, 438 (N.Y. 1931) (doctrine of prevention applies to a brokerage agreement when vendor actively prevents performance of the underlying, but separate, contract of sale).

### III.   The *Shear* Case Does Not Support the Court's Prevention Opinion.

In its Memorandum Opinion, the Court cites *Shear v. National Rifle Ass'n of America*, 606 F.2d 1251 (D.C. Cir. 1979), for the proposition that "there is no prevention when the contract authorizes a party to prevent a condition from occurring." Mem. Op. at 7. The Court construes this language as supporting its opinion that because the Letter Agreement did not

*require* Modell to sell all of his stock at any time, it *authorized* him to renegotiate his obligation under the Option Purchase Agreement to sell all of his stock to Bisciotti, thereby precluding Plaintiffs' prevention claim. *Id.* But the decision in *Shear* does not support the Court's opinion on the prevention question. Indeed, *Shear* is just one more case in which avoided obligations under one contract give rise to a claim of prevention under another.

In *Shear,* a real estate agent (Shear) sued the National Rifle Association for a $150,000 commission due him for arranging the sale of the organization's Washington, D.C., headquarters. Under the brokerage commission agreement between Shear and the NRA, which was separate from the purchase contract, payment of the commission was "contingent on settlement." *Id.* at 1254. When the NRA membership enacted a bylaw removing the board's authority to approve the sale, Shear alleged that the NRA "frustrated the sale in a way not contemplated or authorized by the contract." *Id.* at 1256. The D.C. Circuit reversed the district court's dismissal of Shear's claim, holding that "the facts alleged here constitute a classic case of prevention." *Id.*

After noting that "there is no prevention when the contract authorizes a party to prevent a condition from occurring," the *Shear* court noted that "[t]he issue to be decided in this case, therefore, is whether . . . the plaintiff/broker assumed the risk of the NRA's prevention. If Shear did not assume the risk, then the NRA's prevention excuses the condition of settlement, and Shear is entitled to his commission." *Id.* The court then held that Shear did not assume the risk of the prevention that occurred. As the basis for its holding, the court cited two promises that the NRA failed to honor:

> "First, the Management Committee was required to recommend that the Board adopt the sale contract procured by Shear. Second, the contract was to be submitted to the Board for approval. In light of these two promises, the risk assumed by Shear was that the Board, with authority to consider the contract, would withhold approval despite the unanimous recommendation of the

Management Committee." *Id.*

According to Shear's allegations, the NRA broke both of these promises: the Management Committee failed to recommend approval of the contract, and the contract was not submitted to the Board until the Board was stripped of its authority to approve it. The court held that "Shear did not assume the risk that the Management Committee would refuse to recommend the contract, or that the Board would be deprived by a subsequently enacted by-law of authority to approve the contract. Since these risks were not assumed by Shear, the NRA's alleged conduct was unauthorized prevention."

Thus, Shear's claim for prevention was premised on the NRA's avoidance of its contractual duties – *i.e.*, the two breached promises. But those duties were ones the NRA owed the *purchaser* pursuant to the purchase contract. The NRA owed Shear no such duties under the separate brokerage commission agreement between it and Shear; its obligation to pay Shear under that agreement was simply "contingent on settlement." Accordingly, the *Shear* court's determination that the contract did not "authorize" the NRA "to prevent a condition from occurring" referred to the *purchase contract*, not the brokerage commission agreement Shear sought successfully to enforce. *Shear,* like the other cases cited above, thus stands as a perfect example of how courts have held that the avoidance of a contractual duty owed by a defendant to a third party can give rise to a claim of prevention by a plaintiff when the act avoided would have, if performed, satisfied a condition precedent to the required performance of the defendant's separate contractual duty to the plaintiff.

