# EXHIBIT
# 3

'05 DEC 30 P 1:41

CLERK OF COURTS
CUYAHOGA COUNTY

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

THOMAS E. MINOGUE, Trustee, et al. )    Judge: MARY J BOYLE
)
            Plaintiffs,                )                         CV 05 580724
)
vs.                                    )    **PLAINTIFFS' MOTION FOR A**
)    **PRELIMINARY INJUNCTION**
ARTHUR B. MODELL,                      )
)
            Defendant.                 )

Plaintiffs Thomas E. Minogue, Herman H. Tarnow and Jane F. Sims, Co-Trustees of the

Phyllis Andrews Family Trust, hereby respectfully move the Court for a preliminary injunction

pursuant to Rule 65(B) of the Ohio Rules of Civil Procedure and this Court's general equitable

powers enjoining Defendant Arthur B. Modell ("Modell") to maintain under his direct ownership

and control during the pendency of this action at least $21.5 million of the proceeds received

from the sale of his interests in the Baltimore Ravens Limited Partnership, or liquid assets of an

equivalent value, so that those funds or assets will be available to satisfy any judgment in

Plaintiffs' favor.

The grounds for this motion are set forth in the accompanying memorandum of law.

December 30, 2005

_____

Mark R. Koberna, Esq. (0038985)
Daniel D. Domozick, Esq. (0025040)
SONKIN & KOBERNA CO., L.P.A.
55 Public Square, Suite 1660
Cleveland, Ohio 44113
216-861-6833 (telephone)
216-781-6415 (facsimile)
*Attorneys for Plaintiffs*
Thomas E. Minogue, Herman H. Tarnow
and Jane F. Sims, Co-Trustees of
The Phyllis Andrews Family Trust

OF COUNSEL:

Christopher M. Green, Esq.
Jacqueline B. Friedland, Esq.
Melissa S. Kho, Esq.
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)


Neil McGinness, Esq.
McGINNESS, PAINTER & McGINNESS
Tower Press Building
1900 Superior Avenue
Suite 230
Cleveland, OH 44114
(216) 696-8440 (telephone)
(216) 696-0910 (facsimile)

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

THOMAS E. MINOGUE, Trustee, et al.      )      JUDGE:
                                        )
                Plaintiffs,             )      CASE NO.
                                        )
vs.                                     )      **MEMORANDUM OF LAW**
                                        )      **IN SUPPORT OF PLAINTIFFS'**
ARTHUR B. MODELL,                       )      **APPLICATION FOR A**
                                        )      **PRELIMINARY INJUNCTION**
                Defendant.              )

Plaintiffs Thomas E. Minogue, Herman H. Tarnow and Jane F. Sims, Co-Trustees of the

Phyllis Andrews Family Trust, respectfully submit this memorandum of law in support of their

application in the accompanying motion and Complaint for a preliminary injunction pursuant to

Rule 65(B) of the Ohio Rules of Civil Procedure and this Court's general equitable powers.

Plaintiffs seek an order enjoining Defendant Arthur B. Modell ("Modell") to maintain

under his direct ownership and control during the pendency of this action at least $21.5 million

of the proceeds received from the sale of his interests in the Baltimore Ravens Limited

Partnership, or liquid assets of an equivalent value, so that those funds or assets will be available

to satisfy any judgment in Plaintiffs' favor.

## PRELIMINARY STATEMENT

In 1963, Modell agreed to pay Vincent Andrews, Sr. ("Andrews") a finder's fee equal to 5% of Modell's net gain from the future divestment of his stock interest in the Cleveland Browns football team (now known as the Baltimore Ravens), which Andrews helped him purchase.

Because there has already been substantial litigation relating to Modell's obligation to pay the finder's fee, most of the material facts relating to the dispute are now known. Although Modell has strenuously argued against any finding of liability, it is clear that (as one of Modell's own experts has admitted) sooner or later a substantial fee will have to be paid. Indeed, there are several bases for the Court to find that Modell owes the fee now:

1.  Under the common law doctrine of prevention, Modell breached his 1963 contract with Andrews (the "Letter Agreement") on April 8, 2004, when he amended a pre-existing agreement to sell all of his remaining interest in the Ravens to Stephen Bisciotti's Baltimore Football Company ("BFC") *after* Bisciotti had exercised his option to purchase that interest from Modell. The April 8, 2004 amendment allowed a recently created entity named Nevermore, LLC ("Nevermore"), in which Modell holds an indirect interest, to retain a purported 1% interest in the limited partnership that owns the Ravens, and thus purported to prevent the occurrence of the condition precedent to Modell's contractual obligation to pay the finder's fee.

