# EXHIBIT
# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

THOMAS E. MINOGUE, TRUSTEE,        )
CO-TRUSTEE OF THE PHYLLIS          )
ANDREWS FAMILY TRUST, ET AL.,      )        CASE NO. 1:06cv0286
                                   )
            Plaintiffs,            )
vs.                                )        JUDGE PATRICIA GAUGHAN
                                   )
ARTHUR B. MODELL                   )
                                   )
            Defendant.             )

DECLARATION OF THOMAS E. MINOGUE
IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND THIS CASE TO
THE CUYAHOGA COUNTY COURT OF COMMON PLEAS

Thomas E. Minogue declares as follows:

1.      I am an attorney admitted to practice before the Courts of the State of

Connecticut, and I have served as a Co-Trustee of the Phyllis Andrews Family Trust (the

"Trust") since I was appointed to that position on April 8, 2003. I am a citizen of the state of

Connecticut and a resident of Fairfield, Connecticut.

2.      I submit this declaration in support of Plaintiffs' Motion to Remand this Case to

the Cuyahoga County Court of Common Pleas. I also submit this declaration to identify various

exhibits to which Plaintiffs refer in their Memorandum in Support of Plaintiffs' Motion to

Remand.

3.      The Trust Agreement for the Phyllis Andrews Family Trust grants the Co-

Trustees full power to manage and control the Trust and to sue on its behalf.

4.      I was a Co-Trustee of the Trust with Thomas O. Callaghan when, on May 23,

2003, Mr. Callaghan and I first sued Mr. Modell in the Cuyahoga County Court of Common

Pleas on behalf of the Trust. Before that lawsuit was filed, Mr. Callaghan and I reviewed and approved the Complaint and agreed to its filing.

5.      That lawsuit, *Minogue, et. al v. Modell* (hereinafter "*Minogue I*"), was removed by Mr. Modell to the United States District Court for the Northern District of Ohio and transferred to the United States District Court for the District of Maryland.

6.      While *Minogue I* was pending, I learned that Mr. Callaghan had been diagnosed with cancer.

7.      On July 22, 2005, the district court in Maryland granted Mr. Modell summary judgment in *Minogue I* – not on the merits of our claims, but on the ground that we had failed to "establish" that Mrs. Andrews transferred the Letter Agreement from her husband's estate to herself before she transferred it from herself to the Trust. Therefore, according to the district court, we had not established that the Trust had standing to bring its claims.

8.      After the Maryland district court entered summary judgment for Mr. Modell in *Minogue I* on standing grounds, Mr. Callaghan and I determined that the Trust should cure the standing problem identified by the court and continue to press its claims against Mr. Modell for the finder's fee owed to Mr. Andrews, the Trust's predecessor-in-interest.

9.      On September 19, 2005, Mrs. Andrews executed documents reconfirming and ratifying (i) the transfer of the Letter Agreement from her deceased husband's estate to herself, and (ii) the transfer of the Letter Agreement from herself to the Trust.

10.     Sometime after September 8, 2006, Mr. Callaghan decided that due to his health problems, it would not be in the best interests of the Trust or himself and his family for him to continue as a Co-Trustee. Accordingly, he told me he intended to resign as Co-Trustee after an appropriate replacement Co-Trustee could be located and appointed.

2

11.     I did not want to serve as the sole Trustee, both because I did not want to bear all the responsibility for Trust administration, and because there would be a lack of continuity in the administration of the Trust if I were suddenly unable to continue as a Trustee for any reason.

12.     As a consequence of discussions between Mr. Callaghan and me, and after consideration of advice from counsel, we decided to replace Mr. Callaghan with two Co-Trustees to avoid any possibility of a deadlock in future votes among Co-Trustees. Although Mr. Callaghan and I had never seriously disagreed over Trust-related issues, I was concerned that such unanimity may not exist in the future between me and any single replacement Co-Trustee.

13.     Mr. Callaghan and I also decided that it would be in the Trust's best interests to appoint as Co-Trustees attorneys who are well-versed in the respective probate laws of Maryland and Florida, the two states in which Mr. Modell's estate likely will be probated. I understand that Mr. Modell has engaged in extensive estate planning and financial restructuring in which he has transferred substantial portions of his assets to other members of his family, and he has refused to make any provision to ensure that he or his estate will be able to satisfy any potential judgment in the Trust's favor.

14.     In order for the Trust to be well equipped to respond to the consequences of Mr. Modell's estate planning, Mr. Callaghan and I, with the assistance of counsel, selected as replacement Co-Trustees Ms. Jane Sims, an experienced Trusts and Estates attorney with a broad knowledge of Maryland Trust and Estates law, and Herman Tarnow, a family law practitioner and long-time friend of the Andrews family with a solid knowledge of Florida Trust and Estates law reinforced during his recent and successful preparations to join the Florida Bar.

15.     After the new Co-Trustees were appointed and Mr. Callaghan resigned, Ms. Sims, Mr. Tarnow and I reviewed and approved the Complaint and Motion for Preliminary Injunction

3

in this matter before they were filed, and we also reviewed and approved all accrued attorney and expert fees.

16.     If a majority of the current Co-Trustees had not approved the Complaint and Motion for Preliminary Injunction in this matter, those documents would not have been filed. In fact, the current Co-Trustees unanimously approved the filing of the Complaint and Motion for Preliminary Injunction.

17.     Attached as Exhibit A to this declaration is a true and correct copy of the Trust Agreement for the Phyllis Andrews Family Trust, dated December 27, 1999.

18.     Attached as Exhibit B to this declaration is a true and correct copy of the documents pursuant to which Mr. Callaghan and I were appointed Co-Trustees of the Trust.

19.     Attached as Exhibit C to this declaration is a true and correct copy of excerpts from my deposition in *Minogue I*

20.     Attached as Exhibit D to this declaration is a true and correct copy of the Notice of Removal filed by Mr. Modell in *Minogue I.*

21.     Attached as Exhibit E to this declaration is a true and correct copy of the documents that Mrs. Phyllis Andrews executed on September 19, 2005, reconfirming and ratifying (i) the transfer of the Letter Agreement from her deceased husband's estate to herself, and (ii) the transfer of the Letter Agreement from herself to the Trust.

22.     Attached as Exhibit F to this declaration is a true and correct copy of the documents pursuant to which Ms. Sims and Mr. Tarnow were appointed Co-Trustees of the Trust and the document pursuant to which Mr. Callaghan resigned as a Co-Trustee of the Trust.

4

I declare under penalty of perjury that the foregoing is true and correct.

Dated:       New Canaan, Connecticut
             March *14*, 2006

                                          _____
                                          Thomas E. Minogue

PAGE 6/6 * RCVD AT 3/14/2006 1:07:03 PM [Eastern Standard Time] * SVR:RIGHTFAX/6 * DNIS:8300 * CSID: * DURATION (mm-ss):01-44

# EXHIBIT A

# PHYLLIS ANDREWS
# FAMILY TRUST

THIS AGREEMENT, dated _12-23_ , 1999, between PHYLLIS ANDREWS, of South Salem, New York, as Grantor, and VINCENT S. ANDREWS, of South Salem, New York, and ROBERT L. ANDREWS, of South Salem, New York (hereinafter collectively called "my Trustees"),

## W I T N E S S E T H:

In order to fund the trust, I deliver and assign to my Trustees the property specified in Schedule A to this Agreement. My Trustees acknowledge receipt of the property and agree to hold it, in trust, together with any property added to any trust, as follows:

### Article I. Trust for Descendants.

**A.    Distribution of Trust Funds.** My Trustees shall pay or apply all or any part of the net income of the trust to or for the benefit of my descendants and their spouses, in such proportions, equal or unequal or all to one person, as my Trustees in their discretion consider advisable. In addition, my Trustees are authorized in their discretion to pay or apply to or for the benefit of my grandchildren, all or any part of the trust principal that my Trustees in their discretion consider advisable for the grandchild's maintenance in health and reasonable comfort, complete education (including preparatory, college, postgraduate and professional training), or support in the grandchild's accustomed manner of living, with no duty to equalize such payments or applications among beneficiaries. Any undistributed income shall be added to principal.

**B.    Termination of Article I Trust.** My Trustees at any time or times in their discretion may dispose of all or any part of the remaining assets of the trust under this Article pursuant to Article II of this Agreement.

P00133

**Article II. Lifetime Trusts for Descendants.** My Trustees shall divide any property to be disposed of pursuant to Article II into separate shares, per stirpes, with respect to my then living descendants, and dispose of such shares as follows:

My Trustees shall hold the share of each descendant of mine (hereinafter referred to as the "Beneficiary") in a separate trust and shall pay or apply all or any part of the net income therefrom to or for the benefit of the Beneficiary, the Beneficiary's descendants, and the Beneficiary's spouse, in such proportions, equal or unequal or all to one person, as my Trustees in their discretion consider advisable. In addition, my Trustees are authorized in their discretion to pay or apply to or for the benefit of the Beneficiary, the descendants of the Beneficiary and the Beneficiary's spouse all or any part of the trust principal that my Trustees in their discretion consider advisable, with no duty to equalize such payments among eligible beneficiaries. Any undistributed income shall be added to trust principal.

