**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

PHYLLIS ANDREWS, *et al.*,

    Plaintiffs,

    v.

ARTHUR B. MODELL,

    Defendant.

Civil Action No. 07-3368 (SCR)

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION TO REMAND**

**EXHIBIT 3**

**Robert Andrews**

Page 1

```
 1
 2                UNITED STATES DISTRICT COURT
                     DISTRICT OF MARYLAND
 3
        THOMAS E. MINOGUE, Trustee and THOMAS O.
 4   CALLAGHAN, Co-Trustee of the PHYLLIS ANDREWS
     FAMILY TRUST, et al.,
 5
                       Plaintiffs,
 6
              vs.              No. 1:03-CV-03391
 7
        ARTHUR B. MODELL,
 8                                    ORIGINAL
                       Defendant.
 9   ----------------------------)
10
11
12           DEPOSITION OF ROBERT ANDREWS
13                Armonk, New York
14               Monday, May 10, 2004
15
16
17
18
19
20
21   Reported by:
     Alison M. Pisciotta
22   JOB NO. 160168
23
24
25
```

**Robert Andrews**

Page 38

1                          R. Andrews

2    facts surrounding the creation of that trust?

3         A    Yes, I have some information on that

4    trust.

5         Q    What information do you have, sir?

6         A    It was recommended to her by a law

7    firm that specializes in wills, trusts and

8    estates.

9         Q    What law firm was that?

10        A    Cummings, Lochwood.  Stamford,

11   Connecticut.

12        Q    Do you know why the trust was

13   established?

14        A    I believe if you ask the attorneys,

15   it's a better way of succession than not

16   doing a trust.

17        Q    Do you know what the assets of the

18   trust were, sir?

19        A    There is money in the trust.

20        Q    How much money is in the trust, sir?

21        A    I believe it was $200,000 in the

22   trust.

23        Q    What was the source or the origin of

24   that money?

25        A    It was gifted into the trust.

Robert Andrews

Page 39

1                          R. Andrews
2         Q    From whom?
3         A    From Phyllis Andrews.
4         Q    When did that occur?
5         A    This time frame.
6         Q    This time frame meaning what, sir?
7         A    '99.
8         Q    Other than the $200,000, did the
9    trust have any other assets in 1999, sir?
10        A    The trust exchanged its money for the
11   interest in the team, the contract.
12        Q    Sorry, I don't quite follow that.
13   Could you explain that to me.  Explain your
14   answer.  I just didn't follow it.
15        A    The trust exchanged the money for the
16   contract between my father and Art Modell.
17        Q    Well, sir, are you saying the trust
18   transferred the $200,000 to somebody?
19        A    Trust bought the contract from
20   Phyllis Andrews.
21        Q    Is that the source of the $200,000?
22        A    I don't understand that.
23        Q    Okay.  Fair enough.  Let me ask it
24   this way, sir.  What do you understand the
25   assets of the trust to be as of 1999?

**Robert Andrews**

Page 59

1                      R. Andrews

2        Q    Any other lawyers that you recall

3    hearing to have been lawyers who represented

4    your father or his company?

5        A    No, I can't think of any right now.

6        Q    Were you ever told or do you have any

7    information, sir, that subsequent to the date

8    of the letter agreement between your father

9    and Mr. Modell in February of 1963, whether

10   your father did any work for Mr. Modell?

11       A    When I got to the office in '72,

12   around there, I believe somebody there said

13   they used to do books and records or

14   something for Mr. Modell.  But I don't think

15   it was going on when I was there.

16       Q    Have you looked to see if your

17   company has any books or records that relate

18   to any work that either it or your father's

19   predecessor company did for Mr. Modell?

20       A    I haven't looked at that, no.

21       Q    Have either you personally or the

22   Vincent Andrews Management Company been

23   involved in federal bankruptcy procedures?

24       A    Yes, we have.

25       Q    You personally or the company or

**Robert Andrews**

Page 60

1                    R. Andrews

2    both?

3         A    Both.

4         Q    When were those proceedings

5    commenced, sir?

6         A    1994.

7         Q    What precipitated that?

8         A    We were in a contractual dispute and

9    we were facing a jury loss and we had no way

10   of posting a bond or paying the bill, so we

11   put ourselves into bankruptcy until we could

12   work out the appeal process.

