IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHYLLIS ANDREWS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ARTHUR B. MODELL, <br><br> Defendant. | Civil Action No. 07-3368 (SCR) |

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION TO REMAND**

**EXHIBIT 6**

Westlaw.

Not Reported in F.Supp.2d                                                                                                     Page 1
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Ohio, Eastern Division.
Thomas E. MINOGUE, Herman H. Tarnow, and Jane
F. Sims, Co-Trustees of the
Phyllis Andrews Family Trust Plaintiffs,
v.
Arthur B. MODELL Defendant.
**No. 1:06CV286.**

June 16, 2006.

Daniel D. Domozick, Mark R. Koberna, Sonkin & Koberna, Cleveland, OH, Christopher M. Green, Jacqueline B. Friedland, Melissa Kho, Boies, Schiller & Flexner, Armonk, NY, for Plaintiffs.

Brian J. Lamb, David J. Hooker, Nicole K. Wilson, Thompson Hine, Cleveland, OH, Douglas R.M. Nazarian, Michael J. O'Connor, Steven F. Barley, Hogan & Hartson, Baltimore, MD, for Defendant.

*Memorandum of Opinion and Order*

GAUGHAN, J.

INTRODUCTION

***1** This matter is before the Court upon Defendant's Motion to Dismiss, or in the Alternative, to Transfer Venue (Doc. 4) and Plaintiffs' Motion for Remand (Doc. 15). This case relates to defendant Arthur Modell's failure to pay a finder's fee upon the alleged divestment of his stock interest in the company that owned the former Cleveland Browns football team. For the following reasons, Plaintiffs' Motion is GRANTED.

FACTS

In 1960, Vincent "Vinnie" Andrews informed Arthur Modell, then a New York television executive, of an opportunity to purchase a portion of the Cleveland Browns football team. Andrews arranged for Modell to meet with the sellers and originally planned to participate in the purchase. However, when Andrews was unable to come up with his portion of the money Modell was forced to find another partner. Prior to the time that the 1961 purchase was finalized, Andrews agreed to release Modell from any obligation to pay a finder's fee. Nonetheless, in 1963 Modell signed a Letter Agreement stating as follows:

  1. You [Modell] hereby retain me [Andrews] as your business manager for the period commencing January 1, 1963 and ending December 31, 1970. You will pay me a compensation of $3,000 for each of the calender years during that period.... In consideration of such retainer, I shall render to you at reasonable times and places such business advice, including the preparation of federal and other income and similar tax returns, as you may request.
  2. In addition to the foregoing, and as a finder's fee payable to me as a result of my efforts in the negotiations and transactions leading to your ownership of stock in Cleveland Browns, Inc., a Delaware corporation ("Browns"), and the acquisition by that corporation on March 22, 1961, of substantially all the assets of Cleveland Browns, Inc., an Ohio corporation, you agree that when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate, you shall pay me an amount equivalent to 5% of your net gain from either or those transactions and any intervening sales by you of your Browns stock.
* * *
[3.] However, the payments specified in Section 2 above shall be made in the event of my death to my estate.

Modell characterizes the Letter Agreement as "charity" provided on account of Andrews's failure to acquire the money to participate in the original purchase of the Browns. While he does not dispute that he signed and understood the agreement, Modell charges that he was persuaded to do so by his attorney, John Ashley Wells of the law firm Royall, Koegel & Rogers. Modell only later discovered that Robert E. Frisch, another lawyer from the same firm, represented Andrews and actually drafted the Letter Agreement. Correspondence and drafts of the Letter Agreement indicate that Wells was copied on correspondence from Frisch to Andrews.

Modell paid Andrews the yearly compensation set out in Section 1 of the Letter Agreement, even though he claims that Andrews never performed any services. Andrews died on January 2, 1969, naming his widow Phyllis as the executrix of his estate and his sole legatee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                            Page 2
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

**\*2** The value of Modell's interest in the Browns multiplied in the ensuing decades. The Letter Agreement, on the other hand, did not receive serious attention until nearly 30 years later when Modell moved the Browns to Baltimore and announced the potential sale of the team (by then called the Ravens) to Baltimore businessman Stephen Bisciotti. The terms of the agreement allowed Bisciotti's Baltimore Football Company ("BFC") to purchase 49% of the team immediately with an option to purchase the remaining 51% by December 1, 2005. At issue in this lawsuit is the finder's fee of Section 2 of the Letter Agreement, which Plaintiffs claim is now due and worth approximately $21 million.

The Andrews Family Trust was created on December 27, 1999, or soon after the announcement of the sale to Bisciotti. The original trustees were Vincent Jr. and Robert Andrews, Mrs. Andrews's sons and also among the Trust's beneficiaries. [FN1] The Trust was funded with a $200,000 gift from Mrs. Andrews which the Andrews brothers then used for a purported purchase of the Letter Agreement from Mrs. Andrews.

> FN1. Modell notes that the Trust was most likely created to shield any recovery of the finder's fee from the Andrews brothers' creditors. Vincent Jr., Robert and a family-owned company are in bankruptcy proceedings.

Bisciotti announced his intention to exercise his purchase option on the Ravens in the Spring of 2003. Vincent Jr. and Robert then resigned as trustees and appointed Thomas E. Minogue and Thomas O. Callaghan. Minogue was a personal friend of Vincent Jr. while Callaghan was acquainted with Neil McGinness, a Cleveland attorney who was "quarterbacking the situation" at the time. The trustees contacted Modell and he indicated that he did not intend to pay the finders fee. Minogue and Callaghan then filed a complaint in the Cuyahoga County Court of Common Pleas on May 23, 2003. That action was removed to this Court and eventually transferred to the United States District Court for the District of Maryland.

While the original action was pending, Modell engaged in numerous maneuvers to retain a 1% ownership interest in the team. The Court summarized the details of those transactions in its March 14, 2006 Opinion and Order denying Plaintiffs' Motion for a Preliminary Injunction. In short, Modell and Bisciotti agreed that Modell could retain a 1% share in the Ravens through a series of corporate entities. Modell eventually moved for summary judgment in the District of Maryland. This Court previously summarized the District of Maryland decision as follows:

> In the original complaint, the plaintiffs alleged breach of contract and sought an accounting. Defendant filed three motions for summary judgment. The first alleged that the Trust lacked standing to enforce the Letter Agreement because it had never been transferred from Mr. Andrews's estate. The second motion argued that the finder's fee portion of the Letter Agreement was unenforceable because the consideration (finding the opportunity to purchase the Browns) had already occurred when the Letter Agreement was signed. The third motion argued that the triggering event--"when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate"--never occurred.
> **\*3** The district court first found that the Trust did not have standing. Mrs. Andrews's letter purporting to transfer the Letter Agreement was not sworn and was contradicted by her deposition testimony. *Minogue v. Modell,* 384 F.Supp.2d 821, 824-25 (D.Md.2005) (*"Minogue I"* ). The Letter Agreement could not have passed to her by operation of law because the estate was insolvent and not finally closed. *Id.* at 825. Because they could not prove that Mrs. Andrews ever had any rights to the Letter Agreement, plaintiffs also could not prove that she transferred it to the Trust. *Id.* Thus, summary judgment in Defendant's favor was proper.
> The court also addressed the parties' remaining disputes. Regarding Defendant's claim of a lack of consideration, the court found a genuine issue of material fact as to whether the finder's fee was in exchange for the previous act of locating the team or Andrews's later work as Defendant's business agent. *Id.* at 825. The court also found a genuine issue of material fact as to whether Defendant's remaining 1% interest satisfied the triggering event. *Id.* Finally, the court also discussed and rejected the plaintiffs' claim that the doctrine of prevention applied in this case. *Id.* at 826.

