UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

PHYLLIS ANDREWS, THOMAS E. MINOGUE, :
HERMAN H. TARNOW, and JANE F. SIMS, :
:
        Plaintiffs, :   07 Civ. 3368 (SCR)
:
    v. :
:   MEMORANDUM DECISION
ARTHUR B. MODELL, :   AND ORDER
:
        Defendant. :

---

**STEPHEN C. ROBINSON, United States District Judge.**

    Plaintiffs, Phyllis Andrews, Thomas E. Minogue, Herman H. Tarnow, and Jane F. Sims, filed this action against Arthur B. Modell in the Supreme Court of the State of New York for Westchester County. The Complaint asserts claims for breach of contract, violation of the common law doctrine of prevention, and breach of implied covenant of good faith and fair dealing, and it also requested an equitable lien, a constructive trust, and an accounting. On April 27, 2007, Mr. Modell removed this action, pursuant to 28 U.S.C. § 1446(a), to this Court on the basis of diversity jurisdiction. Subsequently, the plaintiffs filed a motion to remand the case back to New York state court. The motion to remand has been fully submitted and argued.

    For the reasons set forth in this opinion, the Court grants, pursuant to 28 U.S.C. § 1447(c), the plaintiffs' motion to remand this case to the Supreme Court of the State of New York for Westchester County.

*[stamp: USDC SDNY / DOCUMENT / ELECTRONICALLY FILED / DOC #: _____ / DATE FILED: _____]*

# I

# BACKGROUND

This case centers on the plaintiffs' claim that Mr. Modell owes a finder's fee of $21.5 million to the Phyllis Andrews Family Trust (the "Trust"). As explained in more detail below, Thomas E. Minogue, Herman H. Tarnow, and Jane F. Sims are Trustees of the Trust. This is the third round of litigation on these claims; the first was dismissed for a standing defect that the plaintiffs have since cured, and the second was dismissed on the basis of *forum non conveniens*.

## A. The Letter Agreement

In 1960, the late Vincent Andrews, Sr., husband to plaintiff Phyllis Andrews, brought to Mr. Modell the opportunity to purchase what were then known as the Cleveland Browns, a professional football team that plays in the National Football League. In 1961, Mr. Modell purchased the football team in 1961 for less than $4 million. Two years later, Mr. Andrews and Mr. Modell signed a document (the "Letter Agreement"), in which Mr. Modell allegedly agreed, in part, to pay Mr. Andrews or his estate a finder's fee of 5% of his net gains when he sold all of his stock interest in the Browns.[1] The plaintiffs allege that this 5% interest, which they claim to be worth approximately $21.5 million, is now due to the Trust. Mr. Andrews died in 1969, naming his wife, plaintiff Phyllis Andrews, as executor of his estate and leaving his interest in the Letter Agreement to her as sole legatee. *See* Compl. ¶ 43.

---

[1] The Letter Agreement, Section 2, states: "[A]s a finder's fee payable to me as a result of my efforts in the negotiations and transactions leading to your ownership of stock in Cleveland Browns, Inc., a Delaware corporation ('Browns'), and the acquisition by that corporation on March 22, 1961, of substantially all the assets of Cleveland Browns, Inc, and Ohio corporation, you agree that when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate, you shall pay me an amount equivalent to 5% of your net gain from either or those transactions and any intervening sales by you of your Browns stock." Declaration of Thomas E. Minogue ("Minogue Decl.") Exh. E at 9. The Letter Agreement also states, "The payments specified in Section 2 above shall be made in the event of my death to my estate." *Id.* at 10.

In 1996, Mr. Modell moved the Browns to Baltimore and renamed the team the Baltimore Ravens. In February 2000, Mr. Modell agreed to sell 100% of the Ravens, for approximately $600 million to the Baltimore Football Company ("BFC"), a company owned by Baltimore businessman Stephen Bisciotti. The terms of the agreement allowed BFC to purchase 49% of the team immediately and gave BFC an irrevocable option to acquire by December 1, 2005 the remaining 51% of the team.