*Shear*'s analysis of the assumption of risk actually underscores the economic rationale for the prevention doctrine. In each of the preceding cases, any number of events outside the control of the parties might have prevented the occurrence of the condition precedent (*e.g.*, the NRA

Board might have disapproved the sale while still empowered to do so, Gepo's hotel might have burned down, Transatlantic's pipeline to Texas Eastern might have ruptured). But the fact that events beyond plaintiffs' control might have deprived them of the fruits of the contract does not mean that plaintiffs had no claim. Rather, as *Suter* noted, what mattered is precisely whether the condition precedent did not occur because of the *defendant's own actions, over which the plaintiff had no control*. *Suter*, 126 N.E. at 306. Understood this way, the doctrine simply reflects the common law's clear and longstanding disapproval of opportunistic or bad faith conduct by contracting parties: it bars a party from manipulating obligations under one contract to the detriment of another contracting party who has no ability to police his behavior.

This understanding of the prevention doctrine confirms that, if anything, this is a clearer case than *Suter*, *Benatty* or *Shear* for application of the doctrine. Specifically, the Court's Memorandum Opinion can be read as holding that what Modell did here did not violate the doctrine of prevention because Modell was free to sell 99% of the team, so if that is what he ended up doing, how he got to that point is irrelevant. But once it is accepted that the doctrine of prevention is concerned precisely with the *defendant's own actions*, then Modell's affirmative effort to renegotiate his sale contract to retain a nominal 1% interest is at least open to question. Moreover, the cases make clear that if Modell had contracted to sell his remaining 51% of the team and then unilaterally prevented that closing (e.g., by not providing financial statements), he would be liable for "preventing" the condition precedent to his payment to Andrews – precisely as the seller was in *Stern*, and as the NRA was in *Shear*. But it makes no sense to hold Modell liable for violation of the doctrine of prevention when there was no closing at all, yet excuse that liability where the closing documents are amended to appear, on their face, to avoid triggering Modell's obligations to Andrews.

Thus if anything, the doctrine is *more* necessary where (as here) the defendant has negotiated with the third party to retain most or all of the benefits of their contract while avoiding defendant's obligations under his prior contract with the plaintiff, because the incentives for such opportunistic behavior are so clear.

The Court is, of course, correct that Modell was not required to agree, *ex ante*, to sell 100% of the team to Bisciotti. But the doctrine of prevention, properly understood, does not even suggest such a holding. Indeed, the doctrine would not have prevented Modell from announcing in 1999 that he was only going to sell 99% of the team because he wanted to avoid triggering Andrews' rights, and then doing just that (if he could have found a buyer). The doctrine only prevented him from negotiating a deal that by its own terms triggered Andrews' rights, and then – after being reminded of those rights – taking affirmative steps to frustrate them. There are not many situations where such conduct occurs, but when it does occur it implicates a core principle of contract law, grounded in notions of fairness and efficiency. And, we respectfully submit, it requires this Court to reconsider its prior decision on this key legal issue.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court amend its Memorandum Opinion to confirm that under the doctrine of prevention, Defendant Modell could not avoid his duty to pay Vincent Andrews's estate merely by renegotiating his separate duty to sell all of his interest in the Baltimore Ravens to Stephen Bisciotti.

Date: August 5, 2005

                                Respectfully submitted,

                                _____/s/_____
                                Andrew Jay Graham (Fed. Bar No.: 00080)
                                George E. Brown (Fed. Bar No.: 14681)
                                Kramon & Graham, P.A.
                                One South Street, Suite 2600
                                Baltimore, Maryland 21202
                                (410) 752-6030 (telephone)
                                (410) 539-1269 (facsimile)
                                agraham@kg-law.com
                                gbrown@kg-law.com

                                *Attorneys for Plaintiffs*
                                *Thomas E. Minogue and*
                                *Thomas O. Callaghan, Co-Trustees of the*
                                *Phyllis Andrews Family Trust*

OF COUNSEL:

Andrew W. Hayes, Esq.
Christopher M. Green, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)

Neil McGinness, Esq.
McGinness, Painter & McGinness
Tower Press Building
1900 Superior Avenue
Suite 230
Cleveland, OH 44114
(216) 696-8440 (telephone)
(216) 696-0910 (facsimile)

13