2.  Modell's conduct also breached the implied covenant of good faith and fair dealing, because a reasonable person in Andrews' position would have been justified in understanding that the Letter Agreement included a promise by Modell that he would not undertake to avoid indefinitely paying Andrews or his descendants a finder's fee by reconfiguring his existing contractual arrangement with Bisciotti to, in substance, defer the final $6 million installment of the $600 million sale proceeds.

3.  In addition, because the character of Modell's indirect interest in Nevermore is so materially different from the character of the "stock interest" that was the subject of the Letter Agreement that it is appropriate to conclude that Modell has divested all of that original "stock interest," Modell's non-payment of the finder's fee is a straightforward breach of the Letter Agreement.

2

Even if these and Plaintiffs' other claims fail, it is clear that the *de minimis* Nevermore interest will devolve to Modell's heirs at his death, thus causing a triggering event under the Letter Agreement. Despite this, Modell believes he or his estate will never have to pay the finder's fee. Moreover, Modell (i) already has the benefit of 99% of his net gain, (ii) has been reducing his holdings by transferring his assets to family members, and (iii) has refused to make any provision to ensure that he or his estate will be able to satisfy any potential judgment in the Plaintiffs' favor. Instead, Modell continues to engage in estate planning and financial restructuring, transferring substantial portions of his assets to other members of his family.

Accordingly, Plaintiffs respectfully ask that this Court issue an order enjoining Modell from transferring at least $21.5 million of the proceeds received from the sale of his interests in Baltimore Ravens Limited Partnership. Such an order will preserve the *status quo* until Plaintiffs' claims can be fully and fairly adjudicated.

## STATEMENT OF FACTS

In 1963 Modell and Andrews entered into the Letter Agreement, in which Modell agreed to compensate Andrews for making possible the transaction that enabled Modell to acquire stock in Cleveland Browns Inc., the entity that operated the Cleveland Browns professional football team. Complaint ¶ 35; Exhibit 15.[1]

In the provision of the Letter Agreement that is the subject of this lawsuit, Modell promised Andrews a 5% finder's fee upon liquidation of the Browns or divestment of all of Modell's "stock interest" in the team. *Id.*; Complaint ¶ 36. When Andrews died in 1969, he willed his interest in the Letter Agreement to his widow, who later assigned it to the Phyllis

---

[1] The exhibits referred to herein are exhibits to the Complaint.

Andrews Family Trust (the "Trust"). Complaint ¶¶ 40, 51, 52; Exhibits 20, 34 & 35. Plaintiffs are Co-Trustees of the Trust.

By 1997, entities controlled by Modell owned 100% of the Baltimore Ravens (the successor to the Cleveland Browns). Complaint ¶ 43. However, the team was heavily in debt, and Modell was obliged to sell the team or find a minority investor. *Id.* at ¶ 44. In a transaction that was announced in December 1999 and finalized in February 2000, Modell and his wife agreed to sell all of their interests in the Ravens to Stephen Biscotti's BFC for approximately $600 million. *Id.* at ¶ 48; Exhibits 31 & 27. The sale was to take place in two stages: in the first stage, in February 2000, BFC purchased 49% of the Ravens and obtained an option to purchase the remaining 51% four years later. Complaint ¶ 49-50; Exhibits 32 & 33. Biscotti has testified that at the time of their original agreement, Modell did not insist on retaining ownership of any portion of the team. Complaint ¶ 45; Exhibit 25 at 15:16 – 16:15. Indeed, because he sorely needed to pay creditors, Modell agreed to Biscotti's terms, including Biscotti's *unqualified* option to buy out Modell's *entire* interest in the team. Complaint ¶ 46; Exhibit 26.