Any trust principal remaining at the death of the Beneficiary shall be distributed to or in trust for the benefit of such persons or organizations, upon such conditions and terms, as the Beneficiary shall direct and appoint in an inter vivos instrument filed with my Trustees or by a Will (dated subsequent to all such inter vivos instruments) expressly referring to and exercising this power; provided, however, that this power shall not be exercisable to any extent for the benefit of the Beneficiary, his or her estate, his or her creditors or the creditors of his or her estate. Any trust principal not effectively so appointed shall be distributed to the Beneficiary's then living descendants, per stirpes, or, if none, to the then living descendants, per stirpes, of his or her nearest ancestor who was a descendant of mine and who has descendants then living, or, if none, to my then living descendants, per stirpes; provided, however, that any such property thereby distributable to a person who is the Beneficiary of a trust under this Article shall instead be added to the principal of such trust; and provided further, however, that any

-2-

P00134

such property thereby distributable to a person who is not the Beneficiary of a trust under this Article shall instead be held in a separate trust for such person pursuant to this Article.

**Article III. Discretionary Termination of Trust.** I recognize that there may be circumstances in which it is not in the best interests of the income beneficiary of a trust established under this Agreement to continue the trust, taking into account all relevant factors, including the costs of administration and any tax benefits or lack thereof. Accordingly, my Trustees are authorized in their discretion and for any reason which they deem sufficient to terminate the trust and distribute any remaining trust property to the income beneficiary, or, if there is more than one income beneficiary, to any one or more of the income beneficiaries in such proportions as my Trustees consider advisable. In exercising their discretion, my Trustees shall have no obligation to consider the interests of any other person in the trust.

**Article IV. Additional Dispositive Provisions.**

**A.     Family Disaster.** If the principal of any trust established under this document is not effectively disposed of by the foregoing provisions of this document, such property shall be distributed to those persons to whom and in those proportions in which my Administrator would have been required to distribute the same had I died intestate, unmarried, a resident of New York, and possessed thereof immediately after the termination of such trust.

**B.     Withdrawal of Contributions to Trust Under Article I.** The following persons who are living on the date of any lifetime transfer to a trust under this Agreement shall be immediately entitled to withdraw from the trust an amount equal to the fair market value of any such transfer which is treated as a gift for federal gift tax purposes (a "contribution"), subject to the provisions which follow, except as modified in writing by the donor prior to or at the time of the contribution giving rise to those withdrawal rights.

-3-

P00135

1.    Each of my descendants and their spouses shall have the right to withdraw (i) the maximum amount allowable to a donor as an annual exclusion for federal gift tax purposes, or (ii) in the case of a married donor, twice said amount, reduced as provided in subsection 2 of this section.

2.    The amount that any descendant of mine may withdraw under subsection 1 of this section shall be reduced by the amounts given to that descendant or which that descendant could withdraw from all irrevocable trusts as a result of prior gifts by the donor and the donor's spouse to that descendant or those trusts during the calendar year that qualify for the federal gift tax annual exclusion.

3.    My Trustees shall give reasonable notice of the right of withdrawal and the conditions under which it may be exercised to each person entitled to make a withdrawal or, if such person is under a legal disability, to such person's legal representative or natural guardian, other than the person making the contribution (such person's "legal representative"). My Trustees' determination of the amount subject to any right of withdrawal shall be conclusive.

4.    A right of withdrawal shall be exercisable only by delivery to my Trustees of a written instrument signed by the person holding such right, or such person's legal representative, exercising the right. Any right of withdrawal may be exercised in anticipation of the creation of that right, but any anticipatory exercise shall be effective only as to withdrawal rights created in the calendar year in which such instrument is delivered to my Trustees.

5.    On December 31 of each calendar year, the aggregate value of each person's exercised cumulative rights of withdrawal that are attributable to lifetime gifts made to the trust prior to December 1 of such year shall be reduced by an amount equal to five percent (5%) of the fair market value of the trust principal as of December 31 of such year, and such rights shall continue with respect to any such excess and shall not

-4-

P00136

terminate until and to the extent that termination does not exceed the greater of such amounts in any one calendar year.

6.    Rights of withdrawal pursuant to this Article shall have priority over (i) distributions of trust principal under any other Article of this Agreement and (ii) the exercise of a power of appointment under any other Article of this Agreement. Failure to exercise a right of withdrawal shall not increase the amount of any other person's right of withdrawal. All unexercised rights of withdrawal held by any person under this section shall be extinguished and shall lapse upon the death of such person.

7.    The withdrawal rights of any class of persons which exceed the contribution subject to such rights shall be reduced equally.

8.    My Trustees may satisfy an exercised right of withdrawal by making a distribution in cash or in kind, or partly in each.

C.    **Withdrawal of Contributions to Trusts Under Article II.** The following persons who are living on the date of any lifetime transfer to a trust under Article II of this Agreement shall be immediately entitled to withdraw from such trust an amount equal to the fair market value of any such transfer which is treated as a gift for federal gift tax purposes (a "contribution"), subject to the provisions which follow, except as modified in writing by the donor prior to or at the time of the contribution giving rise to those withdrawal rights.

1.    Withdrawals shall be made in the following order of priority with respect to each donor's aggregate contributions to the trust during the calendar year:

a)    The Beneficiary of such trust shall have the right to withdraw (i) the maximum amount allowable to a donor as an annual exclusion for federal gift tax purposes, or (ii) in the case of a married donor whose gifts to such trust exceed the withdrawals permitted under (a) (i), twice said amount, reduced as provided in subsection 2 of this section.

-5-

P00137

b)       Each of the descendants and the spouse of the Beneficiary of such trust shall have the right to withdraw (i) the maximum amount allowable to a donor as an annual exclusion for federal gift tax purposes, or (ii) in the case of a married donor whose gifts to such trust exceed the withdrawals permitted under (a) and (b) (i), twice said amount, reduced as provided in subsection 2 of this section.

2.       The amount that each person may withdraw under subsection 1 of this section shall be reduced by the amounts given to such person or which such person could withdraw from all irrevocable trusts as a result of prior gifts by the donor and the donor's spouse to such person or those trusts during the calendar year that qualify for the federal gift tax annual exclusion.

3.       My Trustees shall give reasonable notice of the right of withdrawal and the conditions under which it may be exercised to each person entitled to make a withdrawal or, if such person is under a legal disability, to such person's legal representative or natural guardian, other than the person making the contribution (such person's "legal representative"). My Trustees' determination of the amount subject to any right of withdrawal shall be conclusive.

4.       A right of withdrawal shall be exercisable only by delivery to my Trustees of a written instrument signed by the person holding such right, or such person's legal representative, exercising the right. Any right of withdrawal may be exercised in anticipation of the creation of that right, but any anticipatory exercise shall be effective only as to withdrawal rights created in the calendar year in which such instrument is delivered to my Trustees.

5.       On December 31 of each calendar year, the aggregate value of each person's unexercised cumulative rights of withdrawal that are attributable to lifetime gifts made to the trust prior to December 1 of such year shall be reduced by an amount equal to five percent (5%) of the fair market value of the trust principal as of December 31

-6-

P00138

of such year, and such rights shall continue with respect to any such excess and shall not terminate until and to the extent that termination does not exceed the greater of such amounts in any one calendar year.

6.    Rights of withdrawal pursuant to this Article shall have priority over (i) distributions of trust principal under any other Article of this Agreement and (ii) the exercise of a power of appointment under any other Article of this Agreement. Failure to exercise a right of withdrawal shall not increase the amount of any other person's right of withdrawal. All unexercised rights of withdrawal held by any person under this section shall be extinguished and shall lapse upon the death of such person.

7.    The withdrawal rights of any class of persons which exceed the contribution subject to such rights shall be reduced equally.

8.    My Trustees may satisfy an exercised right of withdrawal by making a distribution in cash or in kind, or partly in each.

D.    **Generation-Skipping Transfer Tax Provision.** Notwithstanding any other provision of this Agreement, I authorize my Trustees (other than any descendant of mine) to divide any trust into two separate trusts based on the fair market value of the trust assets at the time of the division, so that the federal generation-skipping transfer tax inclusion ratio for each such trust shall be either zero or one and to allocate additions to any trust so that all trusts or property with an inclusion ratio of zero shall be allocated to a trust with an inclusion ratio of zero and all trusts or property with an inclusion ratio of one shall be allocated to a trust with an inclusion ratio of one.

E.    **Children and Descendants.** The terms "child," "children," "descendant" and "descendants" as used in this document with regard to any person shall include (i) such person's present natural and adopted children and their present natural and adopted descendants and (ii) any children or other descendants of such person born after

-7-

P00139

the date of this document or legally adopted prior to attaining age eighteen (18) after the date of this document.

      **F.**    **Per Stirpes.** Whenever my fiduciaries are directed to distribute property to an individual's descendants "per stirpes," the property shall be divided into shares beginning with the first generation below such individual, whether or not there are members of such generation living at the time of distribution. Subdivision of shares for successive generations shall be made in the same manner. The meaning of the term "per stirpes" set forth in this section shall override the provisions of any state's law to the contrary.

      **G.**    **Definition of Incapacitated.** An individual shall be considered to be incapacitated if the individual is under a legal disability or by reason of illness or mental or physical disability is unable to give prompt and intelligent consideration to financial matters. The determination as to whether an individual is incapacitated shall be made by my Trustees other than the individual, or, if none, by the institution or individual designated to succeed the individual as Trustee, who may rely conclusively upon (1) the written opinion of the individual's primary physician, (2) the written opinion of any two physicians, or (3) the written order of a court appointing a Conservator or Guardian of the individual's person or property.

      **Article V. Appointment of Fiduciaries.**

      Each of THOMAS A. CHAMPION, of New Canaan, Connecticut, and TIMOTHY TENNEY, of Cold Spring, New York, shall be entitled to become a Trustee upon signing a written Acceptance of the responsibility as Trustee.