13        Q    Do I understand your testimony

14   correctly, both you personally and the

15   company filed for bankruptcy?

16        A    Yes.

17        Q    Did your brother Vincent Andrews also

18   file?

19        A    Yes.

20        Q    What is the status of those

21   proceedings?

22        A    It's on appeal.  We had a

23   determination in our favor.  The plaintiffs

24   get a second shot at that.  That's in the

25   appellate court right now.

Page 61

```
 1                    R. Andrews
 2       Q    What is on appeal, if you know?
 3       A    We appealed the verdict in the case.
 4       Q    You are talking about the underlying
 5  case?
 6       A    Uh-huh.
 7       Q    Is that what you are talking about,
 8  sir?
 9       A    Let's start from scratch.
10       Q    What's the status of the bankruptcy
11  case?
12       A    Everything in the bankruptcy case is
13  on hold waiting to find out what happens in
14  the other case.
15       Q    The other case to which you refer is
16  what?
17       A    The underlying case which we lost in
18  the California lower court, which was
19  overturned in the appellate court.  But as I
20  said, they get a second opportunity at that.
21  That's up in the appellate level right now.
22       Q    Let's get this straight.  You are
23  talking about the underlying case, what case
24  is that?
25       A    There is a contract dispute between
```

Page 62

1               R. Andrews
2  Lefit Pincay and Chris McCarron and Vincent
3  Andrews Management Corporation and Vincent
4  Andrews and Robert Andrews.
5        Q    The nature of that dispute is what?
6        A    They claim they paid additional
7  management fees over and above what they
8  thought was the only fee they should be
9  paying.  We said that the additional fees
10  that you paid for were outside the scope of
11  your initial retainer.  That with
12  specifically had you signed off on the
13  additional fees in writing.  They said they
14  read the documents, they never read those
15  documents and they couldn't be held for the
16  additional fees.
17        Q    And do I understand your testimony
18  correctly that that case has been tried?
19        A    That case was over in '92.
20        Q    There was a trial, was there not?
21        A    Yes, there was.
22        Q    Was it a jury trial?
23        A    Yes, it was.
24        Q    I'm correct, am I not, that the jury
25  returned a verdict in favor of the plaintiffs

Page 63

1                   R. Andrews

2    McCarron and Pincay and against you, your

3    brother and the Vincent Andrews Management

4    Company, correct?

5        A    That's correct.

6        Q    That verdict was in what amount?

7        A    I don't remember the exact numbers

8    but it was a couple of million dollars.

9        Q    Do you recall what the legal claims

10   were in that case, sir?

11       A    The first instance it was a RECO

12   claim.  Okay.  That was the basis for the

13   that decision.

14       Q    Were there any other claims?

15       A    Then you had the second claim under

16   the state law issues.  That was the second

17   set of claims.  The first set of claims were

18   dismissed by the appellate court.  Second set

19   of claims are up at the appellate level now.

20       Q    Point of fact, isn't it true, that

21   what happened was that the jury returned a

22   verdict both on the RECO claim and on the

23   fraud claim.  Then the appellate court ruled

24   that the RECO claim was barred by the statute

25   of limitations?

**Robert Andrews**

Page 64

1                    R. Andrews

2        A    No.  I don't think that's accurate at

3    all.  I think the jury returned a verdict

4    under a RECO claim.  Then also under a

5    punitive damages claim.  I don't know the

6    term fraud was ever in there.

7        Q    Punitive damages, common law,

8    punitive damages?

9        A    The appellate court ruled that they

10   knew the law case now is they probably knew

11   they constructively they had to have known

12   what was in these contracts and therefore

13   because they knew they can't say that they

14   didn't know and the statute of limitations

15   prevents that.

16       Q    But the common law punitive damages

17   claim, what is the status of that?

18       A    That's now under appeal.  In the 9th

19   circuit in California.

20       Q    Hasn't the 9th circuit in fact

21   affirmed that, sir?

22       A    No, it hasn't.

23       Q    Are you aware of any issue in the

24   case about failure to file a timely appeal?