*Minogue v. Modell,* 1:06-cv-286, 2006 U.S. Dist. LEXIS 10714, \*6-7 (N.D.Ohio March 14, 2006).

Accordingly, summary judgment in favor of Modell was granted on July 22, 2005. The trustees then began their own series of maneuvers to get the action back into court. On September 19, 2005, Mrs. Andrews executed a "Receipt, Release, Refunding Agreement, Indemnification Agreement of Waiver of Citation" bearing a caption of the Nassau County, New York,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

Surrogate's Court. In that document, she acknowledged that she received the Estate's interest in the Letter Agreement "on or before January 27, 2000, or if not at that time, then, at the latest, on the date of her execution of this instrument...." She also purported to "re-confirm and re-acknowledge" the sale of this interest in the Letter Agreement to the Trust, "or, alternatively," stated as follows:

> [I]n the event that the aforementioned sale and assignment of her interest in the Letter Agreement pursuant to the Purchase Agreement and Assignment of Rights and Claims, respectively are deemed by an appropriate authority to have been ineffective, does hereby confirm and acknowledge the assignment to the Trust of all the rights and claims to which she is entitled in connection with the Letter Agreement pursuant to the Restated Assignment of Rights and Claims, a copy of which is appended hereto....

Callaghan was diagnosed with cancer and decided to resign as trustee after the conclusion of *Minogue I.* Two new trustees were appointed. Jane Sims is a trusts and estates attorney who resides in Maryland. Herman Tarnow is a family law practitioner from Florida. Maryland and Florida also happen to be where Modell keeps his summer and winter residences. Plaintiffs explain that Modell has engaged in extensive estate planning that may dissipate the assets available to pay the finder's fee should the trustees successfully prosecute this lawsuit or if the finder's fee comes due through Modell's estate. Thus they argue that trustees Sims and Tarnow were appointed for their knowledge of the law in the jurisdictions where any action related to Modell's estate would have to be adjudicated. Minogue also explains that he sought an odd number of trustees to avoid potential deadlocks in future trust-related decisions.

**\*4** The new trustees filed a second Complaint in the Cuyahoga County Court of Common Pleas on December 30, 2005. The matter was removed to this Court on the basis of diversity of citizenship on February 6, 2006. Modell has filed a Motion to Dismiss, or in the Alternative, a Motion to Change Venue. Plaintiffs have filed a Motion to Remand the case to the Cuyahoga County Court of Common Pleas.

*MOTION TO REMAND*

Plaintiffs filed this action in the Cuyahoga County Court of Common Pleas. Modell removed the action to this Court pursuant to 28 U.S.C. § 1441(a), on the grounds that this is a "civil action brought in State court of which the district courts of the United States have original jurisdiction...." Modell argues that this lawsuit is subject to the Court's diversity jurisdiction. 28 U.S.C. § 1332(a)(1). Plaintiffs disagree and have filed a motion to remand under 28 U.S.C. § 1447(c).

The Court has diversity jurisdiction where the amount in controversy is met and the action is between citizens of different states. The rule of complete diversity requires that each plaintiff be a citizen of a different state from each defendant. *Glancy v. Taubman Ctrs., Inc.,* 373 F.3d 656, 664 (6th Cir.2004). Here, plaintiffs seek in excess of $21 million dollars so the amount in controversy is clearly met. The citizenship of the parties is also known. Modell and Sims are citizens of Maryland while Tarnow and Minogue are citizens of Florida and Connecticut, respectively. The parties' dispute boils down to whether the Court should disregard Sims's citizenship for purposes of determining diversity jurisdiction. If the Court does so, federal jurisdiction is appropriate. If not, the Court is without jurisdiction and the action must be remanded to the Cuyahoga County Court of Common Pleas.

Modell argues that Sims was appointed as trustee solely to frustrate diversity jurisdiction. Attempts to create or defeat diversity jurisdiction are nothing new. Litigants have a long history of gaming parties and claims to obtain or avoid federal diversity jurisdiction. One method to avoid federal jurisdiction is to bring claims against a non-diverse defendant. Courts have employed the doctrine of fraudulent joinder to thwart this tactic. *E.g., Wecker v. National Enameling & Stamping Co.,* 204 U.S. 176, 27 S.Ct. 184, 51 L.Ed. 430 (1907). The removing party bears the burden of proving that the plaintiff lacks a colorable claim against the non-diverse defendant. *Coyne v. American Tobacco Co.,* 183 F.3d 488, 493 (6th Cir.1999). Because fraudulent joinder is determined solely on the basis of the claims, the plaintiff's motive is irrelevant to the fraudulent joinder inquiry. *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.,* 176 F.3d 904, 907 (6th Cir.1999); *Harris v. Great Lakes Steel Corp., Div. of Nat'l Steel Corp.,* 752 F.Supp. 244, 246 n. 4 (E.D.Mich.1990). All doubts are resolved in favor of remand. *Coyne,* 183 F.3d at 493.

This is not a fraudulent joinder case. Modell seeks the opposite of the fraudulent joinder inquiry. Rather than asking the Court to examine the substance of Sims's claims, Modell wants the Court to consider the motive for appointing Sims as trustee. Were the plaintiffs seeking to bring their claims in federal rather than state court, the Court would no doubt be authorized to make such an inquiry. Under 28 U.S.C. § 1359, "[a]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-03368-SCR     Document 11-7     Filed 07/24/2007     Page 5 of 15

Not Reported in F.Supp.2d                                                                                        Page 4
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." [FN2]

> FN2. As will be discussed in some detail below, it was not always so clear that Section 1359 applies to representatives and fiduciary appointments. However, most courts now consider the plaintiff's possible motive to create diversity, and the Supreme Court has indicated that it would do so also. *Navarro Savings Ass'n v. Lee,* 446 U.S. 458, 465-66, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980).

 *5 By enacting Section 1359, "Congress sought to assure that ordinary contract and tort litigation is not diverted to the federal courts by litigants using devices to create the appearance, but not the substance, of federal diversity jurisdiction." *Gross v. Hougland,* 712 F.2d 1034, 1037 (6th Cir.1983) (citing *Kramer v. Caribbean Mills,* 394 U.S. 823, 838-39, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969)). One way litigants attempt to do so is through the appointment of representatives and fiduciaries who then bring the lawsuit in their own name. *Gross,* 712 F.2d at 1037. Even though the fiduciary party plaintiff is a real party in interest, [FN3] courts will look beyond an otherwise legitimate appointment or assignment to determine whether the "primary aim of the transaction or appointment is to manufacture federal jurisdiction." *Id.* at 1037-1038. Although the subjective purpose of the party can be considered, courts may also look to:

> FN3. *See, e.g.,* Fed.R.Civ.P. 17 (explaining that, among others, "[a]n executor, administrator, guardian, bailee, trustee of an express trust ... may sue in that person's own name without joining the party for whose benefit the action is brought").