Soon thereafter, Ms. Andrews created the Trust for the benefit of her and her husband's descendants. Her sons Robert Andrews and Vincent Andrews, Jr. were named sole Trustees and were among the Trust's beneficiaries. She funded the Trust with $200,000, and the Trust used that money to purchase the Letter Agreement from her. Robert and Vincent, Jr. eventually resigned as Trustees, and Thomas O. Callaghan and Thomas E. Minogue were appointed their successors on April 8, 2003.

In early 2003, press reports indicated that BFC intended to exercise its option to purchase Mr. Modell's remaining interest in the Ravens. For financial reasons, however, BFC offered Mr. Modell the opportunity to retain a minority interest, up to 20%, in the team. Mr. Modell allegedly responded to BFC that he did not want to retain any interest in the team. The Trustees contacted Mr. Modell about the finder's fee, but Mr. Modell refused to provide information regarding the planned sale of the entire team.

### B. *Minogue I*

On May 23, 2003, the Trust filed suit against Mr. Modell in the Court of Common Pleas in Cuyahoga County, Ohio to recover the finder's fee. On the basis of diversity jurisdiction, Mr. Modell removed the case to the United States District Court for the Northern District of Ohio

(the "Ohio District Court"). Mr. Modell then had the case transferred, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the District of Maryland (the "Maryland District Court"). In mid-2003, after Mr. Modell had been served with the Complaint in *Minogue I*, Mr. Modell notified BFC that he wanted to retain a nominal 1% interest in the Ravens. The plaintiffs allege that Mr. Modell, under the original agreement with BCF, became obligated to sell the entire Ravens team to BCF (and thus pay the finder's fee under the Letter Agreement); Mr. Modell then, according to the plaintiffs, engaged in a series of amendments to the original agreement to avoid paying the finder's fee.

After two years of litigation, the Maryland District Court dismissed the plaintiffs' claims, in part, on the ground that the Trust lacked standing to sue because it could not demonstrate rightful ownership of the Letter Agreement. The court also found that there were genuine issues of material fact regarding whether there was sufficient consideration to support the enforceability of the Letter Agreement and as to whether Mr. Modell's transfer of all but 1% interest in the team was a triggering event under the Letter Agreement.[2] *See Minogue v. Modell*, 384 F. Supp. 2d 821 (D. Md. 2005) (*Minogue I*).

Subsequently, Thomas Callaghan, one of the Trustees, was diagnosed with cancer and therefore sought to resign as a Trustee. Callaghan and Minogue decided to appoint two new Trustees to replace Callaghan so that, according to the plaintiffs, there would be a total of three Trustees, thus avoiding any future deadlock. They appointed Jane F. Sims, a citizen of Maryland like Mr. Modell, and Herman H. Tarnow, a citizen of Florida, where Mr. Modell resides in the winter. These appointments occurred on December 17, 2005, and December 19, 2005, respectively, and Callaghan resigned as a Trustee on December 19, 2005. The plaintiffs claim

---

[2] As will become evident later in this opinion, Mr. Modell contends that because the Maryland District Court made these findings, the plaintiffs filed this action in order to avoid further litigating their claims before that court and therefore currently are attempting improperly to defeat federal jurisdiction.

they selected these two individuals because they are attorneys who are familiar with the probate laws of Maryland and Florida, the two states in which Mr. Modell's estate likely will be probated, and because they are concerned that Mr. Modell has engaged in extensive financial restructuring to make his estate judgment-proof against the Trust. Mr. Modell, however, contends that the plaintiffs' intention was to defeat diversity jurisdiction by appointing a Maryland citizen as Trustee and plaintiff in this action.