Following the announcement of the deal, the Trust requested information from Modell about the planned sale. Complaint ¶ 55; Exhibit 21, 22 & 36. On May 23, 2003, after Modell's refusal to respond to these requests, Plaintiff Minogue and former Co-Trustee Thomas O. Callaghan sued Modell in this Court on behalf of the Trust. *Minogue, et. al v. Modell*, Case No. 1:03-cv-03391 (D. Md. 2003) (hereinafter "*Minogue I*"). Modell removed that lawsuit to the United States District Court for the Northern District of Ohio, from whence it was transferred to the United States District Court for the District of Maryland. *Id.*

On March 18, 2004, Biscotti exercised his option to buy out Modell's remaining interest in the Ravens by delivering to Modell an "Option Exercise Notice" which obligated Modell to

sell all of his 51% interest to BFC on the previously agreed-to "Closing Date." Complaint ¶ 58;
Exhibit 37. Subsequently, on April 8, 2004, almost a year *after* the Trust had filed its initial
complaint seeking payment under the Letter Agreement, Modell arranged for one of his
companies, named Nevermore, LLC ("Nevermore"), to retain a purported 1% limited partnership
interest in the Ravens. Complaint ¶ 62.

The Ravens' accountant testified that one reason Modell arranged for Nevermore to keep
a purported 1% of the Ravens was so he could maintain that he had not divested all of his stock
interest in the team, and thus avoid paying the Trust the finder's fee required by the Letter
Agreement. *Id.* at ¶ 72; Exhibit 43 at 76:5 – 82:7.

Plaintiffs contend that Modell engineered the Nevermore arrangement for no legitimate
reason other than to deny the descendants of Vincent Andrews the finder's fee of at least $21.5
million to which they are entitled. Nevermore's purported 1% interest in the team is subject to
Calls, contractual restraints on transferability, and an irrevocable voting proxy, all in favor of
BFC. Complaint ¶¶ 67-70; Exhibits 40 & 41. With all of these encumbrances, the only logical
explanation for Modell to have retained any interest at all is a desire to avoid his obligation under
the Letter Agreement. Plaintiffs also argue that these encumbrances so change the nature of
Modell's ownership interest that they bear no relationship to the "stock interest" contemplated in
the terms of the Letter Agreement, and that Modell has divested himself of his interest in the
team to such an extent that his obligations under the Letter Agreement have been triggered. In
addition, Plaintiffs maintain that by his actions, Modell violated the common law doctrine of
prevention, and breached the covenant of good faith and fair dealing implicit in the Letter
Agreement.

These claims have not yet been adjudicated, because on July 22, 2005, the district court in Maryland granted Modell summary judgment in *Minogue I*, holding that plaintiffs had failed to establish that they had standing to bring their claims, because they had failed to establish that Mrs. Andrews transferred the Letter Agreement from the estate to herself before she transferred it from herself to the Trust.  Complaint ¶ 79; Exhibit 7 at 5-6.[2]

On September 19, 2005, Mrs. Andrews executed documents reconfirming and ratifying (i) the transfer of the Letter Agreement from her deceased husband's estate to herself, and (ii) the transfer of the Letter Agreement from herself to the Trust.  Complaint ¶ 80; Exhibit 8.  In addition, one of the Trust's former Co-Trustees, Thomas O. Callaghan, has resigned and has been replaced by two new Co-Trustees.  Complaint ¶ 53; Exhibit 16.  Having cured the standing issues identified by the Maryland district court in *Minogue I*, the Trustees have returned to this Court, where they now bring this second action against Modell.

Modell's position is that his indirect ownership interest in Nevermore precludes him from being obliged to pay any finder's fee pursuant to the Letter Agreement.[3]  Further, Modell does not believe that he will ever have to pay anything to Plaintiffs (or anyone else) under the Letter Agreement, and he has refused to make any provisions to guarantee the availability of funds to

---

[2]  In *Minogue I*, plaintiffs filed a motion for preliminary injunction seeking the identical relief that they seek here.  That motion was never decided by the district court.