      If either of THOMAS A. CHAMPION or TIMOTHY TENNEY fails or ceases to act as Trustee, JOHN R. MUSICARO, JR., of Darien, Connecticut, is entitled to become a Trustee, upon his signing a written Acceptance of the responsibility as Trustee

-8-

P00140

My Trustees may appoint one or more additional Trustees or successor Trustees at any time.

Any individual Trustee may at any time appoint his or her successor as Trustee, unless the foregoing provisions of this Agreement effectively provide for his or her successor.

If JOHN R. MUSICARO, JR. or any successor to him fails or ceases to act as a fiduciary and fails to appoint his successor, the law firm of Cummings & Lockwood may appoint a successor fiduciary, including a member of such firm.

If a Trustee of any trust fails or ceases to act and the foregoing provisions of this Agreement do not effectively provide for a successor, a majority of the adult eligible income beneficiaries of any trust may appoint one or more successor Trustees of such trust.

My sons, VINCENT and ROBERT, shall have the right to remove any Trustee of any trust hereunder and to appoint one or more successor Trustees; provided, however, that both sons are living and competent and agree with such action and that any such successor Trustee would not be a related or subordinate party subservient to the wishes of any such son (within the meaning of section 672(c) of the Code) if such son were the grantor of such trust.

A majority of the adult eligible income beneficiaries of any trust, with the concurrence of a majority of the adult presumptive remaindermen of such trust, may remove any Trustee of such trust and appoint a Trustee or Trustees to succeed the removed Trustee, provided at least one (1) adult income beneficiary and one (1) adult presumptive remainderman join in the exercise of such power.

Any fiduciary is authorized to resign at any time without court approval. The resignation, appointment or revocation of appointment of a Trustee may be made by the person authorized to take such action by delivery of an acknowledged instrument to my

-9-

P00141

Trustees then acting and any Trustee to be appointed, or, if none, to a court having jurisdiction over the trust. Any appointment of a Trustee may be conditioned to commence or cease upon a future event and may be revoked or modified at any time before such future event has occurred. Unless otherwise expressly provided, any power to appoint a Trustee shall permit appointment of an individual, bank or trust company as such fiduciary, and shall be exercised by the parent (or, if none, the legal representative) of any minor and the legal representative of any incapacitated person holding such power. A determination that any individual fiduciary acting hereunder is incapacitated shall be deemed a resignation by that individual fiduciary as of the date of the determination.

### Article VI. Administrative Provisions.

**A.    Irrevocable Trust.** This Agreement and any trust created hereunder shall be irrevocable and, except as otherwise specifically provided in this Agreement, shall not be subject to alteration or amendment in any respect.

**B.    Additions to Trust.** Any person may add property to any trust under this Agreement by lifetime gift or by transfer taking effect at death, provided such property is acceptable to my Trustees.

**C.    Discretionary Distributions Limited to Independent Trustee.** Notwithstanding any other provision of this document to the contrary, no Trustee who is not an "Independent Trustee" (as defined in this section) shall participate in any decision regarding any discretionary accumulation, payment, application or allocation of income or principal or termination of a trust unless such decision is limited by an ascertainable standard as defined in section 2041(b) of the Code. A Trustee is an Independent Trustee with regard to any such discretionary decision to accumulate or distribute income only if such Trustee is not a current eligible income beneficiary of such trust, and with regard to any such discretionary decision to distribute principal or terminate a trust only if such Trustee is not a current eligible beneficiary of the income of such trust and has not been

-10-

P00142

appointed as a Trustee by any such beneficiary other than pursuant to a power to appoint which requires that at least one adult income beneficiary and one other adult presumptive remainderman of such trust join in the exercise of such power. All such decisions shall rest exclusively in the discretion of the other Trustees who are Independent Trustees. If no Independent Trustee is then acting and there is no other provision of this Agreement by which an Independent Trustee can be appointed, then (1) JOHN R. MUSICARO, JR., or if he fails to act, (2) the law firm of Cummings & Lockwood or, if they fail to act, a majority of the adult income beneficiaries (of which there must be one) and a majority of the adult presumptive remaindermen (of which there must be one other) of such trust may appoint an Independent Trustee, or, if no Independent Trustee is so appointed, then any adult beneficiary may request a court having jurisdiction over such trust to appoint an Independent Trustee.

In addition, I, whether acting as a Trustee hereunder or otherwise: (1) shall have no right or power to vote any stock or other security of a controlled corporation as defined in section 2036(b) of the Code comprising a part of any trust estate; and (2) shall have no right to participate in any decision regarding the discretionary payment or application of principal or income to or for the benefit of any beneficiary. All such voting rights, powers, discretions and authorities shall be vested exclusively in and exercisable by the other Trustee or Trustees, if any, then acting hereunder.

**D. Legal Obligations Not Relieved.** No provision of this Agreement shall be construed as relieving any person of his or her legal obligations, including the obligation to support any beneficiary hereunder, and no part of the income or principal of any trust hereunder and no exercise of a power of appointment granted herein shall be used to satisfy any such legal obligations.

**E. Consideration of Other Resources of Beneficiaries.** In exercising their discretion to distribute trust funds to any beneficiary, my fiduciaries may (but shall

-11-

P00143

not be required to) take into consideration any other resources reasonably available to such beneficiary.

F.     **Rule Against Perpetuities.** I realize that the law imposes certain limits upon the duration of trusts, and accordingly, regardless of any other provision of this Agreement, each trust shall terminate not later than twenty (20) years after the death of all my descendants now living, and my Trustees shall distribute the trust property to the income beneficiary, or, if there is more than one income beneficiary, to any one or more of the income beneficiaries in such proportions as my Trustees consider advisable.

G.     **Distributions to Minors.** If my fiduciaries are authorized or required to distribute property to a beneficiary who is then a minor, and my fiduciaries do not believe that an immediate distribution is in the beneficiary's best interests, they may instead distribute such property to any adult caring for the beneficiary or to the beneficiary's Guardian or Custodian under a Uniform Gifts or Transfers to Minors Act.

H.     **Informal Accountings.** My Trustees may provide to each eligible income beneficiary who is not then incapacitated statements of trust transactions at such time and in such form as they consider advisable. If all such beneficiaries either give written approval of the statement or fail to notify my Trustees in writing of any objection within thirty (30) days of the mailing of the statement to the beneficiaries, the statement shall be final, binding and conclusive on all persons interested in the trust.

I.     **Optional Trusts to Age Twenty-One.** If property is distributable outright to a beneficiary who is then under the age of twenty-one (21) years, my fiduciaries may hold such property in trust and pay or apply all or any part of the net income and principal to or for the benefit of such beneficiary, as they consider advisable. Undistributed income shall be added to trust principal. Any remaining trust principal shall be paid to such beneficiary when he or she attains the age of twenty-one (21) years or, if such beneficiary dies prior to attaining such age, then to his or her estate.

-12-

P00144

**J.    Elections.** I authorize my fiduciaries, in their sole discretion and without the order or approval of any court, to make or not make any election, allocation or other discretionary decision permitted under the provisions of any tax law in effect from time to time, and to make or not make equitable adjustments of interests of beneficiaries in light of such decisions, provided, however, that any adjustment necessary to avoid reducing any marital deduction under any tax law shall be made. No beneficiary shall have any rights against my fiduciaries by reason of any such decisions or adjustments. My fiduciaries may also allocate property (or the right to receive property) which is subject to estate tax and federal income tax as income in respect of a decedent to principal, to income, or in part to each.

**K.    Definition of Code.** Any reference to the "Code" shall mean the Internal Revenue Code of 1986, as amended, and as interpreted by the Treasury Regulations thereunder (including Proposed Regulations), any provisions amendatory thereof, supplemental thereto, or substituted therefor.

**L.    Requirement of Survival.** No beneficiary shall be considered to have survived the event terminating any trust and be entitled to any trust funds on that event unless such beneficiary survives for at least ninety (90) days after that event.

**M.    Disclaimers.** Any person (or his or her attorney-in-fact or legal representative, including the Executor, Administrator, Conservator, or other personal representative of his or her estate) or entity, without approval of any court, may irrevocably disclaim, renounce or release, in whole or in part, any interest, benefit, right, privilege or power granted to such person or entity under this document. My Trustees with regard to any interest in property passing to any trust under this document (including a beneficial interest in a trust) or any fiduciary power under this document, without the approval of any court, may irrevocably disclaim, renounce or release, in whole or in part, any such interest, benefit, right, privilege or power. A disclaimer shall be in writing,

-13-

P00145

signed by the fiduciary, person or entity making the disclaimer before two disinterested witnesses and acknowledged before a Notary Public (or other proper official for taking acknowledgements) and shall also comply with any additional requirements of local, state and federal law regarding the formalities of execution and delivery.

N.     **Powers of Appointment.** Any power of appointment created under this Agreement may be exercised only by an express reference to the power which includes my name. A person exercising a power of appointment may appoint trust funds outright or in trust. The choice of terms, trustees and jurisdiction of any trust shall be entirely within the discretion of the person having the power of appointment, except to the extent otherwise expressly provided in this Agreement. No power of appointment shall be exercisable by a beneficiary over any property or its proceeds added to a trust by means of a disclaimer by such beneficiary.

O.     **Investment Counsel.** My fiduciaries may employ investment counsel; consult with such counsel on any matters relating to the retention, sale, purchase, investment, or reinvestment of securities or other property; delegate to such investment counsel my fiduciaries' investment authority; and pay such investment counsel reasonable compensation for its services in addition to the regular compensation of my fiduciaries. My fiduciaries may act upon or refrain from acting upon the advice of such investment counsel in whole or in part, and to the extent my fiduciaries follow the advice of such counsel or rely upon such investment counsel's exercise of delegated investment authority, my fiduciaries shall not be liable for any action taken or omitted, except in the case of willful misconduct.