25       A    Yes, but on Friday the 9th circuit

**Robert Andrews**

Page 65

```
 1                    R. Andrews
 2    agreed to take over that issue on bank and
 3    they avoided the one you are referring to.
 4        Q    But you are aware of that issue, are
 5    you not, sir?
 6        A    Yes.
 7        Q    That there was an issue as to whether
 8    the failure to file an appeal within 30 days
 9    as provided by the federal rules was
10    excusable negligent, correct?
11        A    Yes.
12        Q    Have you filed any claims against the
13    counsel in that case, sir?
14        A    No, I haven't.
15        Q    Do you have any agreement with
16    counsel in that case for as it relates to
17    counsel's representation of you in this case?
18        MR. HAYES:  I have given you a lot of
19        leeway, Mr. Tyler.  Particularly for
20        someone who has made a lot of noise about
21        the confidentiality, privacy concerns of
22        his client.
23        I would ask you and you can do it
24        without the witness here to tell me what
25        this line of questioning has to do with
```

Page 66

1              R. Andrews

2    anything in this case other than

3    harassing the people in this room.

4         Would you like to do that with the

5    witness present or with the witness

6    excused?

7         MR. TYLER I would like to ask the

8    questions.

9         MR. HAYES:  We have had enough on

10   this line of questioning.  If you don't

11   want to explain the basis for the

12   questioning with the witness either here

13   or outside of the room, I'm going to ask

14   you to move on.

15   Q   Do you have an agreement with

16   counsel, sir, to withhold filing any claim

17   against them for failing to file a timely

18   appeal?

19        MR. HAYES:  Mr. Tyler was there

20   something about the last thing I said

21   that was not clear?

22        MR. TYLER:  Sir, I take no

23   instructions from you.  You understand

24   that.

25        MR. HAYES:  No.  I do understand that

**Robert Andrews**

Page 67

1                    R. Andrews

2        but you understand particularly if you

3        refuse to confer with me, even with the

4        witness out of the room, about what point

5        this line of questioning has with this

6        case, I have the right to suspend the

7        deposition and seek a protective order.

8        Let me finish.  Since you are refusing

9        even to discuss outside the witnesses

10       presence what purpose this line of

11       questioning has, other than harassment,

12       I'm reluctantly forced to assume that it

13       has no purpose other than harassment.

14       Therefore, I'm telling you for the second

15       time, that if you don't move on, I will

16       suspend the deposition and seek a

17       protective order.

18            MR. TYLER:  We will just call the

19       judge.

20            MR. HAYES:  You can call the judge.

21       Q    Let me make it clear, sir.  Your

22   counsel in the Pincay and McCarron case --

23            MR. HAYES:  You don't need to lecture

24       the witness.  It's not a question.  It's

25       the same darn topic.

Page 68

1                    R. Andrews

2          MR. TYLER:  It's a different

3      question.

4      Q    Is it correct sir, that your counsel

5  in the Pincay and McCarron case is the same

6  counsel as you have in this case against Mr.

7  Modell?

8          MR. HAYES:  What does that have to do

9      with anything?  Of course it's all about

10     the same topic.  You know you are asking

11     what the 9th circuit decided.  You want a

12     copy of the order from Friday you can get

13     it.  The majority of the active judge on

14     the 9th circuit decided appellate

15     decision was sufficiently of concern to

16     merit review.

17         Why don't you stop behaving

18     inappropriately, going into completely

19     irrelevant things and finish your

20     examination on issues in this case?

21         MR. TYLER:  I'm entitled to have an

22     answer to this question.

23     Q    Is your counsel in this case the same

24  as your counsel in the Pincay and McCarron

25  case?

## Robert Andrews

Page 69

1                     R. Andrews
2          MR. HAYES:  We are going to take a
3     break.  Come on, take a break.
4          MR. TYLER:  Are you instructing the
5     witness not to answer that question?
6          MR. HAYES:  I have told you three
7     times now.  You are interrupting me.  I
8     have told you three times if you don't
9     move on to a relevant topic we will
10     suspend the deposition and move for a
11     protective order.
12          I'm now giving you an opportunity to
13     behave like a gentleman by taking a
14     break.  We can come back, you can climb
15     down off your perch you are on.  We can
16     finish the deposition.  We are taking a
17     break.
18          MR. TYLER:  Same question will be
19     pending upon your return, sir.
20          MR. HAYES:  Great.
21          (Recess.)
22     Q   Mr. Andrews, is your interest in the
23     letter agreement Exhibit 4 reported anywhere
24     as an asset in connection with your personal
25     bankruptcy proceeding?