among other things, whether the fiduciary has duties other than prosecuting the lawsuit; whether the fiduciary is the "natural" representative; whether the appointment was in fact motivated by a desire to create diversity jurisdiction,; and whether the suit is local in character.
 *Id.* at 1039 (internal citations omitted). These principles have been applied to the appointment of trustees. *E.g., Bartnick v. Reader Co., Inc.,* 487 F.2d 1021, 1022 (8th Cir.1973); *Ferrara v. Philadelphia Labs., Inc.,* 272 F.Supp. 1000, 1014-15 (D.Vt.1967). [FN4]

> FN4. *Ferrara* in particular bears some similarities to the case at bar. In *Ferrara,* the only asset of the trust was the underlying cause of action. The beneficiaries would have been the proper plaintiffs absent the trust. On the facts, the *Ferrara* trustee's powers may have been slightly more limited than those held by Minogue, Sims and Tarnow. Considering the particular circumstances, the district court in *Ferrara* found dismissal under Section 1359 to be proper. *Ferrara,* 272 F.Supp. at 1014-15. On the other hand, *Ferrara* also recognized that "Federal district courts are courts of limited jurisdiction" and "jurisdiction extends no farther than it has been transferred by Congress." *Id.* at 1015. "Should there remain any doubt as to the proper disposition of this case, it must be resolved against jurisdiction." *Id.* at 1014. This highlights that there may be good reasons for distinguishing between efforts to create diversity jurisdiction and efforts to defeat diversity jurisdiction.

 Modell essentially asks the Court to apply these same principles to the plaintiffs' alleged attempt to *defeat* federal diversity jurisdiction through the appointment of Sims as trustee. [FN5] The answer to this question cannot come from the text of Section 1359. By its plain language Section 1359 only applies to attempts to "invoke the jurisdiction" of the federal courts.

> FN5. Plaintiffs dispute the proper test to apply when conducting the collusive plaintiff inquiry. As will be discussed below, a number of courts have formulated a test for assessing whether an assignment made to defeat diversity jurisdiction is collusive. There is little point in quibbling over the proper test. Inquiries into subjective motive are inherently difficult. Whether under *Gross* or the assignment cases discussed below, all of the factors provide some value as objective indicators of the plaintiff's motive.

 Plaintiffs believe that the issue is resolved by reference to Fed.R.Civ.P. 17(a) and *Navarro Savings Assn. v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). Rule 17 provides that "[e]very action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust ... or a party authorized by statue may sue in that persons own name without joining the party for whose benefit the action is brought...." ***Navarro Savings*** answered the

Case 7:07-cv-03368-SCR   Document 11-7   Filed 07/24/2007   Page 6 of 15

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

question of "whether the trustees of a business trust may invoke the diversity jurisdiction of the federal courts on the basis of their own citizenship, rather than that of the trust's beneficial shareholders." *Navarro Savings,* 446 U.S. at 458. The *Navarro Savings* Court answered that question in the positive, concluding that trustees who are not "naked trustees" serving as "mere conduits" to others are "real parties to the controversy ... [who] may sue in their own right, without regard to the citizenship of the trust beneficiaries." *Id .* at 465-66.

Plaintiffs argue that the Court's inquiry thus begins and ends with the question of whether Sims is a real party in interest under Rule 17(a) and *Navarro Savings*. This argument misses the mark. *Navarro Savings* itself explains the limited role of Rule 17(a). Rule 17 provides by rule who can sue in their own name but does not dictate whose citizenship counts for diversity jurisdiction. [FN6] *Id.* at 462 n. 9. For example, a union can sue in its own name but its citizenship is based on that of its members. *Id.*

> FN6. This result is also compelled by Rule 82, which states that "[t]hese rules shall not be construed to extend or limit the jurisdiction of the United States district courts...."

**\*6** *Navarro Savings* answered this second question--whose citizenship decides diversity jurisdiction--as applied to a particular trust/beneficiary relationship. The plaintiffs in *Navarro Savings* were eight trustees of a business trust who sued originally in federal court based on diversity jurisdiction. *Id.* at 459. The defendant, Navarro Savings, was a citizen of Texas and complete diversity existed as to the trustees. *Id.* at 460. However, a number of the trust's beneficiaries were citizens of Texas. *Id.* The Supreme Court concluded that diversity jurisdiction was properly based on the trustees' citizenship. *Id.* at 465. Among other things, the trust instrument "authorized the trustees to take legal title to trust assets, to invest those assets for the benefit of the shareholders, and to sue and be sued in their capacity as trustees." *Id.* at 464. The beneficiaries did not have the power to control the lawsuit and could only intervene in the trust's affairs "in the most extraordinary situations[,]" such as their right to elect or remove trustees. *Id.* at 465 n. 14.

Plaintiffs are correct in one respect. *If* the Court cannot consider the motive for Sims's appointment under a fraudulent or collusive joinder doctrine, *Navarro Savings* dictates that she is a real party in interest whose citizenship is properly considered for diversity of citizenship purposes. [FN7] Under the terms of the Trust, "any Trustee who acts under this Agreement may exercise all of the rights, powers and discretions and shall be entitled to all of the privileges and immunities granted to the named Trustee." In addition, the "Trustee shall have absolute discretion regarding the exercise of his powers, and such exercise shall be final and conclusive upon all persons." In *Navarro Savings,* total control of the business trust's activities was similarly vested in the trustees. 446 U.S. at 464-65. Finally, Sims is not a "naked trustee" serving as a "mere conduit" to the Andrews brothers. Her expertise in probate law is quite relevant to her duties as trustee.

> FN7. A number of courts cast the real party in interest analysis as a fraudulent joinder inquiry for plaintiffs. *E.g., Foslip Pharms., Inc. v. Metabolife Int'l, Inc.,* 92 F.Supp.2d 891, 903-04 (N.D.Iowa 2000). The analysis is similar. Rather than looking at the plaintiff's motive the court's focus is on the legal standing of the particular plaintiff to bring the action. In any event, under *Navarro Savings* it is clear that Sims is a real party in interest.

Modell makes three main arguments that Sims' duties as trustee do not rise to the level that allows consideration of her citizenship. The first two arguments are clearly rebutted by *Navarro Savings*. First, Modell notes that Sims cannot actually exercise total control over the Trust, since the other two trustees could always outvote her. However, in *Navarro Savings* the Supreme Court was willing to consider the citizenship of each of eight trustees. *Id.* at 459, 465. Second, Modell notes that two of the trust beneficiaries (the Andrews brothers) retain the right to replace the trustee under the following provision:

> My sons, VINCENT and ROBERT, shall have the right to remove any Trustee of any trust hereunder and to appoint one or more successor Trustees; provided, however, that both sons are living and competent and agree with such action and that any such successor Trustee would not be a related or subordinate party subservient to the wishes of any such son, (within the meaning of section 673(c) of the Code) if such son were the grantor of the trust.

**\*7** Again, this provision is reminiscent of trust provisions that the *Navarro Savings* Court found unconvincing as to beneficiary control:

> The shareholders may elect and remove trustees; they may terminate the trust or amend the Declaration; and they must approve any disposition of more than half of the trust estate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 6
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

*Id.* at 465 n. 14.