## C. *Minogue II*

Shortly after the appointment of Ms. Sims and Mr. Tarnow as Trustees, on December 30, 2005, the plaintiffs filed a new complaint once again in the Court of Common Pleas in Cuyahoga County, Ohio. This complaint was substantively identical to the first complaint, except that the plaintiffs cured the standing problems found by the Maryland District Court. Mr. Modell again removed the case to the Ohio District Court. In that court, he argued, as he does in this case, that Ms. Sims's citizenship should be disregarded for purposes of diversity jurisdiction because she is not a real and substantial party to the litigation and because her appointment was a collusive device to defeat federal jurisdiction. The plaintiffs moved to remand the case back to the Ohio state court. In a lengthy opinion, the Ohio District Court granted the plaintiffs' motion to remand, holding that *Mecom v. Fitzsimmons Drilling Co.*, 284 U.S. 183 (1931), precluded the court from "speculating [on] the motive for Sims's appointment." *Minogue v. Modell*, No. 06-cv-286, 2006 WL 1704932, at *16 (N.D. Ohio June 16, 2006) (*Minogue II*).

Subsequently, before the Ohio state court, Mr. Modell moved to dismiss on the basis of *forum non conveniens*, arguing that Maryland was the more appropriate forum. The Ohio state court granted the motion and dismissed the case. The plaintiffs appealed to the Eighth Appellate

District of Ohio, but a panel of that court dismissed the appeal sua sponte for lack of a final appealable order. The plaintiffs then filed a discretionary appeal to the Supreme Court of Ohio but withdrew the appeal for concerns about the statute of limitations.

## D. The Present Case

On March 13, 2007, the plaintiffs filed this action in the Supreme Court of the State of New York for Westchester County. The Complaint asserts claims for breach of contract, violation of the common law doctrine of prevention, and breach of implied covenant of good faith and fair dealing, and it also requested an equitable lien, a constructive trust, and an accounting. On April 27, 2007, Mr. Modell removed this action, pursuant to 28 U.S.C. § 1446(a), to this Court on the basis of diversity jurisdiction.

## II

## DISCUSSION

Before the Court is the plaintiffs' motion to remand the case back to New York state court. The plaintiffs contend that, on the face of the Complaint, there is no federal diversity jurisdiction because one of the plaintiffs, Jane Sims, and the defendant, Arthur Modell, are both citizens of Maryland. The plaintiffs make several additional arguments in support of their motion to remand. *First*, under 28 U.S.C. § 1447(d), this Court may not "review" the Ohio District Court's remand order. *Second*, the Ohio District Court's remand order should be given preclusive effect under the doctrine of collateral estoppel. *Third*, even if the motion to remand is not granted based on the Ohio District Court's remand order, Ms. Sims is a real and substantial

party to the litigation and was appointed as a Trustee for legitimate reasons, thus requiring remand to New York state court.

In opposition to the plaintiffs' motion for remand, Mr. Modell contends that 28 U.S.C. § 1447(d) applies only to preclude a court from reconsidering an order issued by that court in that action and that issue preclusion does not apply to remand orders because such orders are not appealable. Mr. Modell submits that Ms. Sims's citizenship should be disregarded for purposes of determining diversity jurisdiction because her powers as Trustee are subject to extensive limitations and therefore she is not a real and substantial party to the controversy. He also contends that Ms. Sims's appointment as a Trustee was a collusive device designed to defeat federal jurisdiction.

## A. Collateral Estoppel

The doctrine of collateral estoppel (otherwise known as issue preclusion) prevents a party from relitigating a particular legal or factual issues in a subsequent proceeding if "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001). There is a considerable amount of disagreement as to whether remand orders—or, even more generally, any orders that are unappealable—may trigger collateral estoppel in subsequent proceedings.[3] Both parties marshal cases that lend support to their respective positions. Indeed, the precedent, as well as the

---

[3] Under 28 U.S.C. § 1447(d), "[a]order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." *See also Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 127 (1995) (holding that "only remands based on grounds specified in § 1447(c) are immune from review under section 1447(d)." (citing *Thermtron Prod., Inc. v. Hermansdorfer*, 423 U.S. 336 (1976))). The remand order issued by the Ohio District Court in *Minogue II* was pursuant to section 1447(c) and therefore is unappealable under section 1447(d).