[3]  Nevermore's creation in January 2003 illustrates Modell's disregard for applicable legal strictures.  Nevermore is indirectly owned by Modell through his stock ownership in two other entites, Baltimore Ravens, Inc. ("BRI") and MSLP, Inc., which collectively own a 100% membership interest in Nevermore.  Complaint ¶ 61; Exhibit 42 at ABM06108.  From April 2000 until April 2004 (when BRI's certificate of incorporation was amended), BRI was expressly prohibited from "(a) acquir[ing] or own[ing] any asset other than" a general partnership interest in BRLP, and "(b) own[ing] any subsidiary".  Modell thus acquired Nevermore in January 2003 even though BRI lacked legal authority to own a membership interest in another company during that three year period.  Complaint ¶ 64; Exhibit 23 at ABM04877; Exhibit 47.

pay any finder's fee pursuant to the Letter Agreement. Complaint ¶ 77; Exhibit 2 at 5:1 – 7:7, 121:7-18. Instead, Modell has recently transferred significant assets to other family members for estate planning purposes. Complaint ¶ 78. For example, in 1997, Modell transferred to entities controlled by his wife the rights to the team's Baltimore stadium lease, which she then exchanged for a 68% interest in the Ravens that she subsequently sold to BFC for roughly $395 million. See Exhibit 49. (Modell sold his remaining 31% interest in the Ravens – an interest that was originally 32%, but was reduced to 31% by the 1% interest purportedly retained by Nevermore – for approximately $179 million.)

Given Modell's stated belief that he owes them nothing, his desire to pay them nothing, and his undisputed efforts to reduce the value of his estate by transferring assets to his family, even by bending the rules, Plaintiffs are justifiably concerned that if they prevail in this action they will be unable to collect on any judgment they receive. Accordingly, Plaintiffs bring this motion for a preliminary injunction to prevent Modell from transferring or otherwise dissipating the funds to which they are rightfully entitled before they can reduce their claims to judgment.

## ARGUMENT

### I.   This Court Has Authority to Grant the Preliminary Injunction that Plaintiffs Request.

An Ohio court may use its equitable powers to freeze assets while it adjudicates the parties' rights to the property in dispute. In *Consun Food Industries, Inc. v. Fowkes*, 610 N.E.2d 463 (Ohio Ct. App. 1991), the Ohio appellate court upheld the trial court's use of a preliminary injunction in an effort to "restrain [the defendants] from taking any action that could adversely affect the subject matter of the litigation prior to trial." *Id.* at 467. Likewise, in *Woodrum v. Iles*, 2003 WL 366758 (Ohio Ct. App. 2003), in which the litigants disputed ownership rights in the decedent's estate property, the appellate court approved of "the probate court's attempt

temporarily to freeze the assets and property of the trust, the estate, and any property located at the former residence of [the decedent], *until a legal solution could be reached.*" *Id.* at *2 (emphasis added). Similarly, in *Burns v. Daily*, 683 N.E.2d 1164 (Ohio Ct. App. 1996), the appellate court approved of the probate court's order freezing a woman's assets pending the court's determination of her mental capacity. The court noted that the "order, by its terms, *restrains transfers of assets 'until the final hearing* on the application for the appointment of a guardian is held *and the final determination of this Court is made . . . .*'" *Id.* at 1173 (emphasis added). The court recognized the order as a preliminary injunction, though the probate court did not use that term, because the order "was clearly designed to preserve the *status quo* until the issue whether a guardian should be appointed could be resolved." *Id.*

A preliminary injunction serves an important function in the adjudication of any dispute where there is a danger that the defendant's assets will disappear prior to judgment. "The *purpose* of a preliminary injunction is to preserve the *status quo* between the parties pending final adjudication of the case upon the merits." *Yudin v. Knight Indus. Corp.*, 672 N.E.2d 265 (Ohio Ct. App. 1996) (emphasis added) (citing *Cardinale v. Ottawa Regional Planning Comm.*, 627 N.E.2d 611 (Ohio Ct. App. 1993)); *see also Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 273 (Ohio Ct. App. 2000); *Laffer v. Cincinnati & Suburban Bell Tel. Co.*, 144 N.E.2d 158, 159 (Ohio Com. Pl. 1957) ("It is within the powers of a court of equity to retain the *status quo* until a matter can be heard on its merits.").