P.     **Delegation.** Except as otherwise provided herein, any fiduciary may delegate to the other fiduciaries the right to exercise any power (discretionary, administrative or otherwise) and may revoke the delegation at any time by delivery of an acknowledged instrument to such other fiduciaries.

-14-

P00146

Q. **Trustee Relieved From Liability.** No individual Trustee who is a descendant of mine shall be liable for any mistake or error of judgment, or for any action taken or omitted, either by my Trustees or by any agent or attorney employed by my Trustees, or for any loss or depreciation in the value of the trust, except in the case of willful misconduct.

R. **Successor Trustee.** No Trustee has a duty to examine the transactions of any prior Trustee. Each Trustee is responsible only for those assets which are actually delivered to it.

S. **Governing Law.** The validity, construction and administration of this document and any trust hereunder shall be governed by the laws of New York.

T. **Definition of Trustee.** Except as otherwise provided herein, any Trustee who acts under this Agreement may exercise all of the rights, powers and discretions and shall be entitled to all of the privileges and immunities granted to the named Trustee. In this Agreement, I sometimes refer to my Trustees as "my fiduciaries." Any references in this Agreement to my Trustees or my fiduciaries shall include (unless otherwise expressly provided) all Trustees. No surety bond shall be required of any Trustee.

U. **Discretion of Trustee.** The Trustee shall have absolute discretion regarding the exercise of his powers, and such exercise shall be final and conclusive upon all persons.

V. **Closely Held Businesses.** This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business"). I realize that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds. Nonetheless, my fiduciaries shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the

-15-

P00147

business or the exercise of any power conferred upon my fiduciaries with respect to the business.

My fiduciaries shall have the following powers with respect to the business, in addition to any granted by law or elsewhere in this document.

1.     To retain and continue the business or any interest therein for such time as they consider advisable;

2.     To operate or participate in the operation of the business in the form of a corporation, partnership or proprietorship, or in any other form, whether or not in such form at my death;

3.     To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as officers and directors of the business; and to receive from the business compensation for their services in addition to their compensation as fiduciaries;

4.     To delegate all or any part of their power to supervise, manage or operate the business to such persons as they may select, including any director, officer, or employee of the business;

5.     To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as they consider advisable, including anyone who may be a beneficiary or fiduciary;

6.     To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as they consider advisable;

7.     To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as they consider advisable, and to sell the business to anyone who is a beneficiary or fiduciary; and

-16-

P00148

8.    To exercise with respect to the retention, continuance, and disposition of such business all the rights and powers which I would have were I to make the decision at the time of such exercise.

W.    **Spendthrift Provision.**  The income and principal of any trust hereunder shall be used only for the personal benefit of the designated beneficiaries of the trust, and no distributions or expenditures of trust assets shall be made except to or for the benefit of a trust beneficiary.  To the fullest extent permitted by law, the interest of each trust beneficiary shall not be subject to any form of pledge, assignment, sale, attachment, garnishment, execution, or other form of transfer.

X.    **Virtual Representation.**  I direct that in any proceeding relating to any trust created hereunder, service of process upon any person under a disability shall not be made when another person not under a disability is a party to the proceeding and has the same interest as the person under the disability.

Y.    **Reacquisition of Trust Principal.**  Notwithstanding any provision of this Agreement to the contrary, I, whether or not I am acting as a Trustee, shall at any time have the power, exercisable individually in a nonfiduciary capacity and without the approval or consent of any person or entity in a fiduciary capacity, to reacquire the trust principal (other than voting stock or other securities of a controlled corporation as defined in section 2036(b) of the Code) of any trust under Article I or Article II by substituting other property of an equivalent value at the time of reacquisition.  This power may be released by me at any time by filing an acknowledged instrument of release with my Trustees.

Z.    **Management Powers of Trustee.**  In addition to any powers conferred upon them by law and without the order or approval of any court, except as otherwise provided herein, I authorize and empower my Trustees:

-17-

P00149

(1) To retain, acquire, or sell any variety of real or personal property (including any discretionary common trust fund of any corporate fiduciary acting under this document, mutual funds, covered and uncovered stock options, insurance policies on my life and investments in foreign securities), without regard to diversification and without being limited to the investments authorized for trust funds; (2) to exercise stock options; (3) to enter into agreements for the sale, merger, reorganization, dissolution or consolidation of any corporation or properties; (4) to manage, improve, repair, sell, mortgage, lease (including the power to lease for oil and gas), pledge, convey, option or exchange any property and take back purchase money mortgages thereon, without court order; (5) to make distributions in cash or in kind, or partly in each, and, in the discretion of such fiduciaries, to allocate particular assets or portions thereof to any one or more beneficiaries, without any duty to distribute any asset pro rata among beneficiaries, and to do so without regard to the income tax basis of specific property allocated to any beneficiary, provided that such property shall be valued for purposes of distribution at its value on the date of distribution; (6) to maintain custody or brokerage accounts (including margin accounts) and to register securities in the name of a nominee; (7) to compromise and settle claims (including those relating to taxes); (8) to borrow funds from any person or corporation (including a Trustee) and pledge or mortgage trust assets to secure such loans; (9) to extend, renew or renegotiate loans or guarantees; (10) to lend money to or for the benefit of any person beneficially interested hereunder (including a guardian), (11) to employ attorneys, accountants, investment counsel, custodians, brokers and other agents to assist in the administration of estate or trust property and to delegate discretionary powers (including the granting of a power of attorney and the power to be a signer on any estate or trust financial accounts) to such persons; (12) to vote and give proxies to vote shares of stock; (13) to make joint investments in property, real or personal; to enter into and act as a general or limited partner in general or limited partnerships; to establish corporations

-18-

P00150

(including limited liability companies) of any kind; and to transfer assets to any such joint ventures, partnerships or corporations; (14) to divide any trust into separate trusts based on the fair market value of the trust assets at the time of the division; and (15) if there is more than one trust established under this document, to administer such trusts as a single fund.

AA.    **Execution and Identification of Agreement.**  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed an original and may be referred to as the "Phyllis Andrews Family Trust."

IN WITNESS WHEREOF, PHYLLIS ANDREWS, the Grantor, and VINCENT S. ANDREWS and ROBERT L. ANDREWS, my Trustees, have hereunto set their respective hands and seals as of the day and year first above written.

Witness

Witness

Witness

Witness

Witness

PHYLLIS ANDREWS
Grantor

VINCENT S. ANDREWS
Trustee

ROBERT L. ANDREWS
Trustee

-19-

P00151

STATE OF Connecticut          )
                              ) ss: Darien
COUNTY OF Fairfield           )

    On the 21st day of December in the year 1999 before me, the undersigned, a Notary Public in and for said State, personally appeared PHYLLIS ANDREWS, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                     Notary Public
                                       Commissioner of the Superior Court

                                       SONYA NEILSEN
                                       NOTARY PUBLIC
                                  My Commission Expires July 31, 2001

STATE OF Connecticut          )
                              ) ss: Darien
COUNTY OF Fairfield           )

    On the 21st day of December in the year 1999 before me, the undersigned, a Notary Public in and for said State, personally appeared VINCENT S. ANDREWS, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                       Notary Public
                                       Commissioner of the Superior Court

                                       SONYA C. NEILSEN
                                       NOTARY PUBLIC
                                  My Commission Expires July 31, 2001

P50152

STATE OF *Connecticut* )
        ) ss: *Danbury*
COUNTY OF *Fairfield* )

  On the 29th day of *December* in the year 1999 before me, the undersigned, a Notary Public in and for said State, personally appeared ROBERT L. ANDREWS, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

          _____
          Notary Public
          Commissioner of the Superior Court

           SONYA NEILSEN
           NOTARY PUBLIC
        My Commission Expires July 31, 2001

-21-

P50153

## SCHEDULE A

FIVE DOLLARS .................................................................................. $ 5.00

StmLib1.732953.1 12/22·99

# EXHIBIT
# B

## Appointment of Trustees

WHEREAS,

1. Phyllis Andrews, as Grantor, by a Trust Agreement dated December 27, 1999 (the "Agreement") with Vincent S. Andrews and Robert L. Andrews, as Trustees, established the Phyllis Andrews Family Trust.

2. Article V of the Agreement provides that the Trustee may appoint one or more additional Trustees at any time by delivery of an acknowledged instrument to the Trustees then acting and any Trustee to be appointed.

3. Vincent S. Andrews and Robert L. Andrews are acting as Trustees and wish to appoint Thomas O. Callaghan and Thomas E. Minogue as additional Trustees.

NOW THEREFORE,

The undersigned Vincent S. Andrews and Robert L. Andrews as Trustees of the Phyllis Andrews Family Trust hereby appoint Thomas O. Callaghan and Thomas E. Minogue to act as Trustees of the Phyllis Andrews Family Trust.

_____
Vincent S. Andrews

_____
Robert L. Andrews

STATE OF CONNECTICUT     )
                         )
COUNTY OF FAIRFIELD      )

The foregoing instrument was acknowledged before me this 8th day of April 2003 2002, by Vincent S. Andrews, who is personally known to me or who has produced a driver's license as identification.