Modell is thus left to contend that while Sims might otherwise have satisfactory powers as Trustee to make her a real party in interest for purposes of diversity jurisdiction, the intent in appointing her was other than to encourage the legitimate exercise of those powers. ***Navarro Savings*** did not absolutely foreclose consideration of a party's motive in naming a trustee. The Supreme Court noted that "[t]here is no allegation of sham or collusion" under Section 1359. *Id.* at 465. Because Section 1359 does not by its express language apply to attempts to defeat diversity, this simply brings the Court back where it started: is a district court allowed to consider whether the motive in naming a trustee was to defeat diversity jurisdiction?

The inquiry starts with the background to Section 1359. Section 1359 is based on former Sections 41(1) and 80 of the United States Code. 28 U.S.C. § 41(1), 80 (1940). Former Section 41(1) was part of the original Judiciary Act of 1789 and included an "assignee clause." [FN8] "The history of the clause ... shows clearly that its purpose and effect, at the time of its enactment, were to prevent the conferring of jurisdiction on the federal courts, on grounds of diversity of citizenship, by assignment, in cases where it would not otherwise exist...." *Sowell v. Federal Reserve Bank,* 268 U.S. 449, 453, 45 S.Ct. 528, 69 L.Ed. 1041 (1925). Section 80 was originally enacted in 1875 [FN9] and was similarly concerned only with attempts to manufacture federal jurisdiction. *See, e.g., Farmington v. Pillsbury,* 114 U.S. 138, 146, 5 S.Ct. 807, 29 L.Ed. 114 (finding that the transfer from Maine bondholders to a Massachusetts plaintiff in a suit against a Maine village was to "get a re-examination in that [federal] jurisdiction of the question decided adversely to the owners of the coupons by the highest judicial tribunal of the State").

> FN8. "[No] district or circuit court [shall] have cognizance of any suit to recover upon any promissory note or other chose in action in favor of any assignee, or of any subsequent holder if such instrument be payable to bearer and be not made by any corporation, unless such suit might have been prosecuted in such court to recover upon said note or other chose in action if no assignment had been made...."
> Act of Sept. 24, 1789, § 11, 1 Stat. 73, 79.

> FN9. "That if, in any suit commenced in a circuit court or removed from a State court to a circuit court of the United States, it shall appear to the satisfaction of said circuit court, at any time after such suit has been brought or removed thereto, ... that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, *for the purpose of creating a case cognizable or removable under this act,* the said circuit court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed...."
> Act of March 3, 1875, § 5, 18 Stat. 470, 472 (emphasis added).

Although these statutes only touched on plaintiffs' attempts to manufacture diversity jurisdiction, the Supreme Court was not blind to attempts to defeat diversity jurisdiction. The doctrine of fraudulent joinder, which was discussed above, has long been employed by the Supreme Court. *E.g., Chesapeake & Ohio Railway Co. v. Cockrell,* 232 U.S. 146, 152, 34 S.Ct. 278, 58 L.Ed. 544 (1914); *Wecker,* 204 U.S. 176, 27 S.Ct. 184, 51 L.Ed. 430. Of course, unlike Section 1359 and its statutory predecessors, the fraudulent joinder doctrine does not allow consideration of the plaintiff's motive to defeat jurisdiction.

Early Supreme Court cases thus refused to consider motive in cases where parties attempted to defeat federal jurisdiction. For example, in *Provident Savings Life Assurance Co. v. Ford,* the New York plaintiff brought an action against a New York defendant in New York state court. 114 U.S. 635, 636, 5 S.Ct. 1104, 29 L.Ed. 261 (1885). The New York plaintiff was assigned the action from an Ohio individual who had obtained a judgment against the defendant in the Northern District of Ohio. *Id.* The defendant removed, claiming that the plaintiff was not the real party in interest. *Id.* at 640. The Supreme Court declined to inquire into the propriety of the assignment. *Id.* The New York court that had the case in the first instance could consider whether the assignment was fraudulent, "and this fact would be a defence to the action brought by the assignee." *Id.* at 640-41.

*8 *Mecom v. Fitzsimmons Drilling Co.* applied similar reasoning to the appointment of a representative. 284 U.S. 183, 52 S.Ct. 84, 76 L.Ed. 233 (1931). In *Mecom,* an Oklahoma citizen died in an accident alleged to be caused by the negligence of the defendants. *Id.* at 184. His widow was appointed as administrator by the Oklahoma state probate court. *Id.* Three times the widow attempted to sue the defendants in state court and three times the case was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

properly removed. *Id.* Finally, the widow resigned and Mecom was appointed as administrator. *Id.* at 185. Because Mecom was a Louisiana resident, total diversity was destroyed. *Id.* The Supreme Court refused to look behind the appointment. However appointed, "[t]he applicable statutes make the administrator the trustee of an express trust and require the suit to be controlled by him." *Id.* at 186-87. To the defendants' allegations that Mecom, the widow and her attorney "were in a conspiracy to defeat federal jurisdiction[,]" the Supreme Court responded as follows:

> But it is clear that the motive or purpose that actuated any or all of these parties in procuring a lawful and valid appointment is immaterial upon the question of identity or diversity of citizenship. To go behind the decree of the probate court would be collaterally to attack it, not for lack of jurisdiction of the subject-matter or absence of jurisdictional facts, but to inquire into purposes and motives of the parties before that court when, confessedly, they practiced no fraud upon it.

*Id.* at 189. The *Mecom* Court was cognizant of and relied on the fraudulent joinder doctrine in refusing to consider the plaintiff's motive for changing the administrator:

> The case falls clearly within the authorities announcing the principle that in a removal proceeding the motive of a plaintiff in joining defendants is immaterial, provided there is in good faith a cause of action against those joined. While those cases involve a somewhat different situation,--that where a plaintiff joins defendants in order to avoid federal jurisdiction,--they are in principle applicable to the present case, where it is claimed a plaintiff was procured for the same purpose.

*Id.*

Section 1359 was enacted in 1948. Its purpose was essentially to fold the assignee clause of former Section 41(1) into the general "improperly or collusively made to invoke" federal jurisdiction language of former Section 80. *See* Historical and Statutory Notes, 28 U.S.C. § 1359. Similar to the statutes from which it was created, Section 1359 "expresses a policy against the creation of federal jurisdiction and not against its avoidance." 14 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3641 (3d ed.1998).

Although the adoption of Section 1359 was intended to diminish confusion, the result was the opposite. Without recognizing that cases such as *Mecom* and *Provident* involved attempts to defeat federal jurisdiction and were decided on motions to remand, a number of courts initially applied per se rules that courts could not consider the motive behind an assignment or an appointment of a representative or fiduciary even in cases of manufactured diversity under Section 1359. Linda S. Mullenix, *Creative Manipulation of Federal Jurisdiction: Is There Diversity After Death?,* 70 Cornell L.Rev. 1011, 1019-20 (1985); *see also, e.g., County of Todd, Minn. v. Loegering,* 297 F.2d 470, 473 (8th Cir.1961); *Jaffe v. Philadelphia & Western R. Co.,* 180 F.2d 1010, 1011-13 (3d Cir.1950).

**\*9** The circuit courts eventually changed course. For example, the Court of Appeals for the Third Circuit overruled its *Jaffe* decision. *McSparran v. Weist,* 402 F.2d 867, 876 (3d Cir.1968). The Third Circuit recognized that Section 1359 (or its statutory predecessors) did not apply to *Mecom* as follows:

> The fundamental distinction between *Mecom* and the present case is that there the collusion statute was not involved because the *resignation of the administratrix and the appointment of her successor were acts done not to create federal jurisdiction but to prevent it from attaching.* Section 1359, as its language clearly shows, expresses a policy against the creation of federal jurisdiction and not against its avoidance. It proscribes improper or collusive conduct "to invoke" diversity jurisdiction and hence was inapplicable in the Mecom case.