commentary,[4] on this issue seems like the proverbial Gordian Knot, with different approaches being taken among,[5] as well as within,[6] the Courts of Appeals, and with some of the approaches

---

[4] *Compare* 18 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 132.03[4][k][iv] (3d ed. 1999) ("In this situation, it might be argued that the determination of the jurisdictional issue should not be given issue preclusive effect in a subsequent attempt to invoke federal jurisdiction on the ground that the determination of the issue was not subject to appeal. Authority is to the contrary, however."), *with* 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4433 (3d ed. 1998) ("There are other well-settled circumstances in which preclusion is defeated because rulings of a sort that ordinarily are reviewable cannot be reviewed in a particular setting. A very narrow example is provided by the statute that prohibits review of an order remanding a removed action to state court. The district court's ruling that there is subject-matter jurisdiction does not support preclusion on the jurisdiction issue . . . .").

[5] The Fifth and Eighth Circuits appear—*but see infra* note 6—to take the position that a remand order may serve as collateral estoppel and that 28 U.S.C. § 1447(d) prevents a party from instituting in another district court a collateral attack, as it were, on a previously entered order of remand. *See Painters Local Union No 109 Pension Fund v. Smith Barney, Inc.*, 133 F.3d 590, 591 (8th Cir. 1998); *New Orleans Public Service, Inc. v. Majoue*, 802 F.2d 166, 167-68 (5th Cir. 1986); *Firth v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899, 901 (5th Cir. 1975); *Napper v. Anderson, Henley, Shields, Bradford & Pritchard*, 500 F.2d 634, 636-37 (5th Cir. 1974). The Seventh and Sixth Circuits disagree. *See Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d 703, 708-09 (7th Cir. 1999) (holding that a prior remand order on jurisdictional grounds "doesn't conclude the issue whether [a] district court has jurisdiction over [a] new and materially identical suit"); *Century Bus. Servs, Inc. v. Bryant*, 69 Fed. App'x 306, 312 n.4 (6th Cir. 2003) (following *Health Cost Controls of Illinois*).

The position of the Second Circuit appears—*but see infra* note 6—to be closer to that of the Seventh and Sixth Circuits. *See MediSys Health Network, Inc. v. Local 348-S*, 337 F.3d 119 (2d Cir. 2003) ("Under contemporary principles of collateral estoppel, the unavailability of appellate review of remand orders under § 1447(d) strongly militates against giving' a judgment preclusive effect, and thus any issues that the district court decided incident to remand may be relitigated in state court." (internal quotation marks and citation omitted)). Indeed, in *Covanta Onandago Ltd. Partnership v. Onondaga Resource Recovery Agency*, the court noted: "If the remand order is not appealable, as the District Court stated in justifying its injunction, then it is highly unlikely that the order has preclusive effect." 318 F.3d 392, 397 (2d Cir. 2003) (citing *Health Cost Controls of Ill., Inc.*, , 187 F.3d at 708). The *Covanta* court, however, does not refer to contradictory precedent, and, toward the end of the opinion, the "court emphasize[d] the limited scope of [its] decision" and stated that it was "not purported to determine whether the District Court's remand decision was collateral estoppel or res judicata effect." *Id.* at 401.