Specifically, "[t]he purpose of a temporary injunction is to preserve and protect the ability of the court to provide an effective judgment on the merits . . . [I]t is a necessary adjunct to the administration of justice, intended as a means of preserving the court's ability to grant effective, meaningful relief after a determination of the merits." *Gobel v. Laing*, 231 N.E.2d

8

341, 342 (Ohio Ct. App. 1967); *see also Pidgeon v. Ramar Land Corp.*, 597 N.E.2d 562, 564 (Ohio Com. Pl. 1991). Under *Gobel*, the "primary question is the effect of failure to give temporary relief upon the court's ability to give any effective ultimate relief to the applicant if that party were to prevail." *Id.* at 343. The touchstone, then, is whether a preliminary injunction will effectively preserve the *status quo*, by freezing property in one party's control long enough to adjudicate the rights of the respective parties, such that the disputed assets will remain available should the court ultimately determine that the other party is entitled to them.

Here, Plaintiffs request that the Court require Modell to maintain under his direct ownership and control at least $21.5 million of the Ravens sales proceeds during the pendency of this action, or liquid assets of an equivalent value, so that those funds or assets will be available to satisfy any judgment in Plaintiffs' favor. If the preliminary injunction is not entered, Modell could make himself and his estate judgment-proof by continuing to transfer his assets to others. Accordingly, the Court may invoke equity to preserve the *status quo* pending judgment, because the legal remedy – a money judgment – might prove inadequate (if uncollectible) and preliminary injunctive relief will further the Court's ability to grant the final relief requested. *Pidgeon*, 597 N.E.2d at 564; *Gobel*, 231 N.E.2d 341, 342.

## II.    Ohio Courts Apply a Multi-Factored Test to Determine Whether a Preliminary Injunction Should Issue.

Before granting a preliminary injunction, the Court must consider (1) the significance of the threat of irreparable harm to plaintiff if the injunction is not granted; (2) the state of the balance between this harm and the injury that granting the injunction would inflict on defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest. *Adams v. Ohio Dept. of Health*, 356 N.E.2d 324, 328 (Ohio Com. Pl. 1976); *Corbett v. Ohio Bldg. Auth.*, 619 N.E.2d 1145, 1148 (Ohio Ct. App. 1993). Although "[c]ourts have stated that demonstration

of the likelihood of irreparable harm is the single most important prerequisite for issuance of a preliminary injunction." *Adams*, 356 N.E.2d at 329 (citing 11 Wright and Miller, Federal Practice and Procedure, § 2948), they "have recognized that no one factor is dispositive." *Cleveland v. Cleveland Elec. Illum. Co.*, 684 N.E.2d 343, 351 (Ohio Ct. App. 1996) (citing *Royal Appliance Mfg. Co. v. Hoover Co., Inc.*, 845 F. Supp. 469 (N.D. Ohio 1994)). The four factors "must be balanced, moreover, with the flexibility which traditionally has characterized the law of equity." *Cleveland Electric*, 684 N.E.2d at 351 (citing *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

Ohio courts compare the first two factors to determine the relative threat of irreparable harm to each of the respective parties, after which they consider the plaintiff's chances of success. This results in a sliding scale that demands less of a showing of likelihood of success on the merits when the relative threat of irreparable harm to the plaintiff is greater than the threat to the defendant, and *vice versa*. *See Adams*, 356 N.E.2d at 329 (When "the balance of hardships tips decidedly toward plaintiff ... it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.") (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)) (internal quotation marks omitted). As the appellate court stated in *Cleveland Electric*, "When there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though a plaintiff's case of irreparable injury may be weak. In other words, what [the] plaintiff must show as to the degree of irreparable harm varies inversely with what [the] plaintiff demonstrates as to its likelihood of success on the merits." *Cleveland Electric*, 684 N.E. 2d at 351; *Friendship Materials*, 679 F.2d at 105.

10

### III.    A Preliminary Injunction Is Appropriate in this Matter.

When the four factors are weighed here in the manner required by *Cleveland Electric* and *Adams*, it is clear that a preliminary injunction should issue.