SONYA NEILSEN
NOTARY PUBLIC
My Commission Expires July 31, 2006

_____
Notary Public

P00173

STATE OF CONNECTICUT )

COUNTY OF FAIRFIELD )
                     )

The foregoing instrument was acknowledged before me this _8ᵗʰ_ day of _April 2003_ 2002, by Robert L. Andrews, who is personally known to me or who has produced a driver's license as identification.

SONYA NEILSEN
NOTARY PUBLIC
My Commission Expires July 31, 2006

_____
Notary Public

The undersigned, Thomas O. Callaghan, hereby acknowledges delivery of the foregoing Appointment of Trustees and consents to act as a Trustee of the Phyllis Andrews Family Trust.

Dated:

_____
Thomas O. Callaghan

The undersigned, Thomas E. Minogue, hereby acknowledges delivery of the foregoing Appointment of Trustees and consents to act as a Trustee of the Phyllis Andrews Family Trust.

Dated:

_____
Thomas E. Minogue

Delivery of the foregoing Appointment of Trustees is hereby acknowledged by Vincent S. Andrews and Robert L. Andrews as Trustees.

_____
Vincent S. Andrews, Trustee

_____
Robert L. Andrews, Trustee

StmLib1:987774.1 03/28/03

P00174

# EXHIBIT C

Thomas Minogue

Page 1

1

2                      UNITED STATES DISTRICT COURT

3                         DISTRICT OF MARYLAND

4

5        THOMAS E. MINOGUE, Trustee and THOMAS O.

6     CALLAGHAN, Co-Trustee of the PHYLLIS ANDREWS

7     FAMILY TRUST, et al.,

8

9                     Plaintiffs,

10

11           vs.              No. 1:03-CV-03391

12

13     ARTHUR B. MODELL,

14

15                     Defendant.

16     - - - - - - - - - - - - - - - - - - - - - - - )

17

18

19              DEPOSITION OF THOMAS MINOGUE

20                    Armonk, New York

21                  Monday, June 21, 2004

22

23
       Reported by:
24     Alison M. Pisciotta
       JOB NO. 161832
25

Case 7:07-cv-03368-SCR    Document 8-5    Filed 07/03/2007    Page 35 of 51
Case 1:06-cv-00286-PAG    Document 15    Filed 03/17/2006    Page 2 of 8
Thomas Minogue

Page 2

```
1
2                    June 21, 2004
3                    1:05 p.m.
4
5        Deposition of THOMAS MINOGUE, held
6    at the offices of Boies, Schiller &
7    Flexner, 333 Main Street, Armonk, New
8    York, pursuant to Notice, before Alison
9    M. Pisciotta, a Notary Public of the
10   State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2    A P P E A R A N C E S:
3        BOIES, SCHILLER & FLEXNER, LLP
4        Attorneys for Plaintiffs
5            333 Main Street
6            Armonk, New York 10504
7        BY: ANDREW HAYES, ESQ.
8
9        McGINNESS, PAINTER & McGINNESS, ESQS.
10       Attorneys for Plaintiffs -
11       Thomas E. Minogue, Trustee and
12       Thomas O. Callaghan, Co-Trustee
13       Of the Phyllis Andrews Family Trust
14           Tower Press Building
15           1900 Superior Avenue
16           Suite 230
17           Cleveland, Ohio 44114
18       BY: NEIL McGINNESS, ESQ.
19
20       HOGAN & HARTSON, LLP
21       Attorneys for Defendant
22           111 South Calvert Street
23           Baltimore, MD 21202
24       BY: DOUG NAZARIAN, ESQ.
25
```

Page 4

```
1
2        IT IS HEREBY STIPULATED AND AGREED,
3        by and between counsel for the
4    respective parties hereto, that the filing,
5    sealing and certification of the within
6    deposition shall be and the same are hereby
7    waived;
8        IT IS FURTHER STIPULATED AND AGREED
9    that all objections, except as to the form of
10   the question, shall be reserved to the time
11   of the trial;
12       IT IS FURTHER STIPULATED AND AGREED that
13   the within deposition may be signed before
14   any Notary Public with the same force and
15   effect as if signed and sworn to before the
16   Court.
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                    T. Minogue
2        T H O M A S   M I N O G U E, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6    EXAMINATION BY
7    MR. NAZARIAN:
8        Q   Please state your name and address
9    for the record.
10       A   Thomas E. Minogue.  80 Roberton
11   Crossing, Fairfield, Connecticut 06825.
12       Q   Good afternoon, Mr. Minogue.
13       A   Good afternoon.
14       Q   Thank you for coming today and for
15   putting up with the excitement occasioned by
16   my travel delays.
17       Have you ever had your deposition
18   taken before, sir?
19       A   Yes.
20       Q   On how many occasions?
21       A   Once, to the best of my recollection.
22       Q   In what kind of case were you
23   deposed, sir?
24       A   I was a defendant in a business
25   lawsuit with one of my brothers-in-law.
```

2 (Pages 2 to 5)

Thomas Minogue

Page 26

1                T. Minogue
2    past experience in serving as fiduciary to
3    trusts or other similar organizations?
4        A   Recognizing that it's possibly
5    subject to the approval of an appropriate
6    court.
7        Q   Have you had any discussion about
8    compensation with Mrs. Andrews, Vincent
9    Andrews, Junior or Robert Andrews?
10       A   No.
11       Q   How about with Mr. McGinness?
12       A   That's a privileged -- I claim the
13   privilege with respect to any discussions I
14   have had with my counsel.
15       MR. HAYES:  I feel terrible.  You got
16   in before me.
17       MR. NAZARIAN:  Let's mark this as
18   exhibit number one.  I think the
19   gentlemen across the table will know what
20   it is but what the heck.
21       MR. HAYES:  Oh.
22       (Defendant's Exhibit 1, Letter
23   agreement dated 2/4/63, marked for
24   identification, as of this date.)
25       Q   Mr. Minogue, the reporter has handed

Page 27

1                T. Minogue
2    you what's been marked as exhibit number one,
3    it's your deposition, sir.
4        A   Yes.
5        Q   Do you recognize this document?
6        A   Yes.
7        Q   Could you tell me what it is, please?
8        A   It's the letter agreement dated
9    February 4, 1963 between Mr. Andrews and Mr.
10   Modell with respect to the subject matter of
11   this litigation.
12       Q   Do you recognize Mr. Andrews'
13   signature on the second page as his, would
14   you be in a position to recognize it?
15       A   I certainly seen his signature.
16   Sitting here today, I cannot swear to the
17   fact that that's his signature.  It certainly
18   looks familiar to the signature I have seen.
19       Q   Did you, sir, in your capacity as
20   trustee to the Phyllis Andrews Family Trust,
21   participate in the decision to bring this
22   lawsuit?
23       A   Yes.
24       Q   Who else participated in that
25   decision?

Page 28

1                T. Minogue
2        A   Counsel, Mr. Callaghan.
3        Q   Anybody else?
4        A   Not with me.
5        Q   Did you have any conversations with
6    Vincent Andrews, Junior regarding the
7    decision whether or not to initiate this
8    lawsuit?
9        A   No.
10       Q   Did you have any conversations with
11   Robert Andrews regarding the decision whether
12   to initiate this lawsuit?
13       A   No.
14       Q   Did you have any conversations with
15   Phyllis Andrews regarding the decision
16   whether to initiate this lawsuit?
17       A   No.
18       Q   So is it fair to say, please answer
19   this only yes or no.
20       A   Don't tell me how to answer the
21   question.  Ask the question and I'll decide
22   how to answer it.
23       Q   All right then.  Is it fair to say
24   then, Mr. Minogue, the only conversations you
25   had relating to the decision whether to

Page 29

1                T. Minogue
2    initiate this lawsuit you had with Mr.
3    McGinness?
4        A   That's not fair to say.
5        Q   With who else then did you have
6    conversations regarding the decision to
7    initiate this lawsuit?
8        A   Mr. Hayes, Mr. Green, I believe.  Mr.
9    Callaghan.  I think that's it, to the best of
10   my recollection.
11       Q   Tell me what conversation you had
12   with Mr. Callaghan regarding the decision to
13   initiate this lawsuit.
14       A   Best of my recollection, Mr.
15   Callaghan and I concurred with the draft of a
16   complaint that had been sent to me and
17   because he was talking about it I presume to
18   him, with respect to the allegations set
19   forth in the complaint.
20       Q   Did you or to your knowledge Mr.
21   Callaghan --
22       MR. HAYES:  I'm sorry, you said
23   concurred.  You concurred or conferred?
24       THE WITNESS:  We both conferred and
25   concurred.  Thank you.

8 (Pages 26 to 29)

Thomas Minogue

Page 30

T. Minogue

1
2    Q   Did you, sir, or did Mr. Callaghan
3  conduct any sort of independent investigation
4  into the factual allegations contained in the
5  complaint that was filed in this lawsuit?
6    A   We certainly -- I certainly read the
7  complaint. I read the Exhibit 1 here. I
8  ascertained during the course of that review
9  the fact that requests had been previously
10  made of your client to supply certain
11  information in connection with events that
12  could have triggered the commission payments
13  set forth in the agreement. I think I saw
14  some letters to that effect.
15    Q   Were those documents that you
16  reviewed provided to you by counsel?
17    A   Yes.
18    Q   Did you review any materials in
19  connection with the decision to initiate this
20  lawsuit other than those provided to you by
21  counsel?
22    A   I'm sorry, I missed the first part of
23  your question.
24    Q   I will repeat it. In connection with
25  your participation in the decision to file

Page 31

T. Minogue

1
2  this lawsuit, did you review any documents
3  other than those provided to you by counsel?
4    A   I may have seen some press releases
5  with respect to Modell transactions. I don't
6  know if they were provided by counsel or not,
7  I just don't recall. It's possible. It's
8  more than likely that they were.
9    Q   More than likely they were provided
10  by counsel?
11    A   Yes.
12    Q   You are not normally in the habit of
13  reading the Baltimore papers, are you?
14    A   I used to be. I'm not anymore.
15    Q   Okay. Take a look please, Mr.
16  Minogue, at Exhibit Number 1.
17    A   Yes.
18    Q   Have you had occasion to discuss this
19  document ever with Phyllis Andrews?
20    A   No.
21    Q   I take it that you have met Phyllis
22  Andrews at some point?
23    A   Several times.
24    Q   When did you first meet her?
25    A   1960's.