*Id.* at 875 (emphasis added); *accord Pallozola v. Rucker,* 797 F.2d 1116, 1120 (1st Cir.1986); *Messer v. American Gems, Inc.,* 612 F.2d 1367, 1375 (4th Cir.1980); *Betar v. De Havilland Aircraft of Canada, Ltd.,* 603 F.2d 30, 33 (7th Cir.1979); *White v. Lee Marine Corp.,* 434 F.2d 1096, 1098 n. 5 (5th Cir.1970); *Illinois ex rel. Scott v. Hunt Int'l Resources Corp.,* 481 F.Supp. 71, 74 (N.D.Ill.1979).

Soon thereafter, the Supreme Court addressed Section 1359 for the first time. In *Kramer v. Caribbean Mills, Inc.,* Caribbean Mills was a Haitian corporation that entered into a contract with Panama and Venezuela Finance Company, a Panamanian corporation. 394 U.S. 823, 824, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969). The Panamanian corporation assigned its interest in the contract to Kramer, a Texas attorney, for consideration of $1. *Id.* Kramer then agreed to pay 95% of any net recovery he obtained under the contract to the Panamanian corporation "solely as a bonus." *Id.* Caribbean Mills was sued in federal court and challenged the assignment under Section 1359. From the beginning of the opinion, the Supreme Court was clear that its task was a narrow one: "The issue before us is whether Kramer was 'improperly or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

Page 8

collusively made' a party 'to invoke the jurisdiction' of the District Court, within the meaning of 28 U.S.C. § 1359." *Id.* at 825.

The Supreme Court ultimately held that "this assignment falls not only within the scope of § 1359 but within its very core." *Id*. at 830. In doing so, the Supreme Court rejected arguments that the underlying legality of the assignment exempted it from judicial review under Section 1359. *Id.* at 829. "[T]o accept this argument would render § 1359 largely incapable of accomplishing its purpose; this very case demonstrates the ease with which a party may 'manufacture' federal jurisdiction by an assignment which meets the requirements of state law." *Id.* The Supreme Court put forth the following reasoning for its decision:

> If federal jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties. Such "manufacture of Federal jurisdiction" was the very thing which Congress intended to prevent when it enacted § 1359 and its predecessors.

*\*10 Kramer,* 394 U.S. at 828-829.

Nonetheless, the Court did not stray from the narrow question before it, and as such, did little to bring harmony to this area of law. In fact, the Supreme Court explicitly left two questions open. First, because the assignment in *Kramer* was partial, "we have no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively made,' regardless of the transferor's motive." *Id.* at 828 n. 9. Second, the Supreme Court, citing *Mecom, McSparran,* and *County of Todd,* declined to decide whether Section 1359 could be used to question representative or fiduciary appointments made with a motive to manufacture jurisdiction. [FN10] *Id.* at 828 n. 10.

> FN10. Three distinctions between assignments and representatives were noted: Cases involving representatives vary in several respects from those in which jurisdiction is based on assignments: (1) in the former situation, some representative must be appointed before suit can be brought, while in the latter the assignor normally is himself capable of suing in state court; (2) under state law, different kinds of guardians and administrators may possess discrete sorts of powers; and (3) all such representatives owe their appointment to the decree of a state court, rather than solely to an action of the parties. It is not necessary to decide whether these distinctions amount to a difference for purposes of § 1359.
> 394 U.S. at 828 n. 10.

The circuit courts have read *Kramer* as expanding the scope of review under Section 1359, and as discussed *supra* have generally felt free to explore whether a representative was appointed to create federal jurisdiction. *Gross,* 712 F.2d at 1037 (Sixth Circuit); *Pallazola,* 797 F.2d at 1126-27 (First Circuit); *Bass v. Texas Power & Light Co.,* 432 F.2d 763, 766 (5th Cir.1970); *O'Brien v. Avco Corp.,* 425 F.2d 1030, 1034-35 (2d Cir.1969); *Lester v. McFaddon,* 415 F.2d 1101, 1104 (4th Cir.1969); *Cf. Hackney v. Newman Mem'l Hosp.,* 621 F.2d 1069, 1071 (10th Cir.1980) (declining to apply Section 1359 where the plaintiff-administrator was also a beneficiary with a substantive stake in the litigation).

However, development of the law regarding representative appointments was abruptly cut short by the 1988 modifications to the diversity statute, 28 U.S.C. § 1332. Commentators had long proposed statutory changes to thwart attempts to manufacture or defeat of diversity jurisdiction. One such proposal addressed representatives in wrongful death actions as well guardians of infants and incompetents:

> General Diversity of citizenship jurisdiction; amount in controversy; costs
> \* \* \*
> (b) For the purposes of this section and section 1302 [exceptions to diversity] of this title:
> \* \* \*
> (4) An executor, or an administrator, or any person representing the estate of a decedent or appointed pursuant to statute with authority to bring an action because of the death of a decedent shall be deemed to be a citizen only of the same State as the decedent; and a guardian, committee, or other like representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the person represented.

American Law Institute, *Study of the Division of Jurisdiction Between State and Federal Courts* (1969). By definitively basing diversity on the citizenship of the decedent, infant or incompetent, this proposal would moot all attempts to game federal jurisdiction in these cases.

Trustees were dealt with in a proposed modification

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-03368-SCR    Document 11-7    Filed 07/24/2007    Page 10 of 15

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

to Section 1359. One part of the proposal would explicitly state that the collusive or improper joinder doctrine of *Kramer* applies to transfers to trustees and other representatives. This is essentially the state of the law post-*Kramer.* However, unlike Section 1359, the proposal would apply this analysis equally to attempts to defeat federal jurisdiction:

> **\*11** *Parties joined or made with a purpose of invoking or defeating federal jurisdiction*
> * * *
>
> (b) Whenever an object of a sale, assignment, or other transfer of the whole or any part of an interest in a claim or any other property has been *to enable or to prevent the invoking of federal jurisdiction* under this chapter or chapter 158 of this title, jurisdiction of a civil action shall be determined as if such sale, assignment, or other transfer had not occurred. The word 'transfer' as used in this section includes the appointment of a *trustee, receiver, or other fiduciary,* or any other person to hold or receive interests of any kind, whether made by private persons or by a court or any other official body.
>
> *Id.* (emphasis added).

The citizenship proposal was essentially adopted by Congress in 1988. Other than the fact that it was never adopted, the fate of the proposal to expand Section 1359 is unknown. Thus, while Section 1359 is unaltered from its original language, the diversity of citizenship statute now reads as follows:

> (c) For the purposes of this section and section 1441 of this title--
> * * *
>
> (2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.
>
> 28 U.S.C. § 1332(c)(2).