[6] In *Winters v. Diamond Shamrock Chemical Co.*, the Fifth Circuit appears to have stepped back from the analysis in *Napper* and *Firth*. *See* 149 F.3d 387, 395-96 (5th Cir. 1998). In *Winters*, the plaintiff sought to use offensive, non-mutual collateral estoppel to prevent the defendant from arguing in a subsequent district court that removal to federal court was proper. After setting forth an extensive review and analysis of offensive collateral estoppel and the general rule that nonappealable orders should not serve as the basis for collateral estoppel, the Fifth Circuit explained that, in light of its analysis, "it would seem appropriate to hold as a matter of law that collateral estoppel may not be applied offensively to a jurisdictional decision—such as one granting a motion to remand—that is not capable of being subjected to appellate review." *Id.* Citing to the Supreme Court's decision in *Johnson Steel Street Rail* and the Fifth Circuit's prior decision in *Napper* and *Firth*, however, the panel explained that the "restraining hand of precedent . . . limits our ruling in this case today." *Id.* at 396. In light of these prior precedents, the court merely held that the district court did not "abuse[] its discretion in refusing to offensively apply collateral estoppel to the issue of subject matter jurisdiction under § 1442." *Id.*

The Second Circuit, notwithstanding its dicta in *MediSys* and *Covanta*, has cited with approval the Fifth Circuit's decision in *Napper*, 149 F.3d at 495-96. *See, e.g., Winters v. Lavine*, 574 F.2d 46, 62 (2d Cir. 1978) ("[E]ven if there were no opportunity whatsoever for Winters to appeal the Appellate Division's ruling, that decision would still retain its preclusive effect, *for the extent of preclusion produced by a prior judicial determination of material and essential issues is not affected by the fact that the losing party could not appeal that determination to a higher court*." (emphasis added)). Of course, in *Winters*, the party against whom preclusion was sought was afforded at least one layer of review by the Appellate Division.

appearing, at least at first blush, to conflict with Supreme Court pronouncements.[7] Not wishing to draw comparisons with Alexander the Great or Henry V[8]—and because Mr. Modell's arguments regarding diversity of citizenship are more easily disposed of—the Court shall bypass this issue and turn to whether Ms. Sims's citizenship should be disregarded for purposes of the diversity statute.

## B. Diversity Jurisdiction

### 1. Standard of Review

Removal to federal court is proper where there is federal subject-matter jurisdiction over the claim being litigated. *See* 28 U.S.C. § 1441. As a general matter, the party asserting jurisdiction bears the burden of proving that the case is properly in federal court. *United Food & Commercial Workers Union, Local 919 v. Centermark Props. Meriden Square*, 30 F.3d 298, 301 (2d Cir. 1994). Thus, a defendant who asserts federal jurisdiction in a removal petition bears the burden of establishing that removal is proper. *See id.* Moreover, the Supreme Court has explained that, in light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability. *Shamrock Oil & Gas Corp.*

---

[7] *See Johnson Steel Co. v. Wharton*, 152 U.S. 252, 260-61 (1884) ("The existence or nonexistence of a right, in either party, to have the judgment in the prior suit re-examined, upon appeal or writ of error, cannot, in any case, control [the estoppel] inquiry."); *Ex parte State of Pennsylvania*, 109 U.S. 174, 176 (1883) ("The remedy, if any, [that the plaintiff in this case had sought by writ of prohibition] is by appeal. If an appeal will not lie, then the parties are concluded by what has been done. Congress alone has the power to determine whether the judgment of a court of the United States . . . shall be reviewed or not. If it fails to provide for such a review the judgment stands as the judgment of the court of last resort, and settles finally the rights of the parties which are involved."). *Compare Kircher v. Putnam Funds Trust*, 547 U.S. 633, 646-47 (2006) (concluding that a federal court's jurisdictional findings made incident to a remand decision are not binding in a *state* court).

[8] *See* SHAKESPEARE, HENRY V, act 1, sc. 1 ("Turn him to any cause of policy, The Gordian Knot of it he will unloose, Familiar as his garter.").

*v. Sheets,* 313 U.S. 100, 108 (1941); *Ca. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004).