First, it is very likely that Plaintiffs will be irreparably harmed if the injunction is denied. Without the protection of an injunction, Plaintiffs risk losing completely their rightful interest in the agreed-upon finder's fee. If Plaintiffs prevail on the merits of their finder's fee claim, Modell will owe the Trust a fee of not less than $21.5 million, according to calculations performed by plaintiffs' expert in *Minogue I*; Modell's expert put the number between $1.45 million and $14.9 million.[4]

Although the parties dispute whether, as a matter of law, Modell has divested 99% of his interest in the Baltimore Ravens or all of that interest, it is undisputed that he and his family have already received 99% of the proceeds from the sale of the entire team, or approximately $579 million.[5] It is also undisputed that Modell has engaged in extensive estate planning in recent years, including the transfer of valuable assets to family members.[6] For example, by transferring to entities controlled by his wife the rights to the team's Baltimore stadium lease, he has effectively funneled $395 million of the $579 million received from BFC from his hands into his wife's.

As the Court is aware, the goal of estate planning is to reduce the value of one's estate to the smallest amount possible, so as to avoid death taxes. *See* Robert B. Smith, *Reconsidering the Taxation of Life Insurance Proceeds Through the Lens of Current Estate Planning*, 15 Va. Tax

---

[4]    *See* Exhibit 49, Expert Report of D. Lee McCreary. Jr., at 18; Exhibit 50, Rebuttal Report of William F. Chandler at 17-18; Exhibit 39, Expert Report of William F. Chandler at 14.

[5]    *See* Exhibit 39, Expert Report of William F. Chandler at 9, n.14.

[6]    *See* Exhibit 2 at 149-50.

Rev. 283, 369 (1995) ("Stated generally, estate planning is the effort undertaken to assist a person in transferring his or her wealth to the beneficiaries he or she selects at the least possible cost.").

At the same time that Modell has actively striven to reduce his personal holdings for estate planning purposes, he has also refused to make provisions to guarantee the availability of funds or liquid assets to satisfy a judgment in Plaintiffs' favor.[7] If Modell is successful in emptying his pockets, Plaintiffs will be unable to realize on any ultimate judgment they receive, and thus will be harmed irreparably.

Second, the harm to Modell from the injunction would be slight, tipping the balance of hardships strongly in favor of Plaintiffs. The injunction would affect a relatively small portion of Modell's considerable personal fortune. The funds that Plaintiffs ask the Court to freeze represent less than 5% of the proceeds received from the sale of Modell's and his family's interests in the Baltimore Ravens. What's more, the injunction would not divest Modell of the enjoined assets. Modell could still enjoy the investment or interest value of the money, which would remain in his possession. Since Modell will still be able to use the enjoined assets as long as they remain liquid, the sequestration of such a relatively small amount of Modell's family fortune would only harm him if it were to result in increased estate taxes. Of course, the alternative would be to allow Modell to avoid paying estate taxes – and Plaintiffs – altogether. The possible imposition on Modell's estate of estate taxes on $21.5 million is a significantly less burdensome harm to Modell than Modell's complete avoidance of the $21.5 million finder's fee would be to Plaintiffs, who deserve to be paid in full.

---

[7]    When Plaintiffs' counsel Andrew Hayes informed Modell's counsel Douglas Nazarian that a similar application in *Minogue I* could be mooted by a written assurance from Modell that he would guarantee the availability of funds or liquid assets to satisfy a judgment in the Plaintiffs' favor, Modell refused to provide the requested assurance.

Third, Plaintiffs have raised "questions going to the merits that are so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Adams*, 356 N.E.2d at 329. Although Ohio courts lessen the burden on Plaintiffs to show their chances of prevailing on the merits of their claims when the balance of hardships weighs so heavily in their favor, *see Cleveland Electric*, *supra*, Plaintiffs nonetheless can demonstrate that their claims are meritorious, adding yet more weight to Plaintiffs' side of the scale.

As Plaintiffs explain in their Complaint filed simultaneously herewith, in addition to seeking a declaratory judgment and an accounting, they make four substantive claims: (i) a claim for breach of contract, (ii) a claim for violation of the doctrine of prevention, (iii) a claim for breach of the implied duty of good faith and fair dealing, and (iv) a claim for an equitable lien. As we explain below, each of these claims is fair ground for litigation under *Adams*.