Page 32

T. Minogue

1
2    Q   Over the time that has passed since,
3  roughly how many times do you think you have
4  met or seen Mrs. Andrews?
5    A   Certainly more than 20. Best I can
6  give you right now.
7    Q   That's fine. In what settings would
8  you have come into contact with Mrs. Andrews
9  in the time since you first met her?
10    A   Mostly social. I had occasion to see
11  her at the time of her husband's funeral. I
12  had occasion to see her at other events. I
13  guess you could characterize it as social
14  also. I believe she came to my mother's
15  funeral. I may be wrong about that. They
16  were friends.
17    Q   I won't hold you or her to that.
18  Other than social events and funerals, things
19  like that, have there been any other
20  occasions or settings in which you have come
21  in contact with Mrs. Andrews?
22    A   To the best of my recollection, no.
23    Q   Other than your service as trustee to
24  the Phyllis Andrews Family Trust, have you
25  done any sort of business or provided any

Page 33

T. Minogue

1
2  sort of legal counsel over the years to
3  Phyllis Andrews?
4    A   What was the first part of your
5  question?
6    Q   Other than your service as trustee to
7  the Phyllis Andrews Family Trust, have you
8  provided any sort of legal counsel or done
9  any sort of business with Phyllis Andrews in
10  the time since you met her?
11    A   No.
12    Q   Have you had occasion to discuss the
13  agreement that's Exhibit Number 1 with
14  Vincent Andrews, Junior?
15    A   I don't believe so.
16    Q   Have you had occasion to discuss the
17  agreement that is Exhibit Number 1 with
18  Robert Andrews?
19    A   No.
20    Q   Have you had occasion to discuss the
21  agreement that is Exhibit 1 with Mr.
22  Callaghan?
23    A   Yes.
24    Q   Tell me about those conversations.
25    A   What would you like to know about

9 (Pages 30 to 33)

Thomas Minogue

Page 54

T. Minogue

1
2  the trust would assume the obligation to pay
3  Kramon and Graham's bills in connection with
4  this lawsuit?
5      A  It's not unfair to say that.
6      Q  We will stop short of saying it is
7  fair to say that?
8      A  I don't know.
9      Q  Would it be possible, though, in your
10  view for the trust to assume obligations to
11  pay lawyers' bills without trustees' consent
12  to do so or direction to counsel or somebody
13  else?
14      A  You mean assuming an affirmative act
15  of acceptance?
16      Q  Let me ask it this way.  Would there
17  be anybody other than the trustees who would
18  have the authority to direct the trust to pay
19  Kramon and Graham's bills in this lawsuit?
20      A  Not to my knowledge.
21      Q  Only people that have access to the
22  checkbook are you, Mr. Callaghan and Mr.
23  McGinness, correct?
24      A  That's correct.
25      Q  Now the bills that have been made to

Page 55

T. Minogue

1
2  Kramon and Graham, the bills of Kramon and
3  Graham's that have been paid by the trust --
4      A  Yes.
5      Q  -- have been paid in the time since
6  you have assumed the role of trustee,
7  correct?
8      A  Yes.
9      Q  Now, I thought you testified, but
10  correct me if I misunderstood you, that you
11  have never yourself consented to or directed
12  that those bills be paid, correct?
13      A  That's not correct.
14      Q  All right.
15      A  If you are talking about Graham's
16  bills?
17      Q  Kramon and Graham's, yes, sir.
18      A  That's not correct.
19      Q  So you have agreed that the trust
20  would fund Kramon and Graham's bills?
21      A  Agreed and I've approved the bills as
22  submitted.
23      Q  But you did not participate in the
24  initial decision by the trust to assume that
25  obligation, is that your testimony?

Page 56

T. Minogue

1
2      A  Of --
3      Q  Kramon and Graham.
4      A  I think I did participate in that.  I
5  recognize the need for outside counsel based
6  upon the fact that the case had been
7  transferred to Maryland and with my
8  concurrence and Mr. Callaghan's, local
9  counsel had been hired and paid as the bills
10  are submitted.
11      Q  I didn't mean to cut off your answer.
12  I thought you were finished.
13      A  Go ahead.
14      Q  How is it decided, though, that the
15  trust would fund Kramon and Graham's bills?
16      A  Because it was an obligation in my
17  mind of the trust to pursue this litigation.
18      Q  But the trust is not paying Boies,
19  Schiller and Flexner, correct?
20      A  We haven't received a bill from that
21  firm, to the best of my knowledge.
22      Q  Does the trust have a contingency fee
23  arrangement with Boies, Schiller and Flexner?
24      A  It has no contingent fee agreement,
25  to the best of my knowledge.

Page 57

T. Minogue

1
2      Q  Are you aware in your capacity of
3  trustee of the fee agreement between the
4  trust and its counsel?
5      A  Which one?
6      Q  Any, all three.
7      A  There is a fee agreement I know in
8  respect to the Graham firm.  I'm unaware of
9  any written fee agreement with respect to
10  other counsel.
11      Q  So your testimony is there is no
12  agreement in place obligating the trust to
13  pay fees to Boies, Schiller and Flexner or
14  Mr. McGinness' firm?
15      MR. HAYES:  Objection to the form of
16  the question.
17      A  That's not my -- that's not correct
18  respectfully.
19      Q  I'm not trying to mislead anybody.
20  I'm trying to understand what your testimony
21  is.
22      MR. HAYES:  The question was
23  misleading, intentional or not.
24      MR. NAZARIAN:  The witness can
25  clarify it and we will get the answer.

15 (Pages 54 to 57)

Thomas Minogue

Page 62

        T. Minogue
1
2    that actually relate to the merits of the
3    litigation, we will suspend the
4    deposition so we can make a motion for
5    protective order and quite possibly
6    sanctions for the continuation of lines
7    of questioning begun in the deposition of
8    the children of the person who signed the
9    contract, which are frankly nothing other
10    than harassment.
11        MR. NAZARIAN:  Have you made your
12    objection?
13        MR. HAYES:  I have also given you
14    fair warning.  Yes, you should now
15    continue with whatever you think is an
16    appropriate professional examination.
17        MR. NAZARIAN:  Thank you.
18    Q    Take a look, Mr. Minogue, at Exhibit
19    3, if you would, the trust document.
20    A    Okay.
21    Q    Tell me, if you could, where that
22    document conveys to you and Mr. Callaghan as
23    trustees the authority to fund this
24    litigation?
25    A    Well, the document speaks for itself

Page 63

        T. Minogue
1
2    obviously, you know that.  But I believe
3    there is a section of the document that
4    confers upon the trustee the general powers
5    of a fiduciary, if you will.  In so doing,
6    it's the trustees and their discretion, both
7    the power and capacity to incur and pay
8    reasonable expenses on behalf of the trust.
9    Q    Can you point me to the provision you
10    have in mind?
11    A    Well, I don't know if I can or I
12    can't.  I would refer you to pages 17, 18 and
13    a portion of 19 in that regard.
14    Q    Okay.  So, your testimony is that
15    your authority in that of your co-trustee to
16    fund this litigation derives from the
17    management powers of trustee articulated in
18    paragraph Z of what's been marked as Exhibit
19    Number 3?
20    A    No.  Sorry.  Yes, that's true.  I
21    didn't see the semicolon or the colon.
22    Q    Can you tell me, Mr. Minogue, which
23    of the 15 management powers defined under
24    paragraph Z of Exhibit 3 conveys to you and
25    Mr. Callaghan or your predecessors as trustee

Page 64

        T. Minogue
1
2    the authority to fund this litigation?
3    A    Certainly paragraph four does on page
4    18.
5    Q    Paragraph four that says to manage,
6    prove, repair, sell, mortgage, lease
7    (including in the power to lease for oil and
8    gas) pledge, convey, option or exchange any
9    property and take back, purchase, money,
10    mortgages thereon without court order.
11    That's the section --
12    A    Certainly one of them.  The trustees
13    have the authority to manage any property.
14    Part of management is retaining, paying and
15    counsel for the protection of that property.
16    Whether it's the agreement or cash or actual
17    real estate.
18        I suppose also on page 16 paragraph
19    five, empowers the trustees to engage
20    attorneys, agents, accountants, etcetera, for
21    presumably the conduct of business in
22    connection with the trust and its property.
23    Q    What would be the closely held
24    business that would trigger subparagraph five
25    on page 16?