Although there is little legislative history on this provision, what history there is indicates that the goal was to decrease the number of diversity cases. [FN11] *Cf.* Wright, Miller and Cooper, *Federal Practice & Procedure* § 3641(3d ed.1998) (explaining that the 1998 amendment "clarif[ied] an aspect of diversity of citizenship jurisdiction that plaintiffs frequently manipulated in attempts to defeat diversity jurisdiction (or, more commonly, to fabricate that kind of jurisdiction)"). Whatever its purpose, by defining the citizenship of representative plaintiffs as that of the decedent, infant or incompetent, Congress made it impossible to either manufacture or defeat diversity jurisdiction in most but not all cases involving representative plaintiffs. Thus, while there are a number of classes of representative plaintiffs (such as trustees) to which Section 1332(c)(2) does not apply, little law has been developed in this area in the last two decades.

> FN11. "The provisions of this title make modest amendments to reduce the basis for Federal court jurisdiction based solely on diversity of citizenship.
> * * *
> While the Judicial Conference of the United States has long supported total abolition of diversity jurisdiction, such measures are very controversial. There are many litigants who zealously protect the right to choose between the State and Federal courts. This title makes three changes in the diversity area: It increases the amount in controversy from $10,000 to $50,000; it treats permanent resident aliens in the United States as citizens of the State of domicile; and it provides that citizenship in representative party cases (estates, infants, and incompetents) is determined by reference to the citizenship of the 'represented' party."
> 134 Cong. Rec. S16284-01; 1988 WL 177968 (1988).

The law has continued to develop in cases involving assignments. Modell thus points the Court to a number of lower court decisions that have essentially applied the *Kramer* analysis of collusive assignments to plaintiffs' attempts to defeat diversity jurisdiction. [FN12] The leading case is the Fifth Circuit's decision in *Grassi v. Ciba-Geigy,* 894 F.2d 181 (5th Cir.1990). The *Grassi* plaintiffs obtained a default judgment against Ciba-Geigy PLC in Texas state court. *Id.* at 182. Unable to enforce the judgment, the plaintiffs sued Ciba-Geigy PLC's parent company, Ciba-Geigy, Ltd. *Id.* Before doing so, the plaintiffs assigned 2% of their interest in their claim to a Costa Rican corporation. *Id.* This had the result of destroying diversity jurisdiction since foreign parties were on both sides of the dispute. *Id.*

> FN12. It is worth noting at the outset that "[t]he Supreme Court has not yet spoken as to whether the lower federal courts have correctly read the *Kramer* case as authorizing application of its principles to attempts by plaintiffs to *defeat* federal diversity jurisdiction." *Louisiana v. Sprint Communications Co., L.P.,* 892 F.Supp. 145,

Not Reported in F.Supp.2d                                                                                                          Page 10
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

149 n. 4 (M.D.La.1995) (emphasis in original).

**\*12** The plaintiffs relied on *Provident* for the proposition that courts cannot question assignments made to defeat diversity jurisdiction. *Id.* at 182-83. The Fifth Circuit read *Provident* as standing for two propositions: "First, that federal courts lack the power to look beyond the pleadings in determining the existence of diversity jurisdiction absent specific statutory authorization; and second, that state law and the state court systems will adequately defend a defendant's right to removal jurisdiction against devices designed to defeat it. These propositions have not fared well since 1887." *Id.* at 183.

As for the second proposition, the Fifth Circuit relied on *Kramer* and the cases interpreting *Kramer* as a direct departure from any reliance on the state courts. *Id.* at 183-84; *see also* Picquet v. Amoco Prod. Co., 513 F.Supp. 938, 942 (M.D.La.1981) (*Kramer* "inject[s] a new note of realism into the determination of diversity jurisdiction"). Regarding the first proposition, the Court cited *Wecker, supra,* as "recogniz[ing] that federal courts do possess some inherent authority to look beyond the pleadings in order to protect a litigant's right to diversity jurisdiction." [FN13] 894 F.2d at 183. *Wecker* is a traditional application of the fraudulent joinder rule that "diversity jurisdiction [is] not defeated by joinder of a nondiverse defendant who could not conceivably be liable." *Id.*

> FN13. As will be discussed in more detail below, this argument does not fare so well in distinguishing *Mecom.* In *Mecom,* the Supreme Court relied upon the fraudulent joinder doctrine in refusing to consider the motive for the representative appointment. 284 U.S. at 189.

The Fifth Circuit concluded as follows: "Although the basic propositions for which *Provident* and its progeny stand have been abandoned, the Supreme Court has not had formal occasion to reexamine that ruling since 1887." *Id.* at 184. Although not overruled, [FN14] *Provident* was limited to its facts of a complete assignment. [FN15] *Id.* at 184-85. According to the Fifth Circuit, courts are free to examine the motive behind partial assignments to defeat diversity jurisdiction. [FN16] *Id.* To do otherwise would be unjust:

> FN14. *See Go Computer Inc. v. Microsoft Corp.,* No. C 05-03356, 2005 U.S. Dist. LEXIS 31404 (N.D.Cal. Nov. 21, 2005) (refusing to remand a case where the assignment was complete, because "it is this Court's view that it is bound by *Provident* and its progeny and cannot examine the motives behind the assignment").

> FN15. Courts have also found that partial assignments are prone to manipulation. With partial assignments the potential to collude to game federal jurisdiction is much greater, since the assignor still has an interest in the litigation. *E.g.,* Grassi, 894 F.2d at 185.

> FN16. "[D]espite the absence of a statute specifically granting district courts the authority to inquire into assignments made for the purpose of defeating federal jurisdiction, the existence of diversity jurisdiction and the removal statute, 28 U.S.C. § 1441, grant the Court the power to protect its own jurisdiction." Picquet, 513 F.Supp. at 943.

Congress has created diversity jurisdiction and the right of removal under 28 U.S.C. § 1441 for the purpose of protecting non-resident litigants from local prejudice. Although there are many, including (or especially) members of the federal judiciary, who question the continuing need for its existence, removal based on diversity of citizenship is a right conferred by Congress, the need for which "may well be greatest when the plaintiff tries hardest to defeat it." American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts, Official Draft, at 169 (1969). This right would be an illusory one indeed if a plaintiff could defeat it by the simple expedient of assigning a fractional interest in the outcome of the suit to an agent performing what is essentially litigation support on a contingent fee basis.

*Id.* at 185; *see also* Gentle v. Lamb-Weston, Inc., 302 F.Supp. 161, 165 n. 10 (D.Maine 1969) ("So long as federal diversity jurisdiction exists[,] the need for its assertion may well be greatest when plaintiff tries hardest to defeat it.").

**\*13** Thus, a number of courts now consider whether a plaintiff's motive for assigning a claim is to defeat diversity jurisdiction. In almost all of these cases, a partial assignment was obviously calculated to defeat diversity. [FN17] *See* Grassi, 894 F.2d at 182 (assigning a 2% interest to a Costa Rican corporation); JMTR Enters., L.L.C. v. Duchin, 42 F.Supp.2d 87, 91 (D.Mass.1999) (assigning a portion of the claim to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

related company of non-diverse citizenship); *Smilgin v. New York Life Ins. Co.,* 854 F.Supp. 464, 465 (S.D.Tex.1994) (assigning only 1% of the claim to the non-diverse plaintiff); *Picquet,* 513 F.Supp. at 940 (assigning 1/108th interest in the land at issue); *Gentle,* 302 F.Supp. at 162 (assigning 1% of the claim to a law school classmate of the plaintiff's attorney). One court has distilled from precedent the following factors that should be considered:

> FN17. A number of courts that consider attempts to defeat diversity jurisdiction rely upon *Miller v. Perry,* 456 F.2d 63 (4th Cir.1972). This reliance is misguided. In *Miller,* the North Carolina wrongful death statute required the appointment of a North Carolina resident as representative in a suit against a North Carolinian. *Id.* at 64. The plaintiff's motive was not to defeat diversity jurisdiction, but to comply with North Carolina law. The Fourth Circuit "inject[ed] a new note of realism into the determination of diversity jurisdiction" not to determine whether an otherwise proper representative was collusively joined to defeat diversity, but to assess whether the representative's citizenship (required only by state law) should be considered at all. *Id; see also Messer,* 612 F.2d at 1374 ("Plaintiff here being plainly non-collusive, having no stake in the matter, being appointed only to fulfill the North Carolina statutory requirement[,]" does not have any "substantive interest in this case."). This Court previously answered this question in the positive as to Sims under ***Navarro Savings***.