The basis for federal jurisdiction asserted by Mr. Modell is diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Federal courts have jurisdiction under section 1332(a)(1) where the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and where the parties are completely diverse. The complete diversity requirement, first announced by the Supreme Court of the United States in *Strawbridge v. Curtis*, 7 U.S. (3 Cranch) 267 (1806), is satisfied if each plaintiff is a citizen of a different state from each defendant. In this case, the amount in controversy is $21 million, but one of the plaintiffs, Ms. Sims, is a citizen of the same state as defendant Mr. Modell, thus destroying completely diversity. Mr. Modell contends, however, that this Court should ignore Ms. Sims's citizenship for purposes of diversity on two grounds: first, because her powers as Trustee are subject to extensive limitations and therefore she is not a real and substantial party to the controversy; second, because Ms. Sims's appointment as a Trustee was a collusive device designed to defeat federal jurisdiction. The Court shall address each of Mr. Modell's submissions in turn.

### 2. Ms. Sims Is a Real and Substantial Party to This Litigation

The analysis of Mr. Modell's claim must begin with the Supreme Court's decision in *Navarro Sav. Assoc. v. Lee*, 446 U.S. 458 (1980). In *Navarro*, the Supreme Court considered whether the trustees of a business trust could invoke the diversity jurisdiction of the federal courts on the basis of their own citizenship, instead of the citizenship of the trust's beneficiaries. The answer to this issue, the Court explained, hinges on whether "a trustee is a real party to th[e] controversy." *Id.* at 462. Whether a trustee is a real party to the controversy, in turn, depends on

the trustee's powers—"to hold, manage, and dispose of assets for the benefit of others." *Id.* at 464. In *Navarro*, for instance, the Court noted that the trustees had "legal title to trust assets" and also had the power "to invest those assets for the benefit of the shareholders," "to sue and be sued in their capacity as trustees," to "transact [the trust's] business [and] execute documents," to "lend money," and to "compromise lawsuits relating to the trust's affairs." *Id.* at 459, 464. Under these circumstances—where the trustees "have legal title . . . , manage the assets . . . , [and] control the litigation"—the trustees were not "'naked trustees' who act as 'merely conduits' for a remedy flowing to others." *Id.* at 465 (quoting *McNutt v. Bland*, 43 U.S. (2 How.) 9 (1844)); *see also Airlines Reporting Corp. v. S & D Travel, Inc.*, 58 F.3d 857, 862 (2d Cir. 1995) (holding that a party was not a real party to the controversy "when it acts merely as an agent representing the interests of others" or does "not seek to protect any . . . interest" of its own).

In this case, the Trustees of the Trust, including Ms. Sims, have powers similar to those that the Supreme Court discussed in *Navarro*. The Trustees have legal title to the Trust's assets and have the power, *inter alia*, to "retain, acquire or sell" that property; "to exercise stock options"; to enter into agreements for the sale, merger, reorganization, dissolution or consolidation of any corporation or properties; to "make distributions" of the Trust's assets; "to borrow funds," mortgage trust assets, and "lend money"; and "to employee attorneys, accountants, investment counsel . . . to assist in the administration of estate or trust property." Declaration of Thomas E. Minogue ("Minogue Decl.") Exh. A at 1, 17-19. In addition, the "Trustee shall have absolute discretion regarding the exercise of his powers, and such exercise shall be final and conclusive upon all persons." *Id.* at 15.

In this case, moreover, all three Trustees "conferred and concurred" to the filing of the Complaint and approved the payment of legal fees. *Id.* Exh. C at 29, 55. All three Trustees also approved of the filing of the complaint and motion for a preliminary injunction in *Minogue II*, and those documents would not have been filed absent the Trustees' approval. *Id.* ¶¶ 15-16. Accordingly, both the writing that created the Trust and the participation and involvement of the Trustees in this litigation demonstrate that the Trustees are real parties to this controversy under *Navarro*.