(i)     Breach of Contract

The character of Modell's indirect interest in Nevermore is so materially different from the character of the "stock interest" that was the subject of the Letter Agreement that it is appropriate to conclude that Modell has divested all of that original "stock interest" even if he is not found to have actually sold Nevermore's purported 1% interest. Modell's non-payment of the finder's fee in such circumstances is a straightforward breach of the Letter Agreement.

The "stock interest" that was the subject of the Letter Agreement was a transferable, direct interest (subject only to a right of first refusal in favor of the other major shareholder) of voting common stock in a corporation that operated an NFL franchise. The stock was subject to market fluctuation, possible capital gain or loss, and had a claim on the franchise's residual profits (it was also held by the controlling stockholder and principal executive officer of that

corporation). The interest in BRLP that Modell now owns has <u>none</u> of those characteristics: it is a non-voting minority interest of highly limited transferability, held through a complex set of intermediate entities which in turn hold a purported 1% non-voting interest in BRLP, the limited partnership that operates the Baltimore Ravens. This indirect 1% interest has no claim on the residual profits of the franchise. It has no real risk of capital gain or loss (precisely because it is hedged with "puts" and "calls"); it is subject to near-total restraints on transferability; and it has no vote in the team's management (because Modell gave Bisciotti an irrevocable proxy).

As Plaintiffs' expert Chandler has opined, the nature of Modell's indirect interest in BRLP has so many of the characteristics of debt, and so few of the characteristics of the "stock interest" that was the subject of the Letter Agreement, that it is appropriate to conclude that Modell has actually divested all of his "stock interest" in the Browns, as that term is used in the Letter Agreement. The fact that Plaintiffs' breach of contract claim is "fair ground for litigation and thus for more deliberate investigation," *Adams*, 356 N.E.2d at 329, is evidenced by the Maryland district court's comment in *dicta* that "the experts' opinions on this issue appear to create a dispute of material fact for the jury."[8]

    (ii)    <u>Violation of the Doctrine of Prevention</u>

The common law doctrine of prevention mandates that "where the obligations arising under a contract have attached and thereafter one party without the consent of the other does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms that party cannot avail itself of that [conduct] to avoid its liability to the other party." *Benatty Corp. v. Transatlantic Energy Corp.*, 1994 WL 668103 at *3 (Ohio Ct.

---

[8]   *See* Exhibit 7 at 7.

App. 1994) (citing and paraphrasing *Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304 (Ohio 1919)).

Under the doctrine, when Bisciotti initiated the second stage of the Ravens sale by delivering to Modell and his companies the "Option Exercise Notice" on March 18, 2004, in which BFC elected to exercise its option to buy the remaining 51% of BRLP, Modell's obligation to pay the Trust attached, and he could not limit his liability to the Trust by making the new arrangement with Bisciotti in April 2004 that prevented BFC from purchasing the entire team. This issue is ripe for litigation, and supports Plaintiffs' request for a preliminary injunction.

    (iii)    <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

The covenant of good faith and fair dealing "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,'" *Evans v. Famous Music Corporation*, 2004 WL 330069 at \*6 (N.Y. 2004), or put another way, reflects "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Society National Bank*, 662 N.E.2d 1074, 1082-3 (Ohio 1996).

Plaintiffs maintain that Modell engineered the arrangement by which he retained an indirect non-voting interest in 1% of the Ravens for no legitimate reason, but instead to deny the heirs of Vincent Andrews the finder's fee of at least $21.5 million that they are rightfully due under the Letter Agreement. The Letter Agreement specifically addresses the payment of a finder's fee on divestment of Modell's "stock interest" in Cleveland Browns, Inc., the entity that in 1963 operated the Cleveland Browns football team.

15

The April 8. 2004 arrangement "take[s] opportunistic advantage" of the language of the Letter Agreement in a manner that could not have been contemplated at the time it was drafted. No one – certainly not Vincent Andrews, Sr. – would have foreseen that Modell's "stock interest" in the Cleveland Browns operating entity, which was a direct, voting, majority interest, would metamorphose so dramatically over the next forty-two years. Certainly, it was unforeseen that Modell would change what remained of that interest – *after* the sale of the Ravens was announced and *after* the complaint was filed – into an indirectly owned *de minimis* interest with no voting rights and no market risk. But that is what has happened. Modell now owns the following: (i) a 65% voting interest in a closely held family corporation (MSLP, Inc.) that acts as the 1% managing member of another limited liability company (Nevermore, LLC), and (ii) a 100% voting interest in a corporation (BRI) that owns the 99% non-voting interest in Nevermore. In turn, Nevermore holds a purported 1% non-voting interest in the limited partnership that operates the Ravens (BRLP). Nevermore's purported 1% interest is subject to stringent contractual restrictions on transferability as well as Puts and Calls and an "Irrevocable Voting Proxy," all in favor of BFC, the 99% owner of BRLP.