Page 65

        T. Minogue
1
2    A    I don't necessarily read this that
3    broadly or that narrowly.
4    Q    Subparagraph five under page 16 comes
5    under a heading closely held businesses,
6    correct?
7    A    It does.
8    Q    The list of powers on page 16 of
9    which number five is one of them?
10    A    Right.
11    Q    Comes under a heading that says, my
12    fiduciaries shall have the following powers
13    with respect to the business, in addition to
14    any granted by law or elsewhere in this
15    document, correct?
16    A    Right.
17    Q    So which business?
18    A    The business of the trust.
19    Q    I see.  So you read that language
20    saying my fiduciaries shall have the
21    following powers with respect to the
22    business, in addition to any granted by law
23    or elsewhere in this document --
24    A    The business, the business of the
25    trust.  In addition, of course, your

17 (Pages 62 to 65)

Thomas Minogue

Page 66

T. Minogue
1
2  questions illuminate the fact there is
3  nothing in the trust document that prohibits
4  the trustees from incurring counsel for the
5  conduct of its business and the commencement
6  of litigation in connection with it.
7      Q  Is it your testimony that any power
8  or any act by trustee not specifically
9  prohibited in this document is available to
10 you and Mr. Callaghan as trustees?
11     A  It's part of my opinion, yes.
12     Q  What's the other part?
13     A  The other part is that I am empowered
14 as a fiduciary to take all reasonable steps
15 for the protection of the trust property
16 including but not limited to the prosecution
17 of litigation.
18     Q  That part of your authority derives,
19 in your view, from subparagraph five on page
20 16?
21     A  No, that --
22     Q  Let me finish the question and then
23 you can correct me, please.  And subparagraph
24 four on page 18 that you read?
25     A  No, that's not correct.  It derives

Page 67

T. Minogue
1
2  in part from those provisions.  It derives in
3  part from I think, hopefully you would agree
4  to be the general powers of a trustee for the
5  protection of trust assets.
6      Q  Your understanding of what you just
7  characterized as the general power of
8  trustees to protect trust assets doesn't in
9  your view need to be articulated in this
10 agreement in order for that power to be there
11 for you, correct?
12     A  That's my view, yes.
13     Q  Do you have any understanding, Mr.
14 Minogue, that your authority as trustee
15 includes the authority to change the
16 beneficiaries of the trust?
17     A  I don't have any understanding in
18 that regard at the present time.
19     Q  How involved, Mr. Minogue, are
20 Vincent Andrews, Junior and Robert Andrews in
21 the administration of the trust?
22     A  To my knowledge they are not
23 involved.
24     Q  In the time since you have become a
25 trustee to the Phyllis Andrews Family Trust,

Page 68

T. Minogue
1
2  on how many occasions have you discussed the
3  business of the trust with Vincent Andrews,
4  Junior?
5      A  I think I testified earlier that I
6  have not.  I don't recall any specific
7  instances where I have.
8      Q  The same for Robert Andrews?
9      A  Yes.
10     Q  Do you know whether they have had
11 conversations with Mr. Callaghan regarding
12 the administration of the trust and the time
13 since you and he have become trustees?
14     A  I do not.
15     Q  Do you know if Vincent Andrews and
16 Robert Andrews have had discussions regarding
17 the administration of the trust with Mr.
18 McGinness?
19     A  I don't know that.
20     MR. NAZARIAN:  Thank you for your
21 time.
22     MR. HAYES:  I have a little bit of
23 cross-examination, Mr. Minogue.
24 CROSS-EXAMINATION
25 BY MR. HAYES:

Page 69

T. Minogue
1
2      Q  If you have Exhibit 3 in front of
3  you.
4      A  I have.
5      Q  Would you be so kind as to turn to
6  page 15.
7      MR. McGINNESS:  I assume if you are
8  asking the questions I'm serving as his
9  counsel?
10     MR. HAYES:  No.
11     Q  Under the paragraph beginning V,
12 closely held businesses.
13     A  Yes.
14     Q  Do you have an understanding today of
15 whether the Baltimore Ravens are a closely
16 held business?
17     A  I don't know whether they are or not.
18     Q  Do you have any understanding whether
19 the Cleveland Browns had represented to the
20 estate of Vincent S. Andrews that the
21 Cleveland Browns were a closely held
22 business?
23     A  I don't know that either, I'm sorry.
24     Q  Okay.  Would it refresh your
25 recollection to see a letter from Mr. Modell?

18 (Pages 66 to 69)

Page 70

T. Minogue

1
2    A  It could.
3    Q  We will come back to that.  Let me
4  move on to page 17, paragraph Z.
5        You see it begins with a clause that
6  reads "in addition to any powers conferred
7  upon them by law and without the order or
8  approval of any court" Do you see that
9  clause?
10    A  I do see it.
11    Q  Okay.  Do you know what law is being
12  referred to there in this trust instrument?
13    A  I assume any law, governing law as it
14  pertains to the trust.
15    Q  Estate power and trust law?
16    A  Yes.
17    Q  If you turn to page 18, if you would.
18    A  Yes.
19    Q  To subparagraph 11.  Do you see the
20  subparagraph 11 which begins with "to employ
21  attorneys, accountants, investment counsel,
22  custodians, brokers and other agents to
23  assist in the administration of estate or
24  trust property?
25    A  I do.

Page 71

T. Minogue

1
2    Q  Do you see that?  Does that clause
3  have any bearing on your understanding of
4  your authority to employ counsel?
5    A  I can employ counsel.
6    Q  Do you have any doubt about that?
7    A  None.
8        MR. HAYES:  Thank you very much.
9  EXAMINATION BY
10  MR. NAZARIAN:
11    Q  Mr. Minogue, looking back to
12  subparagraph 11 on page 18 that Mr. Hayes
13  just read to you.
14    A  Yes.
15    Q  Is it your understanding in your
16  capacity as trustee of the Phyllis Andrews
17  Family Trust that this pursuit of this
18  lawsuit constitutes the administration of
19  estate or trust property?
20    A  It's my understanding that that, yes,
21  that it does.
22        MR. NAZARIAN:  Staying within the
23        scope of cross-examination, I will thank
24        you again for your time.
25

Page 72

T. Minogue

1
2  THE WITNESS:  Thank you.
3  (Time noted:  2:25 p.m.)
4
5        THOMAS MINOGUE
6
7  Subscribed and sworn to before me
8  this ____ day of _____, 2004.
9
10  _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 73

T. Minogue

1
2  C E R T I F I C A T E
3  STATE OF NEW YORK)
4                   : ss.
5  COUNTY OF NEW YORK)
6
7    I, Alison M. Pisciotta, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10    That THOMAS MINOGUE, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that such
13  deposition is a true record of the
14  testimony given by the witness.
15    I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome of
19  this matter.
20    IN WITNESS WHEREOF, I have hereunto
21  set my hand this 6th day of July, 2004.
22
23
24  _____
25        Alison M. Pisciotta

19 (Pages 70 to 73)

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Thomas E. Minogue, Trustee )<br>Co-Trustee of the Phyllis Andrews )<br>Family Trust )<br>237 Elm Street )<br>New Canaan CT 06840 )<br>)<br>and )<br>)<br>Thomas O. Callaghan, Trustee )<br>Co-Trustee of the Phyllis Andrews )<br>Family Trust )<br>7160 Chagrin Road, Suite 250 )<br>Chagrin Falls OH 44023, )<br>)<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>Arthur B. Modell )<br>M&T Bank Stadium )<br>1101 Russell Street )<br>Baltimore MD 21230-2623. )<br>)<br>    Defendant. ) | 1:03CV1273<br><br>CASE NO.:<br><br>JUDGE GAUGHAN<br><br>JUDGE<br><br>MAG. JUDGE HEMANN<br><br>(Cuyahoga County, Ohio<br>Case No. CV-3501916) |

---

**DEFENDANT'S NOTICE OF REMOVAL**

---

10904118.1

Defendant, Arthur B. Modell, through counsel, pursuant to 28 U.S.C. § 1441 and 1446(b), files this Notice of Removal of the case of *Minogue v. Modell*, Case No. CV03501916, Court of Common Pleas for Cuyahoga County, Ohio, to the United States District Court for the Northern District of Ohio on the grounds of diversity jurisdiction. In support of this Notice of Removal, and as grounds therefore, Defendant states as follows:

1.    Plaintiffs, Thomas Minogue and Thomas Callaghan (co-trustees of the Phyllis Andrews Family Trust), filed a Complaint for Declaratory Judgment, Accounting and Damages against Defendant in the Court of Common Pleas for Cuyohoga County, Ohio. Copies of all process, pleadings and orders served upon the Defendant, consisting of the Complaint, Summons and Motion for Admission *Pro Hac Vice* for Andrew Hayes and Christopher Green, are attached hereto as Exhibit A. Defendant received notice of the Complaint on or about June 2, 2003, when the Complaint and Summons were served and this Notice of Removal is filed within 30 days of that date.

2.    Section 1441 of Title 28 states that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." The United States District Court for the Northern District of Ohio embraces Cuyohoga County and has original jurisdiction over this matter under 28 U.S.C. § 1332.

2

10904118.1

3.    Pursuant to 28 U.S. § 1446(d), Defendant has given notice, or will promptly give notice, of the removal of this case to counsel for Plaintiffs in accordance with the attached certificate of service, and Defendant has filed, or promptly will file, with the Clerk for the Court of Common Pleas for Cuyahoga County, Ohio a Notice of the filing of this Notice of Removal.

4.    This Court has diversity jurisdiction over this matter. "The district court shall have original jurisdiction of all civil action where the matter in controversy exceeds the sum or value of $75,000.00 exclusive of interests and costs, and is between . . . citizens of different states." 28 U.S.C. § 1332. "The party seeking to remove has the burden of proving the requirements of diversity jurisdiction, namely, the diversity of citizenship and the amount-in-controversy." *Szalay v. Yellow Freight Sys., Inc.*, 999 F. Supp. 972, 973 (N. D. Ohio 1996) (citations omitted). Defendant, therefore, must prove that the two requirements of diversity jurisdiction are satisfied.