The pattern includes, among other factors: (1) a partial, rather than total, assignment; (2) lack of consideration paid by the assignee to the assignor; (3) the plaintiff's motive was to stay in state court; (4) the assignee had no interest in the litigation before the assignment; and (5) the assignment was made shortly before the suit was filed.
*JMTR,* 42 F.Supp. at 92 (citing *Grassi,* 894 F.2d at 186).

Modell asks the Court to apply these same principles to the appointment of Sims. First, Sims is only one of three trustees, and thus she cannot control the actions of the trust on her own. Second, Modell posits that plaintiffs' reason for seeking remand is to take advantage of local animosity related to his decision to move the Browns to Baltimore. Third, Sims was a stranger to the trust prior to appointment. Fourth, Sims was appointed mere days before this action was filed in the Cuyahoga County Court of Common Pleas.

Modell has not cited, and the Court's research has not uncovered, any Sixth Circuit case where a court considered whether an assignment was motivated to defeat diversity jurisdiction. For the reasons discussed in detail below, there are reasonable arguments that the Sixth Circuit would not follow *Grassi* and its progeny. In any event, this Court does not have before it an assignment and this action is not governed by *Provident.* Rather, Sims is a plaintiff as a result of a representative appointment. The issue is whether the circumstances justify a departure from the rule of *Mecom.*

Modell has not pointed to any case from any jurisdiction where a court has been willing to limit *Mecom* in the same manner that courts have limited *Provident.* [FN18] Every case that the Court has found reached the opposite conclusion.

> FN18. Some courts have implied that *Miller v. Perry* is such a case. E.g., *Picquet,* 513 F.Supp. at 943. However, as explained *supra* at note 17, the *Miller* court did not examine the motive of the appointment. Instead, that court simply decided that the particular representative at issue was not a real party in interest for diversity purposes.

In *Herrick v. Pioneer Gas Prods. Co.,* the plaintiff Herrick (a Texas citizen) was appointed co-administrator of the estate of the victim of an explosion. 429 F.Supp. 80, 81 (W.D.Ok.1976). The plaintiffs then sued the defendants (also Texas citizens) in Oklahoma state court. *Id.* The defendants removed and argued that Herrick was appointed solely to defeat diversity of citizenship. *Id.* The district court surveyed *Mecom, Kramer, McSparran,* Section 1359 and other relevant law before concluding as follows: "For the reasons that Mecom stands criticized but not overruled, and that 28 U.S.C. § 1359 relates only to the improper creation, not the destruction, of federal diversity jurisdiction, this Court feels bound to remand this case." *Id.* at 84. The defendants argued that the case differed from *Mecom* in that Herrick was not the sole administrator. To this the district court responded that "[t]his distinction fails to reach the heart of the problem as it is clear that Idabelle could appear before the probate court and resign as administratrix as did the widow in *Mecom." Id.*

**\*14** In *In re Richardson-Merrell, Inc. "Bendectin" Prods. Liability Litig.,* the district court for the

Not Reported in F.Supp.2d                                                                                                           Page 12
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

Southern District of Ohio considered arguments that it should "engage in a closer scrutiny of the propriety of [an] appointment." MDL No. 486, 1986 U.S. Dist. LEXIS 30825, *12 (S.D.Ohio 1986). The court first noted that the cases cited in support of such scrutiny were creation of diversity cases under Section 1359. *Id.* Absent statutory authorization, the court would not consider whether the appointment was calculated to defeat diversity: "Congress has passed no statute covering it, and it does not threaten this court's jealously guarded jurisdiction." *Id.* at *12-13.

The Court agrees that the result here is compelled by *Mecom.* As Section 1359 jurisprudence developed, the courts changed course and chose not to apply *Mecom* to cases involving representatives precisely because *Mecom* involved an attempt to defeat rather than create diversity jurisdiction. *McSparran,* 402 F.2d at 875; *Pallozola,* 797 F.2d at 1120; *Messer,* 612 F.2d at 1375; *Betar,* 603 F.2d at 33; *White,* 434 F.2d at 1098 n. 5; *Scott,* 481 F.Supp. at 74. Although some later courts discounted this distinction in the case of assignments, it is not a distinction without difference. Both Congress and the courts have traditionally sought to limit diversity jurisdiction, which is the result that is reached through application of Section 1359 to attempts to manufacture diversity jurisdiction. The converse is not true with respect to attempts to defeat federal jurisdiction, particularly on removal.

Congress has had numerous opportunities to abolish the distinction between attempts to defeat and attempts to manufacture diversity jurisdiction. Section 1359 was passed nearly twenty years after *Mecom* was decided and only addressed attempts to invoke federal jurisdiction. The 1988 amendments to Section 1332(c)(2) similarly did not address attempts to defeat jurisdiction. At best, Congress has been silent as to attempts to defeat federal jurisdiction.

While some courts have interpreted this silence as a license to expand federal jurisdiction, the Sixth Circuit does not afford district courts such a luxury. "[A] federal court must proceed with caution in deciding that it has subject matter jurisdiction." *Musson Theatrical v. Federal Express Corp.,* 89 F.3d 1244, 1252 (6th Cir.1996). "The Constitution allows federal courts only a limited and special jurisdiction, and powers not given to the federal courts by Congress are reserved to the primary repositories of American judicial power: state courts." *Id.* Here, Congress has not granted the power Modell asks this Court to exercise. To any pleas that statutes should be interpreted liberally to allow such an inquiry, the response is as follows:

Any notion that the jurisdictional net should be broadly cast by the courts is at odds with the constitutional establishment of a federal government of limited powers. The Supreme Court has appealed to this constitutional vision in directing that the removal statutes are to be narrowly construed....

**\*15** *Palkow v. CSX Transp., Inc.,* 431 F.3d 543, 554-555 (6th Cir.2005); *see also Salei v. Boardwalk Regency Corp.,* 913 F.Supp. 993, 1007 (E.D.Mich.1996).

Even if the Court were to embark on such an analysis, Section 1359 and Section 1332(c)(2) are in fact consistent with *Mecom.* Congress's intent in passing both statutes was to limit rather than expand diversity jurisdiction. Under Section 1332(c)(2), motive is irrelevant for representatives of decedents, infants and incompetents. The only difference is that with these representatives it is the decedent, infant or incompetent's citizenship that counts.