Despite the sweeping authority given to the Trustees of the Trust, Mr. Modell contends that Ms. Sims is not a real party to the controversy because the Trust gives Robert and Vincent, Jr. absolute power to remove any of the Trustees.[9] Mr. Modell submits that this provision allows Robert and Vincent, Jr. to "steer the ship" so long as they are alive; this provision, according to Mr. Modell, "strips Ms. Sims . . . of authentic power over the trust and this litigation" because "[a]ny decision she makes must conform to Robert's and Vincent's will . . . [or] she can be removed." Defendant's Opposition to Plaintiffs' Motion to Remand ("Def.'s Mem.") at 15-16. The Court cannot accept Mr. Modell's argument, for it proves too much. As already recounted, all of the Trustees, including Ms. Sims, have been given real and substantial powers and responsibilities in administering the Trust and its assets, and nothing in the Trust itself indicates that the Trustees' powers and responsibilities were to be discharged in anything but an independent manner. Nor does Mr. Modell contend that either Robert or Vincent, Jr. have endeavored to influence, or even played a role in, this litigation. Although Robert and Vincent, Jr. retain the power to remove a Trustees, there is no indication that they intend to exercise that

---

[9] The provision states: "My sons, Vincent and Robert, shall have the right to remove any Trustee of any trust hereunder and to appoint one or more successor Trustees; provided, however, that both sons are living and competent and agree with such action and that any such successor Trustee would not be a related or subordinate party subservient to the wishes of any such son . . . if such son were the grantor of such trust." Minogue Decl. Exh. A at 9.

power or that this removal power will guarantee that they will be able (or even agree) to exercise their dominion over the Trust.

Indeed, in *Navarro*, the beneficiaries of the trust had the ability to "elect and remove trustees" and the "terminate the trust or amend the Declaration." *Navarro*, 446 U.S. at 465 n.14. Although Mr. Modell contends that removal here is much easier given that only two individuals need concur to remove a Trustee (as opposed to a majority of 9,500 in *Navarro*), nothing in *Navarro* suggests that the Supreme Court found this number determinative; nor does Mr. Modell cite to any authority suggesting that *Navarro* set a floor for the number of beneficiaries that must agree in order to remove a trustee below which the trustees will be considered naked trustees.

In sum, the sweeping powers given to the Trustees, as well as their the participation and involvement in this litigation, demonstrate that the Trustees are real parties to this controversy. Ms. Sims is not "act[ing] merely as an agent representing the interests of others"; instead, she is seek[ing] to protect" the interests of the Trust. *Airlines Reporting Corp.*, 58 F.3d at 862. Consequently, this Court cannot discount Ms. Sims's citizenship on this basis.

### 3. Ms. Sims Was Appointed Trustee for Legitimate Reasons

Next, Mr. Modell submits that this Court should hold that Ms. Sims's appointment as a Trustee was an illegitimate attempt by the plaintiffs to defeat federal diversity jurisdiction. Mr. Modell analogizes this situation to cases in which parties have collusively transferred part of their interest in a case to stifle diversity jurisdiction, and he invites the Court's attention to *Grassi v. Ciba-Geigy, Ltd.*, 894 F.2d 181, 182 (5th Cir. 1990) (upholding, as not clearly erroneous, a district court's finding that the plaintiffs' partial assignment of a two percent interest in their claim to a foreign corporation was an attempt to destroy diversity jurisdiction).