Modell's claim that Nevermore's *de minimis* interest in the Ravens is substantial enough to vitiate the Plaintiffs' rights to their finder's fee thwarts the intentions of the parties and dishonors the Plaintiffs' reasonable expectations, the very situation against which the implied covenant of good faith and fair dealing is designed to protect.

(iv)    Equitable Lien

Modell and Andrews implicitly intended that Modell's stock interest in the Cleveland Browns and any proceeds received by Modell as a consequence of its partial or complete sale would serve as security for the payment of the finder's fee obligation. *See Landskroner v.*

16

*Landskroner*, 797 N.E.2d 1002, 1014 (Ohio Ct. App. 2003) ("The salient features of an equitable lien, therefore, require (1) a debt, duty or obligation; (2) an identifiable res; and (3) an express or implied intent that the property serve as security for payment of a debt or obligation.").

Modell has, through a number of restructurings and sale transactions, divested essentially all of his stock interest in the football team, both by transferring it to his wife and by selling it for cash to entities controlled by Bisciotti. Modell would be unjustly enriched if he were allowed to transfer his remaining stock interest and not pay the Trust the finder's fee of 5% of the net gain he and his family will have recognized from the complete divestiture of Modell's interest in the team. *See Syring v. M.A. Sartorious*, 277 N.E.2d 457, 459 (Ohio Ct. App. 1971) ("Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises.") (quoting *Restatement, Restitution* § 161). Accordingly, the Trust is entitled to an equitable lien on Modell's remaining interest in the team and the proceeds received by Modell from prior sales of portions of his interest.

Fourth, a preliminary injunction will not in any way adversely affect the public interest. The injunction would freeze only a relatively small portion of a private individual's vast personal fortune. If anything, the public interest would be served by this injunction because public policy strongly favors the enforcement of contracts between private parties. *See Ratchford v. Proprietors' Ins. Co.*, 546 N.E.2d 1299, 1305 (Ohio 1989) ("The right and freedom to contract is an inalienable right which existed prior to, and independent of, government. The power of the parties to contract as they please for lawful purposes remains a basic principle of our legal system."); *see also Rudy March v. Christian Assembly Church of Warren, Ohio*, 1981 WL 4368,

17

*3. unreported (Ohio Ct. App. 1981). This most fundamental of rights, so vital to the public, would be undermined if Modell is allowed to avoid his obligations under the Letter Agreement.

## CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction enjoining Defendant to maintain under his direct ownership and control during the pendency of this action at least $21.5 million of the proceeds received from the sale of his interests in the Baltimore Ravens Limited Partnership, or liquid assets of an equivalent value, so that those funds or assets will be available to satisfy any judgment in Plaintiffs' favor.

December 30, 2005

_____
Mark R. Koberna, Esq. (0038985)
Daniel D. Domozick, Esq. (0025040)
SONKIN & KOBERNA CO., L.P.A.
55 Public Square, Suite 1660
Cleveland, Ohio  44113
216-861-6833 (telephone)
216-781-6415 (facsimile)
*Attorneys for Plaintiffs*
Thomas E. Minogue, Herman H. Tarnow
and Jane F. Sims, Co-Trustees of
The Phyllis Andrews Family Trust

OF COUNSEL:

Christopher M. Green, Esq.
Jacqueline B. Friedland, Esq.
Melissa S. Kho, Esq.
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)

Neil McGinness, Esq.
McGINNESS, PAINTER & McGINNESS
Tower Press Building
1900 Superior Avenue
Suite 230
Cleveland, OH  44114
(216) 696-8440 (telephone)
(216) 696-0910 (facsimile)