5.    At the time the Complaint was filed, and at the date of Removal, the parties here were citizens of different states. There is complete diversity of citizenship. According to the Complaint, Plaintiff Thomas Minogue is a citizen of Connecticut and Plaintiff Thomas Callaghan is a citizen of Ohio. Both Plaintiffs are trustees of a trust created in New York. Defendant, Arthur Modell, is a citizen of Maryland. None of these parties share citizenship, and, therefore, the first requirement of diversity jurisdiction is met.

3

10904118.1

6.    Diversity jurisdiction also requires that the amount in controversy exceed $75,000.00.  In addition to requesting non-monetary relief, Plaintiffs state in the Complaint that exact money damages will be determined at trial, noting that the amount of money damages will be in "excess of $25,000.00." Even though Plaintiffs have not specifically demanded damages exceeding $75,000.00, it is self-evident from the allegations in the Complaint that the amount in controversy in this case exceeds $75,000.00.

7.    Plaintiffs seek damages pursuant to an agreement (hereinafter the "Agreement") that they alleged Defendant entered into with Vincent S. Andrews, deceased (hereinafter "Andrews") in 1963.  Plaintiffs allege the Agreement provides that Defendant will pay Andrews a "finder's fee" equal to 5% of the

> 'net gain' recognized by Modell from the complete liquidation of the Cleveland Browns or a complete divestiture by Modell of Cleveland Browns stock, as well as any intervening sale or gift of stock, prior to the complete divestiture or complete liquidation of the Cleveland Browns, in which case the finder's fee would be payable by Modell, his estate, in case of his death or, in case of a gift, by the donee.

Compl. ¶ 8.  Plaintiffs seek a judgment that they are entitled to 5% of the net gain from every transaction involving Defendant's Cleveland Browns stock since 1963. In the Complaint, Plaintiffs reference several transactions that allegedly "triggered rights and obligations under the Agreement."  Compl. ¶ 14.  For example, according to Plaintiffs:

> in 1999 Bisciotti purchased from Modell 49% of the stock ownership in Baltimore Ravens, Inc. for $275,000,000,

4

with an option to acquire the remaining 51% by 2004 for an additional $325,000,000.

Compl. ¶ 14 D.  Plaintiffs allege that Baltimore Ravens, Inc. is the successor to Cleveland Browns, Inc. and that under the terms of the Agreement, they are entitled to 5% of the net gain recognized from these transactions.  Plaintiffs, therefore, are clearly seeking more than $75,000.00 in this action.

8.    The Sixth Circuit has concluded that when a plaintiff seeks to recover an *"unspecified* amount" the burden is on the "defendant seeking to remove an action to federal court to show by a preponderance of evidence that the amount in controversy requirement has been met." *Hayes v. Equitable Energy Resources,* 266 F.3d 560, 572 (6th Cir. 2001); *see also Gafford v. General Electric Co.,* 997 F. 2d 150, 158 (6th Cir. 1992).  The standard requires that the Defendant "allege facts sufficient to establish that the Plaintiff would more likely than not recover more than the jurisdictional amount, assuming the failure of all the Defendant's affirmative defenses." *Szalay,* 999 F. Supp. at 973 (quoting *Garza v. Bettcher Indus., Inc.,* 752 F.Supp. 753, 763 (E.D. Mich.1990)). 1/  The facts alleged in the Complaint allow the Defendant easily to satisfy this burden.  *See Hayes,* 266 F.3d at 573 (holding that defendant satisfied its burden of showing, by a preponderance, that more than $75,000.00 was in controversy because "a fair reading of the unspecified

---

1/    "The preponderance standard is a moderate burden that balances the defendant's right to remove and the federal interest in limiting diversity jurisdiction." *McCraw v. Lyons,* 863 F. Supp. 430, 434 (W.D. Kent. 1994).  And, it does "not place upon the defendant the daunting burden of proving, to a legal certainty, that the plaintiff's damages are not less than the amount-controversy requirement." *Hayes v. Equitable Energy Resources,* 266 F.3d 560, 572 (6th Cir. 2001) (internal citation and quotations omitted).

5

10904118.1

and unliquidated damages sought by Plaintiffs provided that more than $75,000 was in controversy"); *see also National Nail Corp. v. Moore*, 139 F. Supp. 2d 848, 850 (W.D. Mich. 2001) (citing *Laughlin v. Kmart Corp.*, 50 F.3d 871 (10th Cir. 1995)) ("the amount in controversy is usually determined by the allegation of a complaint")). In *Hayes*, the court concluded that the plaintiffs were seeking more than $75,000.00 because the initial complaint "sought, among other damages, royalties and gross values of minerals extracted from four separate wells, two of which dated back to 1941." *Hayes*, 266 F.3d at 573. The Sixth Circuit upheld the district court's removal, concluding that the allegations in the complaint satisfied defendant's burden of demonstrating by a preponderance of evidence that the amount in controversy exceeded the requirement for diversity even though the damages were unspecified. *Id.* A fair reading of the Complaint in this case establishes that the amount in controversy exceeds the statutory requirement of $75,000.00.

9.    Plaintiffs' request for non-monetary relief in the form of a declaratory judgment does not alter the measure of the amount in controversy. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *McIntire v. Ford Motor Co.*, 142 F. Supp. 2d 911, 920 (S.D. Ohio 2001) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 33, 347 (1977)). And, "[t]he Sixth Circuit has determined that injunctions should be valued from the plaintiff's viewpoint for jurisdictional purposes." *Perotti v. Black & Decker (U.S.)*

6

*Inc.*, 205 F. Supp. 2d 813, 818 (N. D. Ohio 2002). Plaintiffs' rights under the

Agreement are the object of this litigation. As explained above, the allegations in

the Complaint support the finding that the asserted contract rights place the

amount in controversy in the Plaintiff's request for declaratory relief in excess of

$75,000.00.

        10.      Finally, removal would be appropriate even if Plaintiffs made

a specific claim for damages less than $75,000.00. When a plaintiff makes a claim

for damages that is specifically less than the federal requirement, the Sixth Circuit

appears to have concluded that a defendant must satisfy "the more demanding

substantial likelihood/reasonable probability standard." 2/ *Perotti*, 205 F. Supp. 2d

at 817; *see also In re Cardizem CD Antitrust Litigation*, 90 F. Supp. 2d 819, 829

(E.D. Mich. 1999); *Crosby v. American Online, Inc.*, 967 F. Supp. 256, 261 n.2 (N.D.

Ohio 1997). The Complaint in this case establishes, even under the more

demanding substantial likelihood standard, that Plaintiffs' claims exceed

$75,000.00. As explained above, Plaintiffs are seeking 5% of the net gain on all

---

2/      "Generally, since the plaintiff is master of the claim, a claim specifically less than the federal requirement should preclude removal." *Gafford v. General Elec. Co.*, 997 F.2d 150, 157 (6ᵗʰ Cir. 1993). But, as the Sixth Circuit noted in *Gafford v. General Elec. Co.*, state procedural rules "might enable a plaintiff to claim in his or her complaint an amount lower than the federal amount-in-controversy requirement in an attempt to defeat federal jurisdiction, while actually seeking and perhaps obtaining damages far in excess of the federal requirement." *Id.* at 157-58. "Thus, courts have considered allowing removal where the defendant establishes a substantial likelihood or reasonable probability that the plaintiff intends to seek damages in excess of the federal amount-in-controversy." *Id.* at 158; *see also Perotti v. Black & Decker (U.S.) Inc.*, 205 F. Supp. 2d 813, 816 (N.D. Ohio 2002). Under Ohio law, a party seeking "more than twenty-five dollars . . . shall so state in the pleading but shall not specify in the demand for judgment the amount of the recovery sought." OHIO CIV. R. 8(A). And, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded the relief in the pleading." OHIO CIV. R. 54(C). In the present case, therefore, even if Plaintiffs make a specific demand for less than $75,000.00, they could recover much more.

10904118.1

transactions involving Defendant's Cleveland Browns stock since 1963 and

Plaintiffs allege that several of these transactions involve amounts that clearly

exceed the threshold limit.  Accordingly, the controversy in this case involves more

than $75,000.00.

      11.    This case meets the requirements of 28 U.S.C. § 1332.  The

parties have diverse citizenship and the amount in controversy exceeds $75,000.00.

Removal to this Court, therefore, is appropriate.


                    Respectfully submitted,


                    David J. Hooker (#0014531)
                    Kathleen M. Minahan (#0064989)
                    Thompson Hine LLP
                    3900 Key Center
                    127 Public Square
                    Cleveland, Ohio 44114-1291
                    (216) 566-5500 (Phone)
                    (216) 566-5800 (Facsimile)
                    *Attorneys for Defendant*

Of Counsel:

Michael D. Colglazier
Mark D. Gately
Hogan & Hartson L.L.P.
111 S. Calvert Street
Suite 1600
Baltimore, MD 21202
(410) 659-2700

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 25th day of June, 2003, I have given notice of Defendant's filing of a notice of removal to the United States District Court for the Northern District of Ohio for the case of Minogue v. Modell, by mailing, first class postage prepaid, defendant's above notice to counsel for the plaintiffs as follows:

Neil McGinness
McGinness, Painter & McGinness
The West Building
1530 St. Clair Avenue
Cleveland, OH 44114

David Boies
Andrew W. Hayes
Christopher M. Green
Boies, Schiller & Flexner LLP
333 Main Street
Armok, NY 10504

David J. Hooker, Esq.

9

10904118.1