Nor has the Supreme Court demonstrated any willingness to ignore the distinction between attempts to create jurisdiction and attempts to defeat jurisdiction. Much like Congress, the Supreme Court has been careful in its language. Although some courts have gleaned from *Kramer* broad authorization to inquire into all forms of transfers or assignments, Justice Harlan's opinion was pointedly narrow: "The issue before us is whether Kramer was 'improperly or collusively made' a party 'to invoke the jurisdiction' of the District Court, within the meaning of 28 U.S.C. § 1359." *Kramer,* 394 U.S. at 825. Contrary to some courts' assumptions, the Supreme Court described Congress's purpose in passing Section 1359 as keeping tort and contract cases out of federal court. *Id.* at 428-29.

In recent dicta the Supreme Court was precise in distinguishing between attempts to create diversity jurisdiction to which Section 1359 and *Kramer* apply and attempts to defeat diversity jurisdiction which are confined to the traditional fraudulent joinder doctrine:
  No party here has been "improperly or collusively" named solely to create federal jurisdiction, *see* 28 U.S.C. § 1359 ("A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."); *Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823, 830, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969) (assignment for collection only, motivated by desire to make diversity jurisdiction available, falls within the "very core" of § 1359); *Little v.*

*Giles,* 118 U.S. 596, 600-607, 7 S.Ct. 32, 30 L.Ed. 269 (1886) (where land was purportedly sold to out-of-state farmer but no money or deed changed hands, quiet title action could not be maintained based on farmer's diverse citizenship), nor to defeat it, *see Chesapeake & O.R. Co. v. Cockrell,* 232 U.S. 146, 152, 34 S.Ct. 278, 58 L.Ed. 544 (1914) (diverse defendants, upon showing that joinder of nondiverse party was "without right and made in bad faith," may successfully remove the action to federal court).

*Lincoln Prop. Co. v. Roche,* 546 U.S. 81, ----, 126 S.Ct. 606, 614, 163 L.Ed.2d 415 (2005).

Although some commentators suggest that the lower courts should lead Congress in the development of this area of the law, [FN19] this case is practically indistinguishable from *Mecom.* Even if the Court were to accept the *Grassi*/assignment line cases, the reasoning employed by those cases does not readily transfer to representative appointments. *Grassi* relied on *Wecker v. National Enameling & Stamping,* a traditional fraudulent joinder case, as a source of power to examine the assignment and to distinguish *Provident. Grassi,* 894 F.2d at 183. The *Grassi* court reasoned that *Wecker,* by showing a willingness to protect a litigant's right to diversity jurisdiction, essentially overruled any notion that federal courts lack power to consider a plaintiff's motive to defeat diversity jurisdiction. *Id.* This reasoning does not serve to distinguish *Mecom.* In *Mecom,* the Supreme Court based its *refusal* to consider motive on the fraudulent joinder doctrine and *Wecker. Mecom,* 284 U.S. at 189-90. Under these circumstances, the Court simply cannot recognize *Wecker* as approving of efforts to inquire into the motive of a representative appointment for purposes of defeating diversity jurisdiction.

> FN19. "As far as the possibility of the enactment of a statutory prohibition on the use of devices to defeat federal diversity jurisdiction that would parallel the prohibition against the creation of diversity jurisdiction found in Section 1359, it appears that this may be an area of the law in which Congress takes its guidance from judicial developments." Wright, Miller and Cooper, Federal Practice and Procedure § 3641 (3d ed.1998); *see also Gentle,* 302 F.Supp. at 165 (citing Moore for the proposition "that the federal courts should not await legislative action to cure an erroneous doctrine which had been evolved by the federal courts").

**\*16** One arguably significant distinction between this case and *Mecom* is that Sims is one of three trustees. *Grassi* and its progeny distinguished *Provident* on the basis that it involved a complete assignment of claims. A complete assignment removes any interest that the assignor may have had prior to assignment. With a partial assignment, the assignor retains an interest in the action. In most of the partial assignment cases, that retained interest was 95% or greater. However, a similar distinction does not apply to representative appointments. No matter how many representatives are appointed, the beneficiary's interest is always the same. Even if *Provident* is properly distinguished on this basis, *Mecom* is not. [FN20]

> FN20. This does not mean that a representative's citizenship will always be considered for diversity purposes. If a particular representative has almost no responsibility, the representative may not qualify as a real party in interest. *Cf., Navarro,* 446 U.S. at 465-66; *Miller,* 456 F.2d at 64.

At the end of the day, the Court is left with the seeming injustice of subjecting Modell to an Ohio State Court in light of the potential bias he may face and the progress already made in *Minogue I.* First of all, the case has been refiled as a result of Modell's decision to seek the previous dismissal well into litigation on a basis other than the merits. Second, such judgments are not for this Court to make when the Supreme Court has spoken decisively on the issue as it did in *Mecom.* Third, this is essentially a contract suit that the parties have argued under New York and Ohio law. The Ohio Courts are more than competent to adjudicate these substantive matters as well as the pending motion to dismiss. Fourth, if the Court of Common Pleas foresees difficulty in seating an unbiased jury, it may transfer the case elsewhere within the state or even out of state. *See* Ohio Civ. R. 3(C)(4) (permitting transfer of a case to an adjoining county "when it appears that a fair and impartial trial cannot be had in the county in which the suit is pending"); *State ex rel. Smith v. Cuyahoga County Court of Common Pleas,* 106 Ohio St.3d 151, 153, 832 N.E.2d 1206 (2005) (explaining that "forum non conveniens applies to cases in which the more convenient forum is in another state or another country").

In sum, pursuant to ***Navarro Savings*** plaintiff Sims is a real party in interest whose citizenship is properly considered for diversity purposes. Pursuant to *Mecom v. Fitzsimmons Drilling Co.* the Court is forbidden

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)  
**(Cite as: 2006 WL 1704932 (N.D.Ohio))**

Page 14

from speculating further into the motive for Sims's appointment as trustee. [FN21] Because Sims and Modell are both citizens of Maryland, there is no diversity of citizenship and thus no subject matter jurisdiction for the Court to hear plaintiffs' state law claims. The action must be remanded to the Cuyahoga County Court of Common Pleas.

> FN21. It is not entirely clear that such an analysis would result in this Court retaining jurisdiction. The fact of Callaghan's illness is undisputed. Although Modell disputes the relevance of Sims's expertise in Maryland probate law, if he is successful in defending this action that is where this dispute will ultimately be settled. The main strikes against Sims are the timing of her appointment and the fact that plaintiffs in fact chose not to refile in the Maryland district court. However, the rule suggested by Modell would essentially require the Court to assume the worst of plaintiffs' motives, effectively precluding the appointment of reasonable nondiverse trustees and depriving plaintiffs of their choice of forum. *See, e.g., Hackney v. Newman Mem'l Hosp.,* 621 F.2d 1069, 1071 (10th Cir.1980) ("Had plaintiff been appointed as the original administratrix, defendants admit they would have had problems in challenging the appointment.").

Finally, Modell argues that jurisdiction cannot be ousted by changes in parties during litigation. The simple response is that *Minogue I* is over. Modell sought dismissal for lack of standing and the district court agreed. That case is now closed. To Modell's complaint that plaintiffs have not returned documents from *Modell I,* the proper response is to enforce the parties' protective order.

**\*17** Because the action is being remanded, Modell's motion to dismiss and motion to transfer are moot.

*CONCLUSION*

For the foregoing reasons, Plaintiffs' Motion to Remand is GRANTED.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 1704932 (N.D.Ohio)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.