Assuming that there is a basis for extending *Grassi* to the area of express trusts, this Court cannot accept Mr. Modell's argument that Ms. Sims was appointed in an attempt to destroy diversity jurisdiction. The record evidence shows that the Trust had sound reasons for appointing her as a Trustee. As a preliminary matter, this Court has determined that Ms. Sims was given real power and real responsibility as a Trustee and that she is participating actively in the litigation. Moreover, the circumstances surrounding Ms. Sims's appointment also tend to show that her appointment was legitimate. Thomas Callaghan was required to resign as a Trustee because he was diagnosed with cancer and could no longer discharge his duties as a Trustee; notably, Mr. Modell does not dispute this fact—a fact that rebuts his claim that the timing of Ms. Sims's appointment is suspicious because it occurred two weeks before the filing of the complaint in *Minogue II*. The plaintiffs also note that Ms. Sims (along with Mr. Tarnow) was appointed because Callaghan and Mr. Minogue agreed that it would be the Trust's best interest—in light of Mr. Modell's extensive estate planning efforts and his alleged efforts to make his estate judgment proof—to appoint as Trustees attorneys who have an understanding of the respective probate laws of the two states in which Mr. Modell's estate likely will be probated. The Trustees also decided to replace Callaghan with two Trustees in order to avoid the possibility of deadlock in the future, and this practice comports with the recommendations of the Uniform Trust Code. *See* Unif. Trust Code § 703 cmt. ("Division of responsibility is often confused, and the accountability of any individual trustee is uncertain, obtaining consent of all trustees can be burdensome, *and unless an odd number of trustees is named deadlocks requiring court resolution can occur*." (emphasis added)).

In contrast, the only evidence that Mr. Modell marshals in support of his argument is that Ms. Sims was appointed (along with Mr. Tarnow) a few weeks before the second complaint was

07 Civ. 3368 (SCR) 15

filed and that the plaintiffs have a "strong incentive" to destroy federal jurisdiction because of the Maryland District Court's ruling in *Minogue I*. A review of the opinion in *Minogue I*, however, reveals that the Maryland District Court did not rule against the plaintiffs in all respects. Indeed, aside from the issue of standing, which the plaintiffs were able to remedy, and Ohio's doctrine of prevention, the court, on several issues, ruled in favor of the plaintiffs and denied summary judgment in favor of Mr. Modell. *See Minogue I*, 384 F. Supp. 2d at 825-26. Consequently, this Court cannot accept Mr. Modell's argument that the plaintiffs had a *strong* incentive to destroy diversity jurisdiction. Moreover, Callaghan's cancer diagnosis rebuts Mr. Modell's claim that the timing of Ms. Sims's appointment is suspicious. In short, Mr. Modell's claim that Ms. Sims was appointed for improper reasons is based on speculation—speculation that is contradicted by the record evidence.

Accordingly, the Court concludes that Mr. Modell has not established that Ms. Sims was appointed Trustee in an attempt to destroy diversity jurisdiction.

\* \* \*

Ms. Sims's citizenship therefore must be taken into account for purposes of determining whether diversity jurisdiction exists under 28 U.S.C. § 1332(a)(1). Because Ms. Sims is a citizen of the same state (Maryland) as Mr. Modell, the complete diversity requirement is not satisfied. *See Strawbridge*, 7 U.S. (3 Cranch) 267. Accordingly, there is no federal jurisdiction, and the Court must grant the plaintiffs' motion to remand under 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

## Conclusion

To summarize, Mr. Modell has not met his burden of establishing that removal is proper. *Shamrock Oil & Gas Corp.*, 313 U.S. at 108; *Ca. Pub. Employees' Ret. Sys., Inc.*, 368 F.3d at 100. The Trustees of the Trust, including Ms. Sims, are real parties to the controversy, and therefore their citizenship must be considered for purposes of the diversity statute. *See Navarro Sav. Assoc.*, 446 U.S. at 462; *Airlines Reporting Corp., Inc.*, 58 F.3d at 862. Finally, Mr. Modell has not met his burden under any standard of proof—*cf. Grassi*, 894 F.2d at 186 (clear and convincing evidence); *Briarpatch Ltd.*, 373 F.3d at 302 (fraudulent joinder must be proved by "clear and convincing evidence")—of establishing that Ms. Sims was appointed in an effort to destroy diversity jurisdiction.

Pursuant to 28 U.S.C. § 1447(c), the Court therefore grants the plaintiffs' motion to remand this case to the Supreme Court of the State of New York for Westchester County.

The Clerk of the Court is directed to close this case, including docket entry number 6. *It is so ordered.*

Dated: *November 18*, 2008

White Plains, New York

Stephen C. Robinson
United States District Judge